IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

ISLAMIC SHURA COUNCIL OF
 SOUTHERN CALIFORNIA,
        etal.,

        Plaintiffs,

              v.                                          Civ. A. No. 07-1088-CJC

FEDERAL BUREAU OF INVESTIGATION;
 and UNITED STATES DEPARTMENT OF
 JUSTICE,

        Defendants.

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since August 1, 2002.

Prior to joining the FBI, from May 1, 2001 to July 21, 2002,1 was the Assistant Judge Advocate

General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of

Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From

October 1, 1980 to April 30, 2001,1 served as a Navy Judge Advocate at various commands and

routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law

in the state of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 199

employees who staff a total often (10) FBIHQ units and a field operational service center unit

whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 12958, as amended,[1] and the preparation of affidavits/declarations in support of Exemption 1 claims asserted under the FOIA.[2] I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 12958, as amended, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the joint FOIA/Privacy Act request of plaintiffs Islamic Shura Council of Southern California, Council on American Islamic Relations ("CAIR") for Southern California, Islamic Center of San Gabriel Valley, Islamic Center of Hawthorne, West Coast Islamic Center, Human Assistance and Development International, Inc. ("HADI"), Dr. Muzammil Siddiqi, Shakeel Syed, Hussam Ayloush, Mohammed Abdul Aleem and Rafe Husain to FBIHQ and Los Angeles Field Office ("LAFO") for records pertaining to themselves.

[1]  60 Fed. Reg. 19825 (1995) and 69 Fed. Reg. 15315 (2003).

[2]  5 U.S.C. § 552(b)(1).

(4)     The FBI released in part 124 pages of records responsive to plaintiffs request.

No pages were withheld in full.  Following Ninth Circuit standards, this declaration is in a

narrative format rather than a coded index, as the FBI would normally use.  In accordance with

Vaughn v. Rosen. 484 F.2d 820 (D.C. Cir. 1973), this declaration, which is being submitted in

support of the FBI's motion for summary judgment, will provide the Court and plaintiff with an

explanation of the FBI's record keeping system and the procedures used to search for records

responsive to plaintiffs' joint request to the Los Angeles Field Office ("LAFO") and FBIHQ.

This declaration will also provide justifications for the withholding of information from these

records pursuant to FOIA Exemptions 1, 2, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552(b)(1), (b)(2),

(b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

### CORRESPONDENCE RELATED TO PLAINTIFFS' JOINT REQUEST

(5)     By letter dated May 15, 2006, plaintiffs' attorney at the ACLU Foundation of

Southern California ("Requestors"), submitted a joint FOIA/Privacy Act request to the FBI

LAFO and FBIHQ for the following subjects: Islamic Shura Council of Southern California,

CAIR's Southern California chapter, Islamic Center of San Gabriel Valley, Islamic Center of

Hawthorne, West Coast Islamic Center, HADI, Dr. Muzammil Siddiqi, Shakeel Syed, Hussam

Ayloush, Mohammed Abdul Aleem, Rafe Husain, and Yasser Aman.[3]  The Requestors sought

"disclosure of any records created from January 1, 2001 to present, which were prepared,

received, transmitted and/or maintained by the FBI, the National Joint Terrorism Task Force, or

any Joint Terrorism Task Force relating or referring to the following:"

---

[3]  Although Yasser Aman was included in plaintiffs initial FOIA/Privacy Act request, he
is not a plaintiff in this complaint.

1.    Any records relating or referring to the Requestors, including but not limited to records that document any collection of information about, monitoring, surveillance, observation, questioning, interrogation, investigation and/or infiltration of any of the Requestors or their activities;

2.    Any records authorizing, ordering, instructing, or agreeing to collect information about, monitor, conduct surveillance of, observe, question, interrogate, investigate, and/or infiltrate any of the Requestors;

3.    Any records relating or referring to how, why or when any of the Requestors was selected for collection of information, monitoring, surveillance, observation, questioning, interrogation, investigation, and/or infiltration;

4.    Any records relating or referring to how collection of information about, monitoring, surveillance, observation, questioning, interrogation, investigation, and/or infiltration of any of the Requestors was or will be conducted;

5.    Any records relating or referring to the names of any federal, state or local government agencies participating in any collection of information about, monitoring, surveillance, observation, questioning, interrogation, investigation and/or infiltration of any of the Requestors;

6.    Any records relating or referring to the specific role of the National Joint Terrorism Task Force or any local Joint Terrorism Task Force in any collection of information about, monitoring, surveillance, observation, questioning, interrogation, investigation and/or infiltration of any of the Requestors;

7.    Any records relating or referring to the specific role of any federal, state, or local government agency participating in any collection of information about, monitoring, surveillance, observation, questioning, interrogation, investigation, and/or infiltration of any of the Requestors;

8.    Any records relating or referring to how records about any of the Requestors have been, will be, or might be maintained or used;

9.    Any policies or procedures for analyzing records about any of the Requestors;

10.    Any policies or procedures for cross-referencing records about any of the Requestors with information contained in any database;

11.    Any policies or procedures for cross-referencing records about any of the

**-4-**

Requestors with information about any other organizations or individuals;

12.     Any policies or procedures for cross-referencing records about any of the
        Requestors with any other information not covered in numbers 10 and 11 above;

13.     Any policies or procedures regarding retention of records about any of the
        Requestors;

14.     Any records referring or relating to the destruction of records about any of the
        Requestors, including any policies permitting or prohibiting the destruction of
        records;

15.     Any records referring or relating to how records about any of the Requestors were
        destroyed or might be destroyed in the future;

16.     Any policies or procedures in place to protect the privacy of records that refer or
        relate to the employees, members, and/or board of directors of any of the
        Requestors;

17.     Any records relating or referring to how, why or when collection of information
        about, monitoring, surveillance, observation, questioning interrogation,
        investigation, and/or infiltration of any of the Requestors was or will be
        suspended or terminated;

18.     Any records referring or relating to the recipient(s) of records about any of the
        Requestors;

19.     A complete list of all recipient (s) of data about any of the Requestors.

(6)     Plaintiffs included signed and notarized Authorization forms from Shakeel Syed

on behalf of the Islamic Shura Council of South California, Hussam Ayloush on behalf of CAIR-

Southern California chapter, Ashraf Jakvani on behalf of the Islamic Center of San Gabriel

Valley, Mohamed Idris Traina on behalf of Islamic Center of Hawthorne, Tawfiq S. Deek on

behalf of the West Coast Islamic Center, and Mohammed Abdul Aleem on behalf of HADI.

Plaintiffs Muzammil H. Siddiqi, Shakeel Syed, Hussam Ayloush, and Mohammed Abdul Aleem

submitted signed and notarized forms authorizing attorneys at the ACLU of Southern California

**-5-**

to receive responsive documents concerning themselves.  Plaintiff Rafe Husain submitted a signed Authorization form under penalty of perjury.  Plaintiffs also requested expedited processing.[4]  **(See Exhibit A.)**

(7)    By letters dated May 25, 2006, FBIHQ acknowledged receipt of the requests made to FBIHQ and LAFO by the Islamic Shura Council of Southern California, CAIR Southern California, Islamic Center of San Gabriel Valley, Islamic Center of Hawthorne, West Coast Islamic Center, and HADI, and assigned the requests FOIPA Numbers 1049664, 1049665, 1049666, 1049667, 1049669, and 1049670, respectively.  **(See Exhibit B.)**

(8)    By letters dated March 1, 2007, FBIHQ acknowledged receipt of the requests made to FBIHQ[5] by Dr. Muzammil H. Siddiqi, Shakeel Syed, Hussam Ayloush, Mohammed Abdul Aleem, and Rafe Husain, and assigned the requests FOIPA Numbers 1071071, 1071079, 1071082, 1071083, and 1071089, respectively.  **(See Exhibit C.)[6]**

(9)    By letters dated April 27, 2007, the FBI advised plaintiffs that searches of the Central Records System ("CRS") at FBIHQ and LAFO located no main files responsive to the requests from plaintiffs Islamic Shura Council of Southern California, Islamic Center of San Gabriel Valley, Islamic Center of Hawthorne, West Coast Islamic Center, HADI, Dr. Muzammil

---

[4] The U.S. Department of Justice ("DOJ") denied the request for expedited processing on February 12,2007.

[5] Due to administrative oversight, the FBI's acknowledgment letters failed to mention LAFO.

[6] The FBI did not initially receive a complete copy of plaintiffs' request, and in particular the Privacy Act authorizations for the individuals; once the FBI realized that the request was not complete, it reached out to plaintiffs' counsel to obtain the missing part of the request and opened up requests for the named individuals.

H. Siddiqi, Shakeel Syed, Mohammed Abdul Aleem, and Rafe Husain . Plaintiffs were advised that they could appeal the FBI's "no record" response by writing to the U.S. Department of Justice ("DOJ") Office of Information and Privacy ("OIP") within sixty (60) days . **(See Exhibit D.)**

    **(10)**    By letter dated May 9, 2007, FBIHQ advised plaintiffs that the request by CAIR was in the "perfected backlog," where it was awaiting assignment to an analyst. (See **Exhibit** E.)

    (11)    By letter dated May 30, 2007, FBIHQ advised plaintiffs that the request by Hussam Ayloush was currently being reviewed by an analyst. **(See Exhibit F.)**

    (12)    By letter dated June 7, 2007, received June 13, 2007, plaintiffs filed a joint administrative appeal questioning the "no records" responses. With regard to CAIR and Hussam Ayloush, plaintiffs alleged that these " responses are untimely under FOIA, and responsive records should be disclosed promptly, with only those exempt records redacted and exemptions claimed in accordance with the FOIA."[7]  (See **Exhibit** G.)

    (13)    By letter dated June 13, 2007, FBIHQ reviewed and released three pages pertaining to Hussam Ayloush. FBIHQ advised that certain information was withheld pursuant to Exemption (j)(2) of the Privacy Act and FOIA Exemptions (b)(2), (b)(6), and (b)(7)(C). Plaintiffs' attorney was advised that he could appeal any denials in the release to DOJ OIP within sixty (60) days.[8] (See **Exhibit** H.)

    (14)    By letter dated June 14, 2007, FBIHQ reviewed and released one page regarding

---

[7]  DOJ OIP has no record of the July 14, 2006 letter which plaintiffs cited in their June 7, 2007 appeal letter.

[8] Plaintiffs did not appeal to DOJ OIP after receiving the FBI's response. As a result, plaintiffs have failed to exhaust their administrative remedies.

CAIR-California.  FBIHQ advised that certain information was withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).  Plaintiffs attorney was advised that he could appeal any denials in the release to DOJ OIP within sixty (60) days.[9]  (See **Exhibit** I.)

(15)    By letters dated July 16, 2007, DOJ OIP acknowledged receipt of plaintiffs* appeals and assigned appeal numbers 07-1922, 07-1923, 07-1924, 07-1925, 07-1926, 07-1927, 07-1928, 07-1929, 07-1930, 07-1931, and  07-1932, respectively.  **(See Exhibit J.)**

(16)    By letters dated September 5, 18, 19 , and 27, 2007, DOJ OIP advised of its decision to affirm the FBI's "no records" responses to the Islamic Shura Council of Southern California, Mohammed Abdul Aleem , Islamic Center of San Gabriel Valley, Islamic Center of Hawthorne, West Coast Islamic Center, Shakeel Syed, HADI, and Dr. Muzammil Siddiqi.  DOJ OIP advised that if plaintiffs were dissatisfied with this decision they could seek judicial review in accordance with 5 U.S.C. § 552 (a)(4)(B).  (See **Exhibit** K.)

(17)    By letter dated September 5, 2007, DOJ OIP advised of its decision to affirm the redactions made to the document released to CAIR-Southern California.  (See **Exhibit L.)**

(18)    By letter dated September 27, 2007, DOJ OIP  advised of its decision to affirm the redactions made to the documents released to Hussam Ayloush.  **(See Exhibit M.)**

(19)    By letters dated March 14, 2008, FBIHQ released a total of one hundred twenty (120) pages of records responsive to the following subjects: Islamic Shura Council (twenty (20) pages); Islamic Center of San Gabriel (two (2) pages); Islamic Center of Hawthorne (one (1) page); HADI (two (2) pages); Muzammil Siddiqi (twenty-six (26) pages); Shakeel Syed (thirteen

---

[9] Plaintiffs did not appeal to DOJ OIP after receiving the FBI's response.  As a result, plaintiffs have failed to exhaust their administrative remedies.

(13) pages); Mohammed Abdul Aleem (fifty-six (56) pages).  The FBI advised that a total of 120

pages were reviewed for processing and the same amount were released with certain information

withheld pursuant **to FOIA** Exemptions (b)(1), (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

The FBI also advised of the right to appeal any denials to DOJ OIP within sixty (60) days.  (See

**Exhibit N.)**

### EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(20)    The Central Records System ("CRS") enables the FBI to maintain information

which it has acquired in the course of fulfilling its mandated law enforcement responsibilities.

The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and

other files compiled for law enforcement purposes.  This system consists of a numerical sequence

of files, called FBI "classifications," which are broken down according to subject matter.  The

subject matter of a file may relate to an individual, organization, company, publication, activity,

or foreign intelligence matter (or program).  Certain records in the CRS are maintained at

FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in

those field offices.  Although the CRS is primarily designed to serve as an investigative tool, the

FBI searches the CRS for documents that are potentially responsive to FOIA/Privacy Act

requests.  The mechanism that the FBI uses to search the CRS is the Automated Case Support

System ("ACS").

(21)    On or about October 16, 1995, the ACS system was implemented for all Field

Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that

were previously automated.  ACS can be described as an internal computerized subsystem of the

CRS.  Because the CRS cannot electronically query the case files for data, such as an individual's

name or social security number, the required information is duplicated and moved to the ACS so

that it can be searched.  More than 105 million records from the CRS were converted from

automated systems previously utilized by the FBI.  Automation did not change the CRS; instead,

automation has facilitated more economic and expeditious access to records maintained in the

CRS.

(22)    The retrieval of data from the CRS is made possible through the ACS using the

General Indices, which are arranged in alphabetical order.[10]  The entries in the General Indices

fall into two categories:

> (a) A "main" entry - A "main" entry, or "main" file, carries the
> name corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry --"Reference" entries, sometimes called
> "cross-references," are generally only a mere mention or reference
> to an individual, organization, or other subject matter, contained in
> a document located in another "main" file on a different subject
> matter.

(23)    Searches made in the General Indices to locate records concerning a particular

subject, such as the Islamic Shura Council of Southern California, are made by searching the

subject requested in the index.

(24)    The ACS consists of three integrated, yet separately functional, automated

applications that support case management functions for all FBI investigative and administrative

cases:

> (a)  Investigative Case Management ("ICM") - ICM provides the ability to open,

---

[10] The General Indices, which became fully automated on September 24, 1987, also
include Index cards which allow a manual search for records prior to that date.

assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("00"), which sets leads for itself and other field offices, as needed, opens a case.  The field offices that receive leads from the 00 are referred to as Lead Offices ("LOs"). When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by all FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the investigation. Using the file number "288 A-LA-C221061," as an example, an explanation of the UCFN is as follows:  "288A" indicates the classification for the specific type of investigation, in this case Computer Intrusions-Criminal Matters; "LA" is the abbreviated form used for the 00 of the investigation; and "C221061" denotes the individual case file number for the particular investigation.

(b)  Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents.  ECF supports the universal serial concept in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system.  All <u>original</u> serials are maintained in the 00 case file.

(c)  Universal Index ("UNI") - UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases.  Only the 00 is required to index; however, the LOs may index additional information as needed.  UNI, an index of approximately 100.7 million records, functions to index names to cases, and to search names and cases for use in FBI investigations.  Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(25)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the FBI Special Agent ("SA") - and on occasion, support

employees - assigned to work on the investigation, the Supervisory SA ("SSA") in the field

office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name

in its files; rather, it indexes only that information considered to be pertinent, relevant, or

essential for future retrieval. Without a "key" (index) to this enormous amount of data,

information essential to ongoing investigations could not be readily retrieved. The FBI files

would thus be merely archival in nature and could not be effectively used to serve the mandated

mission of the FBI, which is to investigate violations of federal criminal and national security

statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can

determine what retrievable information, if any, the FBI may have in its CRS files on a particular

subject matter or individual, such as the Islamic Shura Council.

## SURVEILLANCE ("ELSUR") INDICES

(26)     The Electronic Surveillance ("ELSUR") indices are used to maintain information

on a subject whose electronic and/or voice communications have been intercepted as the result of

a consensual electronic surveillance or a court-ordered (and/or sought) electronic surveillance

conducted by the FBI. The ELSUR indices date back to January 1, 1960. On or about October 9,

1991, the ELSUR indices were automated. Since that time, FBIHQ and all FBI field offices have

electronically generated, maintained, modified and accessed all ELSUR records.

(27)     The ELSUR indices are a separate system of records from the CRS. Prior to

automation, the ELSUR indices consisted of index cards on individuals who had been the subject

of a microphone or telephone surveillance by the FBI from 1960. As stated above, the previous

manual index card system was converted to an automated system on or about October 9, 1991.

-12-

These indices include individuals who were the (a) targets of direct surveillance, (b) participants in monitored conversations, and (c) owners, leasers, or licensors of the premises where the FBI conducted electronic surveillance.  In addition to the names of individuals in the above categories, the cards in the ELSUR index contain the date the voice was monitored, a source number to identify the individual on whom the surveillance was installed, and the location of the FBI field office that conducted the monitoring.

(28)    The ELSUR indices are published as a separate records system in the Federal Register because not all names contained in the ELSUR index can be retrieved through the General Index and CRS.  See 52 Fed. Reg. 8482 (1992).

(29)    The FBI field offices that have conducted electronic surveillance at any time from 1960 to the present also maintain ELSUR indices.  Since January 1, 1960, the field offices have been including in their ELSUR indices - and reporting to FBIHQ for inclusion in its index - the names of all persons whose voices have been monitored through a FBI microphone installation or a telephone surveillance.  The names of monitored subjects are retrievable through the FBIHQ or local field office ELSUR indices.

(30)    Until 1969, FBI field offices were also required to forward the names of all persons mentioned during monitored conversations to FBIHQ for inclusion in the FBIHQ ELSUR index.  Although FBIHQ discontinued this requirement in 1969, some field offices still include the names of individuals mentioned in monitored conversations in the field office's ELSUR index.  All information in the LAFO ELSUR index can be retrieved through the FBI HQ ELSUR index.

-13-

## SEARCHES FOR RECORDS RESPONSIVE TO PLAINTIFFS' JOINT REQUEST

### ISLAMIC SHURA COUNCIL OF SOUTHERN CALIFORNIA"

(31)     In response to plaintiffs' joint request, the FBI conducted a search of the LAFO and FBIHQ indices to the CRS to identify all potentially responsive files indexed to Islamic Shura Council for the requested time frame.  A search was conducted using the following terms: "Islamic Shura Council,"  "Shura Council," and  "Islamic Shura Council of Southern California." This search failed to locate any responsive records at FBIHQ or LAFO.

### ISLAMIC CENTER OF SAN GABRIEL

(32)     In response to plaintiffs' joint request, the FBI conducted a search  of the LAFO and FBIHQ indices to the CRS to identify all potentially responsive files indexed to Islamic Center of San Gabriel Valley for the requested time frame. A search was conducted  using the following terms: "Islamic Center of San Gabriel Valley,"  "Islamic Center of San Gabriel," and "Masjid Quba."[12] This search failed to locate any responsive records at FBIHQ or LAFO.

### ISLAMIC CENTER OF HAWTHORNE

(33)     In response to plaintiffs' joint request, the FBI conducted a search  of the LAFO and FBIHQ indices to the CRS to identify all potentially responsive files indexed to Islamic

---

[11]  I have been advised that during conversations that took place between FBI's DOJ counsel and plaintiffs' counsel, plaintiffs inquired as to whether the searches conducted by the FBI included a search of the Investigative Data Warehouse ("IDW") database.  This was the first time plaintiffs raised this issue, as this was not included in their initial FOIA/Privacy Act request. In any event, any FBI records which would be contained in the IDW database would be captured when conducting a search of CRS.

[12]  Per request letter dated May 15, 2006, Islamic Center of San Gabriel Valley is also known as "Masjid Quba."

Center of Hawthorne for the requested time frame.  A search was conducted using the following

terms:  "Islamic Center of Hawthorne" and "Hawthorne Islamic Center."  This search failed to

locate any responsive records at FBIHQ or LAFO.

## WEST COAST ISLAMIC CENTER

(34)     In response to plaintiffs' joint request, the FBI conducted a search of the FBI

LAFO and FBIHQ indices to the CRS to identify all potentially responsive files indexed to West

Coast Islamic Center for the requested time frame.  A search was conducted  using the term

"West Coast Islamic Center".  This search failed to locate any responsive records at FBIHQ or

LAFO.

## HADI

(35)     In response to plaintiffs' joint request, the FBI conducted a search  of the LAFO

and FBIHQ indices to the CRS to identify all potentially responsive files indexed to HADI for

the requested time frame. A search was conducted using the following terms: "Human Assistance

Development International"  and "HADI."  This search failed to locate any responsive records at

FBIHQ or LAFO.

## MUZAMMIL SIDDIOI

(36)     In response to plaintiffs' joint request, the FBI conducted a search of the LAFO

and FBIHQ indices to the CRS to identify all potentially responsive files indexed to Muzammil

Siddiqi for the requested time frame. A search was conducted  using the name "Muzammil H.

Siddiqi" which would cover a phonetic breakdown of the first, middle and last names. This

search would reveal documents indexed to the following  names: "Muzammil H. Siddiqi," "H.

Siddiqi," Muzammil," "Siddiqi, Muzammil, H.," "Siddiqi, H., Muzammil,","Siddiqi,

-15-

Muzammil," "Siddiqi, M. H.," and "Siddiqi M." This search failed to locate any responsive

records at FBIHQ or LAFO.

## SHAKEEL SYED

(37)    In response to plaintiffs' joint request, the FBI conducted a search  of the LAFO

and FBIHQ indices to the CRS to identify all potentially responsive files indexed to Shakeel

Syed. for the requested time frame.  A search was conducted  using the name "Shakeel Syed"

which would cover a phonetic breakdown of the following  names: "Shakeel Syed," "Shakeel,

S.," "Syed Shakeel," and "Syed, S."   This search failed to locate any responsive records at

FBIHQ or LAFO.

## MOHAMMED ABDUL ALEEM

(38)    In response to plaintiff s joint request, the FBI conducted a search of the FBI

LAFO and FBIHQ indices to the CRS to identify all potentially responsive files. A search was

conducted using the name "Mohammed Abdul Aleem" which would cover a phonetic breakdown

of the first, middle and last names.  This search would reveal documents indexed to the following

names: "Mohammed Abdul Aleem," "Abdul, Aleem, Mohammed," "Aleem, Mohammed,

Abdul," "Aleem, Mohammed, A.," "Aleem, Mohammed," "Aleem, M., A.," and "Aleem, M."

This search failed to locate any responsive records at FBIHQ or LAFO.

## RAFE HUSAIN

(39)    In response to plaintiffs joint request, the FBI conducted a search  of the LAFO

and FBIHQ indices to the CRS to identify all potentially responsive files for the requested time

frame.  A search was conducted using the name "Rafe Husain" which would cover a phonetic

breakdown of the first and last names. This search would reveal documents indexed to the

following names: "Rafe Husain," "Rafe, H.," "Husain, Rafe," and*'Rafe, H." This search failed

to locate any records at FBIHQ or LAFO responsive to plaintiffs requests.

## CAIR-SOUTHERN CALIFORNIA

(40)    In response to plaintiffs' joint request, the FBI conducted a search of the LAFO

and FBIHQ indices to the CRS to identify all potentially responsive files for the requested time

frame. A search was conducted using the following search terms: "Council on American Islamic

Relations, Southern California Chapter," "CAIR," "CAIR Southern California Chapter," and

"CAIR, Southern California Chapter." As a result of this search effort, one cross-reference was

identified as responsive to Council on American Islamic Relations-Southern California Chapter.

After careful review, the document was processed and released in part.

## AYLOUSH

(41)    In response to plaintiff s joint request, the FBI conducted a search of the LAFO

and FBIHQ indices to the CRS to identify all potentially responsive files for the requested time

frame.  A search was conducted using the name "Hussam Ayloush" which would cover a

phonetic breakdown of the first and last names. This search would reveal documents indexed to

the following names: "Hussam Ayloush," "Ayloush, H.," "Ayloush, Hussam," and "Hussam, A."

As a result of this search effort, one cross-reference was identified as responsive. After careful

review, the document was processed in part.

## ADDITIONAL SEARCH EFFORTS

(42)    In addition to the searches described above, RIDS prepared and circulated an

Electronic Communication ("EC") to those FBIHQ divisions and offices most likely to possess

-17-

responsive records requesting a thorough search of any documents in their possession including all material identified as potentially responsive that may be found in the individuals' files, offices and/or computers, e-mails, etc. The date parameters for this search were for documents created on or after January 1, 2001 through May 26, 2006. This EC requested that these FBIHQ divisions and offices conduct the requested searches of their records and remit any possibly responsive documents to RIDS.

(43)    This EC was circulated to the following FBIHQ divisions and offices, which were determined to most likely possess responsive documents concerning the plaintiffs: the Director's Office; the Cyber Division; the Office of the General Counsel ("OGC"); Critical Incident Response Group ("ORG"); the Criminal Justice Information Services Division ("CJIS"); the Counterintelligence Division ("CD"); the Counterterrorism Division ("CTD"); the Criminal Investigative Division ("CID"),  the Inspection Division ("INSD"); the Security Division, and the Laboratory Division. Individuals in all of these FBIHQ divisions and offices searched their office records and files for potentially responsive records. As a result of these search efforts, no responsive documents were identified.

## **FAILURE TO EXHAUST**

(44)    With regard to plaintiffs Hussam Ayloush and CAIR-California, the FBI released a total of four (4) pages of responsive documents by letters dated June 13 and 14, 2006, respectively. Neither plaintiff appealed to DOJ OIP, therefore they both failed to exhaust their administrative remedies.

## **SECOND SET OF SEARCHES AND RELEASE OF DOCUMENTS**

(45.)    The FBI's current policy is to search for and identify only "main " files

responsive to FOIA/ Privacy Act requests at the initial stage.  Nonetheless, upon the receipt of

the complaint in the present litigation, the FBI conducted a second set of searches of the CRS to

locate cross-references responsive to plaintiffs'joint request using the same search terms

described above. In addition, the FBI conducted a search of the ELSUR indices. As a result of

the ELSUR search, no records were located pertinent to any of the subjects.  As a result of the

CRS second set of searches, the FBI located  the following cross- references:  265C-LA-232103-

4, indexed to Islamic Center of Hawthorne;  LA 266-0-407, indexed to HADI and Mohammed

Abdul Aleem;  288A-LA-C221061-98, indexed to Mohammed Abdul Aleem;  188A-LA-

C236680-133 and  188A-LA-C236680-137, indexed to Shakeel Syed; and  188A-LA-C236680-

137,  188A-LA-C236680-143,  188A-LA-C236680-150,  188A-LA-C236680-154, and  188A-LA-

C236680-181, indexed to Mohammed Abdul Aleem.  This search also located twenty seven (27)

cross-references indexed to plaintiffs Islamic Shura Council, Islamic Center of San Gabriel,

Muzammil Siddiqi, and Mohammed Abdul Aleem.  These cross-references' numbers are

classified pursuant to Executive Order 12958, as amended, and therefore not provided here (see U

49, infra).  All cross-references were processed and released by letter dated March 14, 2008 (see

H 18. supra).

(46)    It should be noted that this search only included FBIHQ and LAFO and did not

include any other FBI field offices.  In accordance with Department of Justice FOIA regulations,

28 C.F.R.§§ 16.3(a) and 16.41(a), FOIA requesters are placed on constructive notice that it is

incumbent upon them to direct their requests to those FBI field office most likely to maintain

responsive records.

## JUSTIFICATIONS FOR SPECIFIC DELETIONS OF INFORMATION

(47)    All documents have been thoroughly reviewed to achieve maximum disclosure consistent with the access provisions of the Privacy Act and the FOIA.  Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material.  Accordingly, a review of this information will reveal that all material withheld is exempt from disclosure pursuant to a FOIA exemption, or is outside of the scope of the requests and therefore non responsive. Copies of the pages released in full or in part are attached hereto as **Exhibit O.**  Each page of Exhibit O is consecutively numbered ACLU 1-124[13] in the lower right-hand corner.

(48)    The following paragraphs explain the FBI's rationale for withholding specific information in these documents pursuant to Privacy Act Exemption (j)(2) and FOIA Exemptions (b)(1), (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

## JUSTIFICATION FOR REDACTIONS

(49)    The FBI's rationale for withholding each particular category of information under the specific exemption categories is explained below.

## APPLICATION OF FOIA EXEMPTION (b)(1) AND E.O. 12958. AS AMENDED

(50)    5 U.S.C. § 552(b)(1) exempts from disclosure those records that are: "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive Order.. . ."

---

[13]  Documents previously released to CAIR and Hussam Ayloush are also included.

(51)    Before I consider an Exemption (b)(1) claim for withholding of agency records, I

determine whether the information contained in those records is information that satisfies the

requirements of E.O. 12958, as amended, which governs the classification and protection of

information that affects the national security,[14] and complies with the various substantive and

procedural criteria of the Executive Order. E.O. 12958, as amended on March 25, 2003 by E.O.

13292, is the Executive Order that currently applies to the protection of national security

information.  I am bound by the requirements of E.O. 12958, as amended, when making

classification determinations.

(52)    For information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

E.O. 12958, as amended, § 1.1(a):

> (a) an original classification authority is classifying the information;
>
> (b) the information is owned by, produced by or for, or is under the control of the
> United States Government;
>
> (c) the information falls within one or more of the categories of information listed
> in § 1.4 of this order; and
>
> (d) the original classification authority determines that the unauthorized disclosure
> of the information reasonably could be expected to result in damage to the
> national security, which includes defense against transnational terrorism, and the
> original classification authority is able to identify or describe the damage.

(53)    All information which I determined to be classified and which is under the control

of the United States government, is marked at the "Secret" level since the unauthorized

disclosure of this information reasonably could be expected to cause serious damage to national

---

[14] Section 6.1 (y) of E.O. 12958, as amended, defines "National Security" as "the
national defense or foreign relations of the United States."

security.  See E.O. 12958, as amended, § 1.2(a)(2).  In addition to these substantive requirements,

certain procedural and administrative requirements of E.O. 12958, as amended, must be followed

before information can be considered to be properly classified, such as proper identification and

marking of documents.  I made certain that all procedural requirements of E.O. 12958, as

amended, were followed in order to ensure that the information was properly classified.  In

particular, I made certain that:

> (a) each document was marked as required and stamped with the proper
> classification designation;[15]

> (b) each document was marked to indicate clearly which portions are classified
> and which portions are exempt from declassification as set forth in E.O. 12958, as
> amended, § 1.5(b) and which portions are unclassified;[16]

> (c) the prohibitions and limitations on classification specified in E.O. 12958, as
> amended, § 1.7, were adhered to;

> (d) the declassification policies set forth in E.O. 12958, as amended, § 3.1 were
> followed; and

> (e) any reasonably segregable portion of these classified documents that did not
> meet the standards for classification under E.O. 12958, as amended, were
> declassified and marked for release, unless withholding was otherwise warranted
> under applicable law.

## FINDING OF DECLARANT REGARDING
## EXEMPTION 1

(54)    With the above requirements in mind, I personally and independently examined

the information withheld from the plaintiff pursuant to FOIA Exemption 1.  I determined that the

classified information continues to warrant classification at the "Secret" level, and is exempt

---

[15] E.O. 12958, as amended, §§ 1.6 (a)(l)-(5).

[16] E.O. 12958, as amended, § 1.6 (c).

from disclosure pursuant to E.O. 12958, as amended, § 1.4, category (c) intelligence activities (including special activities), as the unauthorized disclosure of this information could reasonably be expected to cause serious damage to the national security.

## INTELLIGENCE ACTIVITIES

(55)    E.O. 12958, as amended, § 1.4 (c), exempts intelligence activities (including special activities), intelligence sources and methods, or cryptology.  The information withheld on **ACLU Bates** pages 1, 3-6, 8-11, 13-24, 16-29, 31-32, 35, 38, 43, 45, 73, 101, 103 consists of intelligence activities utilized by the FBI for gathering intelligence data.  An intelligence activity or method has two characteristics.  First, the intelligence activity and information generated by it is needed by U.S. Intelligence/ Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity  if the viability, productivity, and usefulness of its information is to be preserved.

(56)    The classification redactions were made to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities directed at specific targets.  The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information.  The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations, and are in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

(57)    The information in these documents concerning activities is very specific in nature

and known to very few individuals.  Disclosure of the specific information which describes these

intelligence activities are still used by the FBI today to gather intelligence information, and could

reasonably be expected to cause serious damage to the national security for the following

reasons: (1) disclosure would allow hostile entities to discover the current activities used; (2)

disclosure would reveal current specific targets of the FBI's national security investigations; and

(3) disclosure would reveal or determine the criteria used—and priorities assigned to—current

intelligence or counterintelligence investigations.  Hostile entities could then develop

countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities.  This

would severely damage the FBI's efforts to detect and apprehend violators of the United States'

national security and criminal laws.

(58)    The FBI  protected specific categories of information related to intelligence

activities because disclosure reasonably could be expected to cause serious damage to the

national security. First, the withheld information contains file numbers that are assigned to a

specific intelligence activity.   Second, the withheld information contains detailed intelligence

activities gathered on specific individuals or organizations of national security interest.  Third,

the withheld information contains standard terminology/phraseology used in the most recent FBI

investigation.   Fourth, the withheld information contains the character of the case which

identifies the specific type of intelligence activity directed at a specific target.  A more detailed

discussion of each of these categories is contained within the narrative description for each

document incorporated as a part of this declaration.

## DEFENDANT'S BURDEN OF ESTABLISHING
## EXEMPTION (b)(1) CLAIMS

(59)    The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense of the United States.  This information was not examined in isolation.  Instead, each piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files, including the secrecy of that other information. Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined, and upon attempts by a hostile entity to analyze such information.

(60)    In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security, and invoked Exemption 1 of the FOIA to prevent disclosure.  Likewise, the justifications for the withheld classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found.  This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by hostile intelligence entities.  It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to the intelligence activities could reasonably be expected to jeopardize the national security of the United States.

## EXEMPTION (b)(2)
## INTERNAL AGENCY RULES AND PRACTICES

(61)    5 U.S.C. § 552 (b)(2) exempts from disclosure information:

> related solely to the internal personnel rules and practices of an agency." This
> exemption protects routine internal administrative matters and functions of the
> FBI which have no effect on the public at large. Disclosure of this information
> could impede the effectiveness of the FBI's internal law enforcement procedures.

### Internal FBI Telephone and Facsimile Numbers

(62)    Exemption (b)(2) has been asserted to protect the internal FBI telephones and

facsimile numbers of various SAs at LAFO. The telephone numbers and facsimiles relates

directly to the internal practices of the FBI in that the numbers are routinely used by some

individuals during the performance of their investigative duties.  Disclosure of those telephone

and facsimile numbers could subject the SSA to harassing telephone calls which could disrupt

the official business of the FBI, including impeding his/her ability to conduct and conclude law

enforcement investigations in a timely manner.  Additionally, in the current technological

environment, it is now possible for persons so inclined to utilize an automated dialing system to

repeatedly dial the same telephone number resulting in an inundation of telephone calls, thus

rendering the telephone useless to the FBI.  Disclosure of routine internal administrative

information such as these FBI telephone and facsimile numbers would not result in any benefit to

the public at large and there is no indication that there is a genuine public interest to be served in

the disclosure of these numbers.  Accordingly, because these internal FBI telephone and

facsimile numbers are related solely to the FBI's internal practices, because disclosure would not

serve any public interest, and because disclosure would impede the FBI's effectiveness, the FBI

-26-

properly withheld these numbers pursuant to Exemption (b)(2). In FOIA practice, this is known as a "low (b)(2)."

## Source Symbol Numbers

(63)    Exemption (b)(2) has been asserted  to withhold one source symbol number in the records responsive to plaintiffs' joint request. Source symbol numbers are used to administratively conceal an individual's identity by inserting this number in written documents in lieu of his/her true name. A source symbol number is comprised of a two or three letter abbreviation which identifies the particular FBI field office where the symbol numbered source is operating or has operated, followed by a sequentially assigned number.  Using a fictitious symbol number, "LA 123," the two-letter abbreviation "LA" reveals that this is a source of the FBI's Los Angeles Field Office and the source is the 123th symbol numbered source of that office.  Source symbol numbers are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an "express" grant of confidentiality.  Once this number is assigned to an individual, it will always be synonymous with him. Disclosure of this material would reveal information as to the strength, breadth and scope of the informant program. Release of the source symbol number in the documents at issue does not shed light upon the FBI's  performance of its statutory duties; therefore, there exists no public interest in the release of that number. In FOIA practice, this is known as a "high (b)(2)."

## Identity and Location of Units

(64)    Exemption (b)(2), when asserted  in conjunction with Exemption 7(E),  is used to protect methods and techniques involving the location and identity of the FBI and/or joint units which were involved in the underlying investigations. The office locations and units are usually

found in the administrative headings of internal FBI documents. These headings identify the location of the office and unit that either originated or received the documents. Disclosure of the location of the units conducting the investigation would reveal to plaintiffs the physical areas of interest of the investigation and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not. If the locations are clustered in a particular area, it would allow plaintiffs to avoid or circumvent those locations especially if one or more location appeared with frequency or in a pattern. This would disrupt the method of the investigative process and deprive the FBI of valuable information. The withholding of the unit involved is justifiable as well under a similar rationale. Once identified, the unit's area of expertise becomes known and the plaintiff would then be aware of exactly what the investigative interest is. For example, knowing that a unit whose focus is on financial crimes is involved is quite different information than knowing that the unit involved has a focus on crimes of violence. This knowledge could allow plaintiff to avoid or circumvent activities in the area of the unit's focus. The revelation of the involvement that one or more units of differing focuses is critical information that can allow the adjustment of behaviors and activities and use of countermeasures.to avoid detection. The release of the identity of a unit or its location does not inform the public of the performance of the FBI's statutory duties and therefore, there is no public interest in that information. Even if one could conclude that such information does shed light on the FBI's performance of its statutory duties, the risk of circumvention far outweighs the minimal public interest. In FOIA practice, this is known as a "high (b)(2)."

## FOIA EXEMPTION (b)(fl
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(65)    5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and
similar files when the disclosure of such information would constitute a clearly unwarranted
invasion of personal privacy."

(66)    When withholding information pursuant to this exemption, the FBI is required to
balance the privacy interests of the individuals mentioned in these records against any public
interest in disclosure.  In asserting this exemption, each item of information has been scrutinized
to determine the nature and strength of the privacy interest of every individual whose name
and/or identifying information appears in the documents at issue.  In conducting this analysis, the
public interest in disclosure of this information is determined by whether the information in
question would shed light on the FBI's performance of its mission to protect and defend the
United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal
laws of the United States, and to provide leadership and criminal justice services to federal, state,
municipal, and international agencies and partners.  In each instance where information was
withheld pursuant to Exemption (b)(6), the FBI determined that the individual's privacy interests
outweighed any public interest in disclosure.

### Names and/or Identifying Information of FBI Special Agents and Support Personnel

(67)    Exemption (b)(6) has been asserted to protect the names, business telephone
numbers/extensions and facsimile numbers of FBI S As who were responsible for conducting,
supervising, and/or maintaining the investigative activities reported in the documents responsive
to plaintiffs' requests.  Publicity (adverse or otherwise) regarding any particular investigation they
have been assigned may seriously prejudice their effectiveness in conducting other

investigations.  The privacy consideration is also to protect FBI SAs from unnecessary, unofficial

questioning as to the course of an investigation, whether or not they are currently employed by

the FBI.  FBI SAs conduct official inquiries into violations of various criminal statutes and

national security cases.  They come into contact with all strata of society, conducting searches

and making arrests, both of which result in reasonable but nonetheless serious disturbances to

people and their lives.  It is possible for an individual targeted by such law enforcement actions

to carry a grudge which may last for years, and to seek revenge on the agents and other federal

employees involved in a particular investigation. The publicity associated with the release of an

agent's identity in connection with a particular investigation could trigger hostility toward a

particular agent. Accordingly, SAs maintain a substantial privacy interest in not having their

identities disclosed.

(68)     The FBI next examined the records at issue to determine whether there was any

public interest that outweighed the substantial privacy interest of the FBI SAs referenced in the

responsive records.  The FBI could not identify any discernible public interest.  In particular, the

FBI could not determine how the disclosure of the names and identifying information of these

FBI SAs would shed any light on the operations and activities of the FBI.  Thus, the FBI

determined that the SAs' privacy interests outweighed any public interest in disclosure, and that

disclosure of the names and identifying information of the FBI SAs would constitute a clearly

unwarranted invasion of their personal privacy.

(69)     The names of and/or identifying data of FBI support personnel are also withheld

pursuant to Exemption (b)(6).  Support personnel are assigned to handle tasks relating to official

investigations.  These individuals are in positions to have access to information regarding official

**-30-**