# EXHIBIT D

**washingtonpost.com**

The Washington Post
Print Edition | Subscribe


Advertisement

**Search at the speed o**
News Searc

NEWS | OPINIONS | SPORTS | ARTS & LIVING | DISCUSSIONS | PHOTOS & VIDEO | CITY GUIDE | CLASSIFIEDS | JOBS | CARS | R

SEARCH [                    ] [go] ⦿ News ○ Web results by Google    |    Search Archives

# News Search: Archive Search   News Search

FREE Article Preview

**The Washington Post**

Buy Complete Document   Buy Page Print

## Interviews Of Muslims To Broaden
*FBI Hopes to Avert A Terrorist Attack*
*[FINAL Edition]*

The Washington Post - Washington, D.C.

| | |
|---|---|
| Author: | Mary Beth Sheridan |
| Date: | Jul 17, 2004 |
| Start Page: | A.01 |
| Section: | A SECTION |
| Document Types: | News |
| Text Word Count: | 1101 |

Law enforcement officials appear to be using different approaches in the interviews. In some cases, they have asked prominent local Muslim figures to simply pass on any helpful information, activists said. Asim Ghafoor, a Muslim attorney in Washington who was visited by two FBI agents about a week ago, said they noted that he had represented various Muslim organizations and charities and asked, "Is there anything we need to know?" He said he assured them that there was not.

Some activists said that Muslims and Arabs were nervous about responding to the FBI, in part because thousands of immigrants wound up being deported after being contacted in earlier phases of the government's anti-terrorism campaign. Several people in the Washington area have told FBI officers that they will meet with them only if their attorney is present.

The FBI is carrying out the interviews in collaboration with the regional Joint Terrorism Task Forces, which include law enforcement officers from other agencies. Those officers have sometimes done the interviews on behalf of the FBI.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

Buy Complete Document   Buy Page Print

**Ads by Google**

**Rockport Shoes & Boots**
Large selection, free shipping, free return. Order now. Aff.
www.shoebuy.com

**Protective Work Boots**
Protective and steel toe workwear leather dress boots, casual boots
www.simplysheepskin.com





Westlaw.

NewsRoom

7/18/04 L.A. Times 17
2004 WLNR 19789299

Los Angeles Times
Copyright 2004 Los Angeles Times

July 18, 2004

Section: Main News

The Nation
FBI Starts to Question Muslims in U.S. About Possible Attacks
Richard B. Schmitt
Donna Horowitz
Special to The Times
Special to The Times

WASHINGTON FBI agents are beginning another round of interviews with Muslims and Arab Americans around the country as part of an effort to root out a possible terrorist attack in the U.S. this summer or fall, civil rights activists and attorneys for some of the people questioned said Saturday.

The interviewing program was announced in late May at a news conference by U.S. Atty. Gen. John Ashcroft and FBI Director Robert S. Mueller III. Officials are concerned that terrorists may seek to disrupt the national political conventions in late July and late August or the general election in November, among other possible targets. But the actual questioning of people has taken weeks to get off the ground.

Muslim advocacy groups and lawyers said that, in recent days, the FBI had begun interviewing dozens of people in Virginia, Florida, New York and California, among other states. The individuals questioned include a U.S. citizen of Iranian descent in Missouri and a Yemeni college student in Arizona. None of the people interviewed so far had been told that he or she was a suspect in a terror investigation.

To many, the interviews are a bewildering case of deja vu. The FBI interviewed thousands of Muslims and Arab Americans after the Sept. 11 attacks and in the walk-up to the war in Iraq last year, fueling accusations of racial profiling by the government. Hundreds of people were jailed or deported for alleged visa and immigration violations after the Sept. 11 roundup.

FBI officials said in announcing the latest set of interviews in May that they would work to ensure that the process would be driven by specific intelligence rather than race or ethnicity. The approach recently was cited by one bureau

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
200

7/18/04 LATIMES 17                                                            Page 2

official as a reason why the interviewing had taken so long to begin.

But Muslim leaders said Saturday that they were concerned that the FBI was
repeating mistakes of the past.

Nihad Awad, executive director of the Council on American-Islamic Relations, or
CAIR, in Washington said his office had received dozens of reports of Muslims
being questioned at their workplaces and homes by the FBI. He criticized the
operation, saying it inexplicably seemed to target even respected community
leaders.

"The way it's being done stigmatizes the entire community and makes Muslims
objects of suspicion to their neighbors and co-workers," Awad said. "This is not
right. This is more politics than security."

He said he hoped to meet with FBI officials on Monday to express his concerns and
appeal to them to more closely cooperate with the community during their
investigations.

"Muslims should be enlisted in the war on terror, not blacklisted," he said.

An FBI spokeswoman, Michelle Palmer, declined comment Saturday about the latest
interviews.

Bureau officials have been meeting in recent weeks with Islamic groups, seeking to
enlist their support at a time when Ashcroft and other officials have said the
chances of a terrorist attack on the U.S. are as high as any time since Sept. 11.

One FBI official in Washington indicated recently that the bulk of the
interviewing would not begin until late this month. And although sources said the
FBI in Southern California had started conducting narrowly tailored interviews,
officials with some Islamic groups in the region were unaware of recent problems
-- or even of any questioning having taken place.

Stacy Tolchin, an attorney with the National Lawyers Guild in San Francisco, said
her group got four calls recently from Muslims and Arab Americans contacted by the
FBI or the local Joint Terrorism Task Force. Tolchin said she accompanied a
Turkish woman to an interview Tuesday in which two agents asked a wide range of
questions -- including whether the client engaged in prayer.

Tolchin said she didn't know why the agents picked her client, a relatively new
immigrant of Kurdish descent who was granted asylum based on her fear of returning
to Turkey. She said the single woman in her 30s, a professional from Northern
California, was unable to help them.

During the interview -- which lasted less than an hour, Tolchin said -- the agents
asked whether her client knew people who had traveled to Pakistan, and whether she
had information about a school in Syria where some American converts to Islam had
studied the Koran.

"They asked if she knew any suspicious people who had come from Mexico and
Canada," Tolchin said. "They asked if she knew people who had licenses to drive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
201

7/18/04 LATIMES 17

Page 3

commercial trucks or transport firearms."

Tolchin said her client had no answers to any of these questions.

In response to the question about prayer, Tolchin said, her client told the agents that, although she is a Muslim, she doesn't pray.

Deedra Abboud, the director of CAIR's Arizona office, said she met with the FBI in Phoenix on Tuesday after receiving phone calls from people who had been recently approached by the bureau for questioning.

The FBI is "really stressing that these people are not under investigation, and that this is just a friendly chat," Abboud said. "We tried to get them to understand they are not having friendly chats with non-Muslims."

Abboud said the FBI told her that it was trying to identify people who may have crossed paths with individuals who could be of use to investigators, including "people who may be six degrees of separation away from somebody who at some point in time may have been under investigation."

She said officials in Arizona told her they were moving ahead aggressively with interviews in part because a proposed presidential debate is planned for Tempe in October.

James Hacking, a Muslim lawyer in St. Louis, said he thought the FBI was on a fishing expedition.

Hacking said he accompanied an Iranian graduate student to an interview with the FBI in St. Louis on Wednesday. He said the client was asked a variety of general questions, including information about Iranian groups operating in the U.S. and abroad, and whether he had traveled recently to Iran. His client, he said, was unable to provide the investigators with much useful information.

"This kid was born and raised in the Midwest. He is as American as apple pie," Hacking said. "I think they are just beating the bushes."

      *

Times staff writer Schmitt reported from Washington and Times correspondent Horowitz from San Rafael. Staff writers Teresa Watanabe, David Pierson and Greg Krikorian in Los Angeles contributed to this report.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Religion (1RE60); International Terrorism (1IN37); Social Issues (1SO05); Islam (1IS02))

REGION:  (Iran (1IR40); Gulf States (1GU47); Missouri (1MI10); USA (1US73); Americas (1AM92); Arizona (1AR13); North America (1NO39); Western Asia (1WE54); Asia (1AS61); California (1CA98))

Language:  EN

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
202

2/13/2007

7/18/04 LATIMES 17                                                     Page 4

OTHER INDEXING:  (BUREAU; CAIR; FBI; ISLAM; JOINT TERRORISM TASK FORCE; MUSLIMS;
NATIONAL LAWYERS GUILD; TIMES)  (Abboud; Arab Americans; Ashcroft; Awad; David
Pierson; Deedra Abboud; Greg Krikorian; Hacking; James Hacking; John Ashcroft;
Michelle Palmer; Muslim; Nihad Awad; Robert S. Mueller; Stacy Tolchin; Teresa
Watanabe; Tolchin)

KEYWORDS: FEDERAL BUREAU OF INVESTIGATION; TERRORISM; MUSLIMS; ARAB AMERICANS;
DISCRIMINATION

EDITION: Home Edition

Word Count: 1275
7/18/04 LATIMES 17


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
203

Westlaw.                                                                 NewsRoom

8/2/04 SDUT A1                                                                Page 1


8/2/04 San Diego Union-Trib. A1
2004 WLNR 16984418

                              UNION-TRIBUNE
                    Copyright 2004 San Diego Union-Tribune

                            August 2, 2004


                            Section: NEWS

                        A SHAKY RELATIONSHIP
        FBI's home visits have some Muslims feeling harassed, alienated

                      Kelly Thornton, STAFF WRITER

   Saudi national Hasan Saddiq Faseh Alddin was jailed without bail and facing
deportation.  Five of his closest friends from the Vista mosque wrote letters or
showed up at his bond hearing in June to show support or testify on his behalf.

   In the days that followed, each of those friends received unannounced home visits
from FBI agents.  The agents appeared on doorsteps purporting to want information
about Alddin, who was described by the government as a friend of a friend of two
9/11 hijackers.

   But according to Alddin's supporters, they quickly became the subject of the
interviews as agents asked them about their religious beliefs, their personal
lives, their knowledge of weapons and explosives, their propensity to blow things
up, their thoughts on Osama bin Laden and the Sept. 11, 2001, attacks.

   To thwart a possible terrorist attack this summer or fall, the FBI has begun a
new wave of interviews with Muslims and Arabs.  But some local Muslims said agents
are alienating the very people they are trying to win over as partners in the war
on terror by ambushing them in their homes, posing offensive and accusatory
questions, misrepresenting the reason for their visit, and delving into personal
lives and politics.

   "If I'm an FBI agent and I'm trying to protect the country, I don't go accusing
people of planning on blowing things up and then, you know what, let's kiss and
make up," said Khalid Al Jaludi, one of Alddin's friends visited by the FBI at his
home in Hawthorne.

   Another of Alddin's friends, Jesse Bernal of Vista, said he was interviewed
recently by federal agents for more than two hours.

   "Does the FBI have a right to question people?  Yes. Does the FBI have a right to

                   © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

                                                                        Exhibit D
                                                                        204

8/2/04 SDUT A1                                                      Page 2

intimidate and coerce? No," he said. "I felt I had to be very careful. I felt anything I said would be used against me. The FBI isn't your friend. They're profiling -- to nail you."

In the FBI's latest outreach program, agents in San Diego County and elsewhere are reconnecting with contacts and cultivating new sources while intelligence analysts search old files for clues that, combined with new information, could become more meaningful.

It's unclear whether the questioning of Alddin's friends is part of that outreach effort or stems from the case against Alddin, who was jailed in May for having two misdemeanor domestic violence convictions. The government was seeking to deport him because the convictions jeopardized his immigration status.

Immigration officials had issued a news release identifying Alddin as having "ties" to two Sept. 11 hijackers because Alddin's former roommate from 1995 became a friend of San Diego-linked terrorists Nawaf Alhazmi and Khalid al-Midhar. Alddin voluntarily returned to Saudi Arabia on July 8.

The next day, FBI agents visited the mosque Alddin attended. Nader Dehaini, president of the Al-Ittihad mosque in Vista, said agents made an appointment with him and other board members to strengthen their partnership in the war on terror and nurture a spirit of cooperation. The agents were cordial and respectful, he said.

Not all Muslims say they feel harassed by agents, Dehaini said. Some understand the reason for the questions and are glad to help.

"I don't think there is a problem. All they wanted is to come and make sure they're more in touch with the community. Their questions were very normal and straightforward. It went very well. They were nice," Dehaini said.

"It's totally understandable with the high alert. They asked me what is a good idea in reaching out to the community so we can have help from you guys instead of being looked upon as the enemy."

FBI officials in San Diego say relationships between agents and the region's relatively large Muslim population are good and getting better.

"The FBI and the intelligence community have achieved some tremendous successes that would not have been possible without the extraordinary efforts of our partners in the Muslim, Iraqi and Arab-American communities," said Dan Dzwilewski, special agent in charge of the FBI office in San Diego.

"We owe them gratitude for that. Many Muslim and Arab-Americans here are very loyal Americans. . . . I don't think we're going to be successful without their continued assistance."

Some local Muslims -- particularly those with one-on-one experience with the FBI -- said agents are attempting to connect with a community that is already disenfranchised by a government that is quick to trample on civil rights by questioning, detaining and deporting Muslims and Arabs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
205

8/2/04 SDUT A1                                                           Page 3

The FBI and federal prosecutors have acknowledged using immigration crimes and
deportation as tools in the war on terror, where terrorism cases either cannot be
proved or would compromise national security by requiring disclosure of sensitive
information.  Since Sept. 11, 2001, that has happened in at least a dozen
instances in San Diego, where hijackers Alhazmi and al-Midhar lived in 2000.

The FBI's Dzwilewski said his agents are not randomly targeting people because of
race or religion.  Agents are reaching out to contacts, old and new, renewing
pleas for help and thanking them for what they've already done.  And, they are
following up on tips.

"People always think there's profiling going on.  Absolutely not.  Department of
Justice regulations strongly prohibit profiling.  The interviews we do are
strictly intelligence-driven," Dzwilewski said.

"There's a lot of intelligence generated from the community reporting suspicious
activity. . . . We'll take that, analyze what we're given and work with it from
that perspective and decide when intelligence indicates an interview might be
useful."

He said agents do not treat people as if they are guilty of something.

"We don't assume when we contact someone they're a terrorist or are going to be
supporting terrorists or espousing radical views," the FBI chief said.  "We're
there to ferret it out and seek their assistance.  If it escalates into something
that gives us cause to believe they may be involved, then that's a different
story."

Uneasy visit

Through large windows in his living room, Jesse Bernal saw the agents walking
toward the door of his Vista home.  They didn't have to introduce themselves.
They fit the stereotype: dark suits and somber, purposeful expressions.

They said they were there to talk about Alddin, but the topics changed within
minutes, Bernal said.

For two hours, they asked questions that bothered the retired business
consultant: whether he supported the Taliban (no), whether he believes in
terrorism (of course not), his thoughts on the Sept. 11 attacks (it was wrong).

Bernal, a native Texan with Hispanic heritage, was raised as a Catholic in
Anaheim.  At one point he wanted to be a priest.  At 16, he became a Protestant
and he later ministered to jail inmates and planned to become a missionary.

By 44, he was disillusioned with Christianity and met a Muslim who influenced
him.  Five years ago, he grew a beard and started attending the mosque and praying
to Allah five times a day.

"I never thought being a Muslim would be this: sitting here, being thought of as
a terrorist," Bernal said.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
206

8/2/04 SDUT A1                                                        Page 4

During the FBI interview, the agents asked Bernal's advice, he said.  How can we be less threatening?  Don't you see we're trying to help the country?  Bernal advised them to make an appointment with the leadership of the Vista mosque -- which they did a few days later.  But he remained convinced that the FBI was still profiling.

"It's nothing but cold and calculated intimidation," he said.  "People in the community are very fearful of the government.  They don't want to say anything.  They're using third-world tactics."

The FBI made an appointment for a few days later to interview Bernal's roommate, Nabil Al-Deiri, a naturalized U.S. citizen from Jordan who invited a Union-Tribune reporter and photographer to attend.  Upon arrival, the two agents aborted the interview when they saw the reporter and photographer, despite protests from Bernal and Al-Deiri, who said they had nothing to hide.

"We don't conduct business that way.  We want to keep your confidentiality as well as our own," one agent told Al-Deiri and Bernal.

Questions about profiling

Khalid Al Jaludi, a U.S. citizen born in Jordan and raised in New York City, was asleep in his Hawthorne home when a knock came at 8:30 a.m. June 30, a Wednesday.  His wife found two FBI agents at the door.  Days before that, the former U.S. Marine had come to federal court in San Diego for Hasan Alddin's hearing.

On his way to answer the door, Al Jaludi nervously recalled faces of friends who had been jailed or deported since Sept. 11.

Hello, the agents said, we are here about Alddin.

It wasn't long before the questions shifted to Al Jaludi and things became tense.

"They asked about three or four questions about Hasan," Al Jaludi said.  "They next asked me if I know Jesse (Bernal).  After that, they asked me if Jesse and I were planning on blowing anything up in the U.S. And that's when I said I think I need my lawyer."

Al Jaludi's lawyer and close friend, a former FBI agent and prosecutor, accompanied his client to the FBI office in Los Angeles the next day.  By that time, Al Jaludi was on the defensive, unwilling to answer questions he considered accusatory.

According to Al Jaludi, again they asked: Have you ever thought about blowing things up?

"It was really a stupid question," Al Jaludi said.  "I honestly think this is nothing more than racial profiling and harassment.  They're out there fishing."

The lawyer, who asked not to be identified because of his former FBI ties, had a different view of the FBI's tactics.  He said they must have been acting on a tip -- however misguided -- and were required to investigate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
207

8/2/04 SDUT A1

Page 5

"The follow-up didn't seem to me to be particularly onerous," the lawyer said. "It did seem a little bit foolish.  Nobody's going to confess if they are planning to blow something up."

The lawyer happened to be with Al Jaludi when a reporter called.  What followed was a friendly debate between the lawyer and client, overheard by the reporter. The lawyer both defended and teased Al Jaludi, affectionately calling him "overly sensitive" and a "crybaby."

"I might be oversensitive, but I've got legitimate reason to be oversensitive," Al Jaludi countered.  "Someone comes into my home and accuses me of plotting to blow things up?  Are these friendly questions?  Are they trying to take me out on a date?

"I've been here all my life," Al Jaludi said.  "I'm willing to wager that that FBI agent that came to my house has not served in the United States armed forces, and yet I have."

OVERVIEW

[] The FBI says it wants to build strong contacts with Muslim and Arab residents in San Diego and across the nation.

[] Some Muslims say the FBI's outreach seems like profiling and harassment because agents ask personal and political questions.

[] The FBI says it is not profiling.  But some Muslims say agents are alientating those they want to befriend.

Kelly Thornton: (619) 542-4571; kelly.thornton@uniontrib.com

---- INDEX REFERENCES ----

NEWS SUBJECT:  (International Terrorism (1IN37); Social Issues (1SO05); Sept 11th Aftermath (1SE05))

REGION:  (Middle East (1MI23); USA (1US73); Americas (1AM92); Saudi Arabia (1SA38); North America (1NO39); Arab States (1AR46); California (1CA98))

Language:  EN

OTHER INDEXING:  (AL; AL ITTIHAD; ALDDIN; DEPARTMENT OF JUSTICE; FBI; HASAN; HASAN ALDDIN; HASAN SADDIQ FASEH ALDDIN; OSAMA; OVERVIEW; SHAKY; UNION TRIBUNE) (Absolutely; Al Jaludi; Alhazmi; Arabs; Bernal; Dan Dzwilewski; Dehaini; Deiri; Dzwilewski; Jaludi; Jesse; Jesse Bernal; Khalid; Khalid Al Jaludi; Laden; Midhar; Muslims; Nabil Al-Deiri; Nader Dehaini; Nawaf Alhazmi; Saudi; Thornton; Uneasy)

KEYWORDS: DISCRIMINATION; POLICE; PROBES; SAN DIEGO; TERRORISM (Khalil Al Jaludi); (Jesse Bernal);  (Dan Dzwilewski)

EDITION: 1,3

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
208

2/13/2007

8/2/04 SDUT A1                                                    Page 6


Word Count: 2175
8/2/04 SDUT A1


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D
209

**SFGate**.com

## Few benefits to questioning targeted groups

Jayashri Srikantiah
Friday, August 6, 2004

Once again, FBI agents are fanning out in Muslim and immigrant communities in the Bay Area and across the country, targeting people for questioning based on ethnicity and religion. Apparently, the Department of Justice has not learned from the failure of its earlier dragnet questioning plans. None of those resulted in a single terrorism-related criminal arrest. Rather, they created fear and distrust in the very communities with which the FBI should be strengthening relationships.

The first discriminatory questioning plan was announced shortly after Sept. 11, 2001. Under that plan, 5,000 innocent noncitizen men of Middle Eastern and South Asian ancestry were targeted for interrogation based solely on their ethnicity, age and immigration status. These men, including ordinary businessmen and students who live and work with their families in our communities, were treated like terror suspects. They were asked, among other things, about their political beliefs and for the telephone numbers used by family members and friends.

Not surprisingly, the Department of Justice's own report about the first round of interviews revealed that no criminal arrests having any connection to terrorism were made. Rather, several noncitizens were deported for minor immigration violations. Despite this failure, the Department of Justice instituted a second round of questioning in the spring of 2002, this time of 3, 000 individuals of South Asian, Middle Eastern or Arab ancestry. Again, no terrorism-related criminal charges were brought.

After the Iraq War began, 11,000 Iraqi immigrants and Iraqi-American citizens, over 350 of them in the Bay Area, were questioned in a third round of interrogations. Refugees who left Iraq to escape Saddam Hussein's oppressive regime were asked whether they knew him, or what they thought of Osama bin Laden. Again, not surprisingly, no terrorism-related criminal arrests were made.

Despite the valuable resources wasted on these previous dragnet questioning plans, and the fear and anxiety created by each plan in immigrant communities, the Department of Justice is now repeating its practice of targeting innocent Americans based on ethnicity. Although FBI officials claim that the interviews are driven by "specific intelligence," all of the interview targets thus far appear to be of Middle Eastern, South Asian or Arab ancestry. Moreover, attorneys representing individuals targeted for interviews confirm that FBI agents are engaging, once again, in fishing expeditions with ordinary people, citizens and noncitizens alike. As with the previous questioning plans, the Department of Justice acknowledges that none of the interview targets are suspected of any wrongdoing.

Immigrant communities know from past experience that, contrary to the department's assertions,

Exhibit D
210

the interrogations are far from voluntary. In the typical scenario, FBI agents arrive at people's homes or workplaces demanding to talk with a particular individual. The person is treated like a terror suspect even though he has done nothing wrong.

Worse yet, the threat of potential deportation looms over the interview. In the past, FBI agents have been deputized to make immigration-related arrests. The targeted person knows, moreover, that previous plans have resulted in deportations for even minor immigration violations.

Sadly, the Bush administration's discriminatory practices extend far beyond decisions to target individuals for questioning based on ethnicity and religion. Most recently, the Census Bureau announced that it provided census data to the Department of Homeland Security, ZIP code-level breakdowns of Arab-American populations. The government has also targeted South Asian, Middle Eastern and Arab immigrants for registration, fingerprinting, increased border scrutiny, detention and deportation, among other things.

The administration's practices are based on its ignorant habit of equating terrorists with immigrants. We should all know better. The Bay Area is home to vibrant, productive and diverse immigrant communities. Now is a time when the FBI should be reaching out to these communities to repair the damage caused by previous selective targeting of community members based on religion and ethnicity. The FBI can then start to build connections with these communities that would encourage community members to come forward with any information they may possess.

Immigrants and citizens alike support our government's efforts to investigate terrorism. Those efforts should include questioning people about whom the government has specific, individualized information of connection to terrorist activity. Those efforts should also include gathering information through collaboration and open communication with immigrant communities. However, dragnet interrogations based on ethnicity and religion hamper communication and stigmatize entire communities. It is time for the Bush administration to stop wasting resources on discriminatory and ineffective plans that give us only the illusion of increased security at huge cost to immigrant communities.

Jayashri Srikantiah is director of the Immigrants' Rights Clinic at Stanford Law School.

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2004/08/06/EDGV682LKA1.DTL

This article appeared on page **B - 9** of the San Francisco Chronicle



**The Seattle Times**

Saturday, December 24, 2005 - Page updated at 12:00 AM

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

# Muslims angered by FBI radiation checks at mosques

**By Richard A. Serrano**
*Los Angeles Times*

WASHINGTON — Federal law-enforcement officials said Friday that FBI agents have secretly monitored radiation levels at Islamic mosques, businesses and homes for several years in large cities to determine whether nuclear or chemical bombs were being assembled.

The officials said no suspicious radiation levels have been found.

The disclosure, after the revelation last week that the government has secretly spied on U.S. citizens without court permission, angered a number of U.S. Muslim leaders. They cited a Supreme Court ruling three months before the Sept. 11, 2001, attacks in which the justices rejected such government monitoring.

"All Americans should be concerned about the apparent trend toward a two-tiered system of justice, with full rights for most citizens and another diminished set for Muslims," said Nihad Award, an official of the Council on American-Islamic Relations, the nation's largest Muslim civil-liberties group.

But Justice Department officials said the monitoring was lawful. They said that investigators used special equipment to gauge radiation levels at homes, warehouses and religious centers of Muslim groups, and that the testing was done in or near parking lots and driveways, areas the government views as public property.

They said the testing was still taking place. It was first reported Friday by U.S. News & World Report.

"This is being done in a manner that protects U.S. constitutional rights," said Brain Roehrkasse, a Justice Department spokesman. "FBI agents do not intrude across any constitutionally protected areas without proper legal authority."

After the Sept. 11 attacks in New York and on the Pentagon, federal officials began monitoring Muslim groups' activities to determine whether they were planning attacks.

Roehrkasse and other federal law-enforcement officials said the agents had targeted mosques, warehouses, businesses and some homes in and near several of the nation's largest cities, including Los Angeles, Washington, New York and Chicago.

## A Seattle connection?

In its report, U.S. News said Seattle was among the cities where monitoring occurred. But Seattle FBI spokesman Robbie Burroughs was surprised by questions about the program. "The Seattle office of the FBI is not involved in that kind of activity," she said. "It's not happening."

Gary Robertson, with the radiation division of the state Department of Health, said, "We're not aware of the

Exhibit D
212

government doing any monitoring around mosques."

The U.S. Environmental Protection Agency (EPA) has had a nationwide program since the 1970s to monitor for fallout from nuclear-weapons tests.

But testing for material emitting radiation — such as radioactive material that could be combined with chemicals to build a dirty bomb — is done differently.

"Normally what they would do is drive by, take an instrument that can detect if radiation is being emitted," said Debra McBaugh, head of the radiation division of the state Department of Health.

The federal Homeland Security Department or other federal officials have been through the region to look for radioactive material, McBaugh said. "They [Homeland Security] have told us after the fact, occasionally, that they've looked for nuclear material," she said.

**Possible targets**

Roehrkasse said the federal monitoring program also was used near other potential targets, including the 2004 political conventions and the Group of Eight summit of the leading industrial democracies that year, in Sea Island, Ga.

"For every single national event, we had these measures deployed," he said. "This is what homeland security is all about."

Another federal source, who asked not to be identified, said government lawyers reviewed the process and found it legal for the tests to proceed without agents seeking court authorization.

The tests are frequent and could pose grave logistical problems if court permission had to be routinely sought, he said.

Awad and other Muslim leaders at the Council on American-Islamic Relations said the monitoring fit a pattern of spying on U.S. citizens without first obtaining a court warrant. "This disturbing revelation coupled with recent reports of domestic surveillance without warrant, could lead to the perception that we are no longer a nation ruled by law but instead one in which fear trumps constitutional rights," Awad said.

Awad and other Muslim officials pointed to a June 11, 2001, Supreme Court decision that found a similar testing program to be unlawful.

*Seattle Times reporters Craig Welch and Maureen O'Hagan contributed to this report.*

*Material from The Associated Press is included in this report.*

Copyright © 2005 The Seattle Times Company

Exhibit D
213

More Like This  |  More Like Selected Text                                  **News**Room

1/24/06 Christian Century 10
2006 WLNR 1436695

Christian Century

Copyright 2006 Christian Century Foundation

**January 24, 2006**

Volume 123; Issue 2

Muslim groups seek answers on spying

Anonymous

AMERICAN MUSLIM groups have asked U.S. government agencies to be more forthcoming about news reports disclosing widespread secret electronic **surveillance** and radiation monitoring of Muslim mosques.

After a New York Times story reported last month that the National security Agency had eavesdropped on communications after September 11, 2001, without first seeking warrants from a special court, and President Bush defended his right to do so in the war on terrorism, Senate judiciary chairman Arlen Specter (R., Pa.) said he might call U.S. Attorney General Alberto Gonzales to testify before a committee hearing this year.

That story, and an earlier one from U. S. News & World Report indicating that warrants were not sought for radiation monitoring of more than 100 Muslim mosques and business and home sites in at least a half-dozen cities, stirred alarm among civil libertarians. But the revelations also disturbed U.S. Muslim-American leaders who have frequently emphasized their cooperation with government and law enforcement agencies to ferret out threats or dangers to civil safety.

"We are requesting to be informed of and included in discussions about homeland security that affect our communities across our nation," said Salam Al-Marayati, Los Angeles-based executive director of the Muslim Public Affairs Council. MPAC urged high-level Justice Department and **FBI** officials to meet with U.S. Muslim leaders.

MPAC later said it was invited to meet with **FBI** Deputy Director John Pistole in mid-January to address the issues raised by the two secret programs.

Meanwhile, the Washington-based Council on American-Islamic Relations (CAIR) filed two Freedom of Information requests for all government records relating to President Bush's executive orders authorizing electronic **surveillance** as well as records on the radiation monitoring program.

"President Bush's wiretapping policy is not only an apparent violation of existing law, it also gives carte blanche for spying, without legal oversight, on any American," said CAIR executive director Nihad Awad. He added that such unrestricted **surveillance** powers could be expanded and used to spy on groups and individuals who hold dissenting political views.

Of the mosque monitoring, CAIR national legal director Arsalan Iftikhar said that CAIR, which has 31 offices and chapters nationwide and in Canada, is concerned that the secret project, which reportedly found no dirty bombs or nuclear devices, created "the impression that American **Muslims** are considered suspect solely because of their faith."

Exhibit D
214

5/10/2006

Also filing a Freedom of Information request was the American-Arab Anti-Discrimination Committee in Washington. "If this demonstrates that Muslim sites were monitored just because they were Muslim sites, without law enforcement leads, it's going to have a chilling effect on people's free speech and hurt the war on terrorism," said Kareem Shora, the ADC legal director.

Shora said the **FBI** has shown in the recent past that it takes the concerns of American **Muslims** seriously. He cited the **FBI's** tracking down of perpetrators of hate crimes against **Muslims** after 9/11. On December 22 the **FBI** offered a $15,000 reward for information about the bombing of a Cincinnati mosque two days after the incident.

---- INDEX REFERENCES ----

COMPANY: ALAN DICK AND CO LTD

NEWS SUBJECT: (Religion (1RE60); Legal (1LE33); Judicial (1JU36); International Terrorism (1IN37); Social Issues (1SO05); Police (1PO98); Islam (1IS02); Sept 11th Aftermath (1SE05))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39))

Language: EN

OTHER INDEXING: (ADC; AMERICAN ARAB; AMERICAN **MUSLIMS**; CAIR; COUNCIL; DISCRIMINATION COMMITTEE; **FBI**; JUSTICE DEPARTMENT; MPAC; MUSLIM; MUSLIM PUBLIC AFFAIRS COUNCIL; **MUSLIMS**; NATIONAL SECURITY AGENCY; SALAM AL MARAYATI; US NEWS WORLD; US MUSLIM) (Alberto Gonzales; Arlen Specter; Arsalan Iftikhar; Bush; John Pistole; Kareem Shora; Nihad Awad; Shora)

KEYWORDS: (**Muslims**); (Terrorism); (Islam); (Law enforcement); (**Surveillance**)

Word Count: 651
1/24/06 CHRSTNCTY 10
END OF DOCUMENT

More Like This | More Like Selected Text

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 Dialog, a Thomson business.                    **News**Room

Exhibit D
215

5/10/2006

More Like This | More Like Selected Text                    **News**Room

3/15/06 Phila. Inquirer A05
2006 WLNR 4282818

Philadelphia Inquirer (PA)
Copyright 2006 The Philadelphia Inquirer

**March 15, 2006**

Section: NATIONAL

**FBI report shows agency monitored antiwar group**
"Our freedoms are being undermined," says the Pa. center's director. The **FBI** said all was legal.

By Jonathan S. Landay, Inquirer Washington Bureau

An **FBI** counterterrorism unit monitored an activist group in Pittsburgh that opposed the invasion of Iraq, according to internal agency documents released yesterday.

The documents were obtained by the American Civil Liberties Union under the Freedom of Information Act. They showed that the Joint **Terrorism** Task Force of the **FBI's** Pittsburgh office conducted an investigation into the activities of the Thomas Merton Center beginning as early as Nov. 29, 2002, and continuing as late as March 2005.

William J. Crowley, a spokesman for the **FBI's** Pittsburgh office, said the monitoring of the center was legal and related to an ongoing investigation. He did not provide any details of the probe. He said that when the **FBI** found no link between its investigation and the center, it ended the surveillance.

The ACLU contended that the documents are the first to "show conclusively" that an antiwar group was **targeted** for "its antiwar views."

"These documents show that Americans are not safe from secret government surveillance, even when they are handing out flyers in the town square, an activity clearly protected by the Constitution," said Marty Catherine Roper, an ACLU staff attorney.

The center, founded in 1972, describes itself as a group of people from diverse faiths who believe in "nonviolent struggle" for peace and justice. Merton, an American Roman Catholic monk, author and poet, died in 1968.

An **FBI** report dated Nov. 29, 2002, identified the center as "a left-wing organization advocating, among many political causes, pacifism."

"The TMC holds daily leaflet distribution activities in downtown Pittsburgh and is currently focused on its opposition to the potential war in Iraq," the report said. "According to these leaflets, Iraq does not possess weapons of mass destruction and... if the United States invades Iraq, Saddam Hussein will unleash bio-chemical weapons upon American soldiers."

The report also noted that the center had cooperated with an Islamic organization in staging an event to promote understanding between **Muslims** and non-**Muslims** in Pittsburgh.

An **FBI** agent photographed center members handing out leaflets, said the report, which added that "one female leaflet distributor, who appeared to be of Middle Eastern descent, inquired" if the picture-

Exhibit D
216

5/10/2006

taker worked for the **FBI**.

A Feb. 26, 2003, **FBI** report titled "International **Terrorism** Matters" detailed a schedule that the center posted on its Web site of antiwar rallies in Pittsburgh, New York and elsewhere.

Four heavily redacted documents - one dated Nov. 5, 2004, another Feb. 28, 2005, and two dated March 23, 2005 - appeared to be reports from an **FBI** informant who had infiltrated the group.

The documents all contained the phrase: "Source, who is not in a position to testify, provided the following information." They also say the source observed and reported on the group. The information reported was blacked out.

"The documents say they were conducting some kind of investigation," Jim Kleissler, the Thomas Merton Center director, said in a telephone interview. "That implies we were under surveillance simply because we were against the war. Our freedoms are being undermined."

The **FBI** agent who photographed the pamphlet distribution "was acting with all appropriate investigative authorities" and destroyed the pictures when it was determined that they were of no value to the probe, Crowley said in a statement. The Feb. 26, 2003, report was a draft document and was never made part of an official file, he said.

---- INDEX REFERENCES ----

NEWS SUBJECT: (International **Terrorism** (1IN37))

INDUSTRY: (Security (1SE29))

REGION: (Middle East (1MI23); Pennsylvania (1PE71); USA (1US73); Gulf States (1GU47); Americas (1AM92); Iraq (1IR87); North America (1NO39); Arab States (1AR46))

Language: EN

OTHER INDEXING: (William J. Crowley; Marty Catherine Roper) (ACLU; AMERICAN CIVIL LIBERTIES UNION; AMERICAN ROMAN CATHOLIC; CONSTITUTION; **FBI**; JOINT **TERRORISM** TASK FORCE; MERTON; **MUSLIMS**; THOMAS MERTON CENTER; TMC) (Crowley; Jim Kleissler; Marty Catherine Roper; Saddam Hussein; William J. Crowley) (Pittsburgh; Iraq; Pittsburgh; Pittsburgh; Pittsburgh; Iraq; Iraq; United States; Iraq; Pittsburgh; Pittsburgh; New York; us; usa; na; us.pa; us.pa.phila; iq; irq; md; mde; nam; us.ny; us.ny.nyc; us.pa.pittbr)

KEYWORDS: (NT/NEC); (SU/nation)

EDITION: CITY-B

Word Count: 699
3/15/06 PHILA-INQ A05
END OF DOCUMENT

More Like This  |  More Like Selected Text

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 Dialog, a Thomson business.                                    **News**Room

Exhibit D
217

# EXHIBIT E

On Behalf of Muslims, ACLU Seeks FBI Surveillance Data - Los Angeles Times          Page 1 of 3

---

**Los Angeles Times** | California | Local

---

You are here: LAT Home > Articles > 2006 > May > 16 > California | Local

Archive for Tuesday, May 16, 2006

# On Behalf of Muslims, ACLU Seeks FBI Surveillance Data

By H G. Reza
May 16, 2006 *in print edition B-4*

Attorneys for the American Civil Liberties Union asked the FBI on Monday to release documents detailing any post-Sept. 11 surveillance of Southern California mosques and Muslims.

Local Islamic leaders said they enlisted the ACLU's help after the FBI provided little information in response to their allegations that the agency was monitoring them and their places of worship. They say some Muslims are afraid to go to mosques because they fear government monitoring

Shakeel Syed, executive director of the Islamic Shura Council of Southern California, said numerous Muslims reported being questioned by the FBI about their religious practices and sermons given during prayer services.

The ACLU filed the request under the federal Freedom of Information Act on behalf of individual Muslims and six Islamic groups, including the Shura Council, an Anaheim-based federation of more than 60 mosques, and the Council on American-Islamic Relations, a Muslim civil rights group whose Southern California chapter is also in Anaheim.

The ACLU has used similar strategies to get government documents on other groups monitored by the FBI.

Records obtained last year on behalf of 150 organizations showed that FBI counterterrorism agents had been covertly watching several activist groups, including the Catholic Worker and Greenpeace, since the Sept. 11 attacks for links to violent or disruptive activities.

In January, the FBI acknowledged that agents monitored mosques, Muslim-owned businesses and homes throughout the country for radiation levels.

Government officials said they were acting on intelligence that Al Qaeda planned to use a radioactive "dirty bomb" in the U.S. The surveillance program, which consisted of checking for radioactivity in the air, began after the Sept. 11, 2001, attacks and continued through 2003.

After the radiation monitoring was disclosed in December 2005, FBI officials met with angry Muslim and Arab-American leaders in Washington to explain the surveillance program.

Syed of the Shura Council said he hoped the Freedom of Information Act request would lead to a similar meeting in Los Angeles with local FBI officials.

."The problem is that we don't know the extent of the surveillance," Syed said.

Exhibit E-1
218

In an e-mail, FBI officials said they would "address" the ACLU's request but did not say whether records would be turned over. "The FBI does not investigate anyone based on their lawful activities, religious or political beliefs," said Assistant Director J. Stephen Tidwell of the L.A. office.

He added that FBI officials met with members of several local Middle Eastern communities, including Muslims, last month to address their concerns at an agency-sponsored town hall meeting in Los Angeles.

Tidwell said "open, honest and continuous dialogue is the only way to build and maintain trust and confidence" between the communities and the FBI.

But Syed said the FBI had a "practice of coming in through the back door to question people based only on the premise of suspicion."

"They have to understand that we too are interested in preventing a terrorist attack," Syed said.

Bill Araiza, constitutional law professor at Loyola Law School in Los Angeles, said the FBI should release the documents, if any exist, under the Freedom of Information Act.

The act "is a fairly aggressive statute in terms of disclosure," Araiza said. "The only possible exception I see would be if releasing these records interferes with an ongoing criminal investigation."

Mathieu Deflem, a University of South Carolina professor who studies law enforcement's role in combating terrorism, said the FBI's role in preventing another attack often puts the agency at odds with the Muslim community. "The relationship with the religion is very delicate," he added.

But Deflem said the FBI was justified in monitoring mosques because extremists may try to blend in among worshippers.

For instance, Nawaf Alhazmi and Khalid Almihdhar, who were in the plane that crashed into the Pentagon on Sept. 11, were virtual unknowns in their community even though they worshiped at a mosque near San Diego.

**Related Articles**
- Area Islamic groups seek FBI records Sep 19, 2007
- Tensions rise again at UC Irvine May 19, 2007
- FBI Tries to Reassure Muslims in Irvine Jun 07, 2006
- FBI Monitors for Radiation at Some Mosques Dec 24, 2005
- FBI Is Sued Over Arab, Muslim 'Interrogations' Oct 23, 2004

**More articles by H G. Reza**
**More articles from the California | Local section**

California and the world. Get the Times from $1.35 a week

Copyright 2008 Los Angeles Times

Exhibit E-1
219

SignOnSanDiego.com > News > Military -- Records detail security failure in base file theft    Page 1 of 3

**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

**PRINTTHIS**

**More Military news**
**U-T SPECIAL REPORT**
Records detail security failure in base file theft

SHARE

**By Rick Rogers**
UNION-TRIBUNE STAFF WRITER

**May 22, 2008**

A group suspected of stealing secret files on potential terrorists in San Diego and elsewhere apparently operated with impunity from one of Camp Pendleton's most heavily guarded buildings, newly obtained court records and investigative reports show.

Its members – military reservists and law enforcement officers -- allegedly swiped the classified documents from the Strategic Technical Operations Center.

Base officials have acknowledged the center's existence without discussing anything about it, citing national security concerns. But FBI and Navy agents said in reports that Col. Larry Richards, a Marine reservist, and his accomplices had no trouble evading the building's security measures.

Richards was the center's chief.

When not on active military duty, Richards worked as a top specialist for the Los Angeles County Terrorist Early Warning Group, a task force largely made up of members from law enforcement agencies.

While working at Camp Pendleton in January 2004, he escorted two Los Angeles County sheriff's deputies through the center's vaultlike doors, past guards and to the man stealing classified files for them, reports said.

Richards arranged the meeting after learning of his pending deployment to Iraq, investigators said. He found a war buddy to replace him in raiding the center's databases.

His recruit was Gunnery Sgt. Gary Maziarz, an intelligence analyst at the center and a survivor of the Sept. 11, 2001, terrorist attacks in New York City.

Maziarz was the linchpin of the theft group until his arrest in late 2006. He pleaded guilty the next summer and named Richards as the ringleader.

As part of his court-martial plea deal, Maziarz agreed to testify against anyone charged in the case and to not speak with the news media. He is serving a 26-month prison sentence.

Maziarz testified that he acted out of patriotism – to make it easier for federal, military and civilian law enforcement agencies to share information about possible terrorists.

Investigators, though, said some of the suspects might have passed files to defense contractors in hopes of later being hired by them.

Exhibit E-2
220

The FBI and military are still investigating Maziarz, Richards, Navy Cmdr. Lauren Martin, Marine Maj. Mark Lowe and former Marine Col. David Litaker. None of the suspects responded to requests for comment.

Government officials also are vetting the backgrounds of participating attorneys ahead of expected charges against the remaining suspects in coming months. Legal proceedings in the case probably will be conducted in private.

"The Marine Corps and the U.S. attorney are hashing out jurisdictional issues and prosecution strategy," said Ed Buice, a spokesman for the Naval Criminal Investigative Service.

*The San Diego Union-Tribune* first wrote about the theft ring in October after obtaining much of the transcript from Maziarz's court-martial.

The newspaper has since received more transcripts, reports from the FBI and naval authorities, and details from people close to the case. Those sources asked not to be identified because the investigation is in progress.

The newly acquired material indicates that Maziarz and other suspects gave investigators self-incriminating evidence. It suggests that a massive number of files were taken from Camp Pendleton, including those with the most confidential classification the government can bestow – Top Secret, Special Compartmentalized Information.

It also details how Maziarz helped funnel the files, hints at a financial motive for the theft and reveals that a mosque in San Diego's Clairemont neighborhood was monitored by a federal surveillance program targeting Muslim groups.

The theft operation began in 2001 or earlier with Richards at the helm, Maziarz testified during his court-martial. It might have stayed undetected had naval agents not stumbled upon classified material while questioning Maziarz for a different crime – stealing Iraq war trophies – at the end of 2006.

In Maziarz's apartment in Carlsbad and a storage locker in Virginia, investigators found more than 100 FBI and Defense Department files. Some documents pertained to surveillance of Muslim communities in Southern California.

"They were looking at specific mosques in Los Angeles and San Diego. The mosque in Clairemont was one," said a source who confirmed some of the files' contents.

That mosque, the Islamic Center of San Diego, is one of 18 houses of worship in the county with prayer services for Muslims, said the Council on American-Islamic Relations.

At his court-martial, Maziarz testified that Richards kept in touch with him during the 2004 deployment in Iraq by talking on a secure, government-issued satellite phone.

Maziarz said he used Richards' logon and password to access confidential computer accounts on the Joint Worldwide Intelligence Communications System and Secret Internet Protocol Router Network.

He also said he regularly obtained and disseminated secret files, such as surveillance reports transmitted by Lauren Martin, an intelligence analyst at U.S. Northern Command headquarters in Colorado Springs, Colo.

The command handles information about suspected terrorism operations nationwide, and Martin was responsible for the region that included Southern California, Maziarz testified.

According to investigators' reports, Richards said in interviews that he cold-called Martin after the Sept. 11

attacks and asked her to supply the Los Angeles Terrorist Early Warning Group with region-specific intelligence. He wanted law enforcement to have more ammunition to build cases against suspected terrorists.

At Maziarz's sentencing hearing in July, Gunnery Sgt. Paul C. Hurst, a security specialist, testified that Maziarz had "taken advantage of known faults within the security system" during wartime, when there weren't enough Marines to monitor the Strategic Technical Operations Center.

"The insider threat is the threat we should be focusing toward," Hurst said. "It's not necessarily al-Qaeda or anyone else."

Maziarz said his group broke laws to minimize the threat of terrorist attacks in Southern California. But federal officials are trying to determine, among other things, whether Richards and others shared anti-terrorism intelligence with defense contractors in exchange for future employment.

Investigators are scrutinizing possible ties between Richards and Kroll Associates, a risk-assessment company with offices in more than 65 cities worldwide. (Kroll's clients have included the city of San Diego, which paid the corporation $20 million for a 2006 report on its pension and financial scandal.)

Some of Kroll's employees and consultants come from law enforcement or go into that field after leaving the company. A few have had ties to the Los Angeles County Terrorist Early Warning Group.

A Kroll spokesman declined to comment on Richards or the theft case.

The investigative reports also note that agents are running down a possible connection between Richards and MPRI International Group, which provides services to law enforcement agencies and the U.S. Department of Defense. Richards told authorities that MPRI offered him $300,000 to work in Afghanistan, reports said.

An MPRI spokesman said Richards was never an employee or contract worker with the company. The spokesman wouldn't answer other questions for this story.

---

■**Rick Rogers:** (760) 476-8212; rick.rogers@uniontrib.com

**Find this article at:**
http://www.signonsandiego.com/news/military/20080522-9999-1n22theft.html

☒ Check the box to include the list of links referenced in the article.

☐ Copyright 2007 Union-Tribune Publishing Co. ? A Copley Newspaper Site

Exhibit E-2
222



GC PRINTTHIS

Click to Print

SAVE THIS | EMAIL THIS | Close

SAVE THIS | EMAIL THIS | PRINT THIS | MOST POPULAR

# Former Marine outlines secret dossiers

### Muslims, Arabs not targeted, FBI says

By Rick Rogers

9:50 a.m. November 17, 2008



Gary Maziarz, a former Marine intelligence specialist, gave secret government files to an anti-terrorism watch group. - *CHARLIE NEUMAN / Union-Tribune -*

OCEANSIDE — Two years after his arrest, a former Marine gunnery sergeant is talking about the FBI, CIA and U.S. Immigration and Customs Enforcement files he stole from Camp Pendleton for a civilian agency.

In interviews with The San Diego Union-Tribune, Gary Maziarz, 39, said "dozens of files" he gave the Los Angeles Terrorism Early Warning Group while serving as an intelligence specialist at the base were dossiers on Muslims and Arabs living in Southern California.

This marks the first time Maziarz has spoken to the media about the files since pleading guilty in July 2007 to mishandling classified material and stealing government property.

He agreed to the interviews despite signing a plea agreement with the government limiting his comments on the security breach, which might involve a decade's worth of intelligence culled from domestic and foreign sources. The deal also requires him to testify if called on.

Exhibit E-2
223

"Most of the (monitored) people were from Los Angeles. The ties they had to San Diego were, like, maybe they had a house down here or a relative or came down to visit or went on vacation here," said Maziarz, who splits his time between North County and Arizona as he looks for work and tries to move on with his life.

Many of the stolen files centered on the meeting spots of "people of interest," including places of worship, businesses and travel plans, he said.

Maziarz's case could have repercussions well beyond Camp Pendleton.

The existence of CIA, FBI and Immigration and Customs Enforcement documents profiling specific minority and religious groups in the United States could undermine contentions by the FBI, the primary federal agency for domestic security, that no programs target upstanding Muslims and Arabs.

"The FBI does not monitor the lawful activities of individuals in the United States, nor does the FBI have a surveillance program to monitor constitutionally protected activities of houses of worship," FBI spokesman Darrell Foxworth said in an e-mail.

Maziarz's arrest in October 2006 sparked multiple investigations, including those by the FBI and the Naval Criminal Investigative Service. Federal agents testifying at his trial said the files found in his possession could not be shared legally with civilian law enforcement.

Essentially, Maziarz said, he used computer networks at Camp Pendleton to tap into classified information that he then passed along to a higher-ranking Marine or one of that person's subordinates. Maziarz and federal investigative documents have identified that individual as reserve Col. Larry Richards, the base's former intelligence chief and co-founder of the Los Angeles Terrorism Early Warning Group.

Maziarz said he and others broke national-security protocols out of concern that FBI officials were not sharing anti-terrorism intelligence with local law enforcement or were doing it slowly because of bureaucracy. There was a feeling that lack of cooperation prevented aggressive efforts to prevent future terrorist attacks.

The Los Angeles Terrorism Early Warning Group is composed of two dozen local, state and federal agencies, including the Los Angeles Police Department, the Los Angeles County Sheriff's Department, the Secret Service and the FBI.

The Union-Tribune first reported on the Maziarz case in October 2007, after it obtained unclassified records from his court-martial.

Maziarz originally was charged with stealing Iraq war souvenirs from a base armory. That investigation evolved into the document-theft case.

He received a 26-month jail sentence. He was released in July after serving less than two years in Camp Pendleton's brig.

In accepting Maziarz's guilty plea, Marine judge Lt. Col. Jeffrey Meeks avoided revealing specific contents of the stolen files. Two federal agents attended the plea-agreement sessions to make sure classified details stayed secret.

While sitting recently at a café in Carlsbad, Maziarz explained how officials from the Los Angeles counter-terrorism group used him for years to steal highly sensitive FBI, CIA and immigration files to track and foil terrorist operations.

Exhibit E-2
224

11/23/2008 3:47 PM

He was more tight-lipped about classified files known as TIGER documents.

TIGER, or the Topologically Integrated Geographic Encoding and Referencing system, is a database developed at the U.S. Census Bureau. It can be customized to identify special demographic centers, such as areas where certain ethnic groups live.

The Union-Tribune asked FBI officials whether any of the files Maziarz stole were were related to this system. They did not respond.

Days after the newspaper made its TIGER inquiry to the bureau, Maziarz said, federal investigators gave him a lie-detector test to see whether he had talked to the media.

Maziarz's claims about profiling have raised concerns among some Islamic, Arab-American and civil-liberty groups. The organizations' leaders said his statements underscore their longtime contention that government agencies are violating Americans' privacy rights with little to no congressional oversight.

The Maziarz case could be "hugely important," said David Blair-Loy, legal director for the American Civil Liberties Union of San Diego & Imperial Counties.

In July, the ACLU filed Freedom of Information Act requests with the Defense Department, the FBI, the Naval Criminal Investigative Service, the National Security Agency and the U.S. Northern Command to flesh out its understanding of the government's domestic surveillance activities.

"What was in these documents (that Maziarz took) is precisely the question we have been asking. What has the government been doing and who authorized it?" Blair-Loy said.

On the criminal-justice front, the document-theft case involving Maziarz has moved slowly and unexpectedly.

On July 18, the Marine Corps brought charges against Gunnery Sgt. Eric Froboese and Master Sgt. Reinaldo Pagan in connection with it. Pagan is accused of dereliction of duty and violation of orders. Froboese is facing charges of dereliction of duty, orders violations, conspiracy and wrongful transmission of classified information.

Before they were charged, neither of the enlisted Marines had been mentioned in court records related to the Maziarz trial. Maziarz said he is angry that no Marine officer has faced the same legal scrutiny.

"I don't think the government is interested in really finding out the truth . . . because the implications are too vast and involve too many senior people for them to really pursue it," he said.

More than 30 interviews with FBI and naval investigators, spanning hundreds of hours over the past two years, have convinced Maziarz that prosecutors plan to pin the national-security breach on those considered least culpable and most vulnerable: the enlisted men.

"If Pagan is getting charged with dereliction of duty, then why not General Conway?" Maziarz said.

He was referring to Gen. James Conway, the commandant of the Marine Corps. Conway served as commanding general of the Camp Pendleton-based 1st Marine Expeditionary Force when Maziarz worked in the intelligence unit and Richards ran it.

A statement from Conway's office said in part: "Generally speaking, a subordinate who is accused of violating a commander's orders . . . and has done so without the knowledge or consent of that commander is

not really in a position to place any portion of the blame for their own actions upon the commander."

Federal agents have warned Maziarz that he could be put back behind bars if he violates his plea agreement. While he is cautious, Maziarz said his intention is to set the record straight.

"I have a pretty good memory," Maziarz said, "and that's what bothers a lot of people."

Rick Rogers: (760) 476-8212; rick.rogers@uniontrib.com

The New York Times
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

October 31, 2008

# Inquiry Targeted 2,000 Foreign Muslims in 2004

By ERIC LICHTBLAU

WASHINGTON — An operation in 2004 meant to disrupt potential terrorist plots before and after that year's presidential election focused on more than 2,000 immigrants from predominantly Muslim countries, but most were found to have done nothing wrong, according to newly disclosed government data.

The program, conducted by the Department of Homeland Security, received little public attention at the time. But details about the targets of the investigation have emerged from more than 10,000 pages of internal records obtained through a lawsuit by civil rights advocates. Parts of the documents were provided to The New York Times.

The documents show that more than 2,500 foreigners in the United States were sought as "priority leads" in the fall of 2004 because of suspicions that they could present threats to national security in the months before the presidential election and the inauguration. Some of those foreigners were detained and ultimately deported because they had overstayed their visas, but many were in this country legally, and the vast majority were not charged.

The internal reports show that immigration agents questioned the foreigners about what they thought of America, whether violence was preached at their mosques, and whether they had access to biological or chemical weapons. A sampling of 300 cases turned over by federal officials showed that none of those interrogated were charged with national security offenses. Fewer than one in five were charged, most of them with immigration violations.

A spokesman for Immigration and Customs Enforcement, Richard Rocha, would say only, "Due to ongoing litigation, ICE is not at liberty to provide any comment."

Officials said they were not aware of any similar programs now under way.

At the time of the 2004 operation, the immigration agency said publicly that it was tracking leads in an effort to disrupt potential terrorism plots, but emphasized that its investigations were being conducted "without regard to race, ethnicity or religion."

But the records showed that 79 percent of the suspects were from Muslim-majority countries, according to an analysis by students at the National Litigation Project at Yale Law School, who obtained the records, as did the American-Arab Anti-Discrimination Committee. Each group sued for the records under the Freedom of Information Act, and both say the operation showed that the government was using ethnic profiling to identify terrorism suspects.

"This was profiling," said Michael Wishnie, a professor at Yale Law School who helped lead the research effort. He added that the findings raised questions about both the effectiveness and the propriety of the program.

Exhibit E-2
227

11/18/2008 8:11 PM

"The resources devoted to this were enormous," he said, "but the results clearly were not."

The issue of ethnic profiling in counterterrorism programs has taken on added significance because of new Justice Department guidelines that go into effect Dec. 1 and give investigators even broader authority to open terrorism investigations without evidence of wrongdoing. The American Civil Liberties Union and other rights groups argue that the new guidelines will allow federal investigators to make targets of Muslims, Middle Easterners and others without evidence of links to terrorist groups.

After the attacks of Sept. 11, 2001, the administration began a series of efforts that strained relations with Muslims and Arab-Americans in particular. The detention of more than 700 illegal immigrants as terrorism suspects — often for months at a time without lawyers — generated a blistering report from the Justice Department on the "unduly harsh" treatment of the prisoners. Follow-up efforts in 2002 and 2003 led to the questioning of thousands of Muslims and Middle Easterners as well as measures requiring that immigrants from some countries register their presence with federal authorities.

The investigations conducted in the fall of 2004 were part of what federal authorities called Operation Front Line. It was unusual in that it relied on intelligence data from across the government to identify "priority leads" and then conduct interrogations in October 2004, just before Election Day.

One foreigner, in the country on a student visa, was asked his "opinion of America," according to internal investigative reports. He responded that he was "living the American dream and cared greatly for the equal opportunities, rights and values that are afforded in America." Another person, from South Asia, was asked about a mosque he attended and told an agent that "the mosque did not espouse any radical or fundamental form of Islam or denounce the United States in any way." A third visa holder was asked if he owned any chemical or biological explosives. He said he did not.

The Homeland Security Department announced several hundred arrests at the time, mostly of visitors whose visas had expired, but the records obtained in the lawsuit show that the scope of the operation reached much further. More than 2,500 people were interrogated, with more than 500 arrests for immigration violations like overstaying visas.

A former immigration official, who spoke on the condition of anonymity because aspects of the program remain classified, said the operation analyzed data, gathered by the Central Intelligence Agency and other agencies, to identify people who might pose particular threats to national security. "I think the intelligence we were getting was bona fide and mineable, and we were doing the best we could to follow it up," the former official said.

Kareem Shora, national executive director of the American-Arab Anti-Discrimination Committee, said he considered the findings a "slap in the face" because they contradicted the claims of American officials.

"It is very disappointing to see that despite all the reassurances that they were not profiling people, this comes out," Mr. Shora said. With nearly 80 percent of the targets in the 2004 operation coming from Muslim nations, he asked, "how can you tell us you're not focusing on people from these countries?"

*Julia Preston contributed reporting from New York.*

Copyright 2008 The New York Times Company

Exhibit E-2
228

Inquiry Targeted 2,000 Foreign Muslims in 2004 - NYTimes.com          http://www.nytimes.com/2008/10/31/us/31inquire.html?_r=1&page...

Privacy Policy | Search | Corrections | **RSS** | First Look | Help | Contact Us | Work for Us | Site Map

Exhibit E-2
229

11/18/2008 8:11 PM

# Weekly.com

## News

### The Usual Suspects

How innocent Muslims got caught in George Bush's dragnet, and how Yale students exposed it as a sham

By Andy Bromage                                                                Thursday, November 20, 2008

Federal agents summoned Rashid to the nearest federal building one day. They wanted to talk about his status as a U.S. immigrant. Rashid went to the office, sat down and answered their questions. Pretty soon, the topic turned to terrorism.

Do you own guns, explosives or chemical components, the agents asked? Do you know anyone who does? Have you had any military or weapons training? Do you know anyone who's taken flight lessons? Or anyone who's laundering money or financed terrorism?

Rashid (not his real name) was taken aback. A twentysomething Pakistani immigrant and recent graduate of a prestigious American university, he told the agents he didn't know anything of the sort.

"They were polite. They weren't belligerent," Rashid says in a phone interview. "I didn't feel uncomfortable. I just thought they were odd questions. I assumed that since I was from Pakistan, that's why they were talking to me."

After 30 minutes, Rashid was free to go. Days later Rashid secured a six-year work visa. That's the last he thought about the short interview. Until now.



*Kathleen Cei photo*

Yale law students Sameer Ahmed and Bram Elias helped expose a secret Bush administration counterterrorism program as a massive fishing expedition predicated on racial profiling

As the Bush administration prepares to make its disgraced exit from Washington, new information has come to light about a secret national security program launched in the waning days of the 2004 presidential election that targeted thousands of innocent Muslim immigrants as suspected terrorists.

Operation Front Line's stated goal was to disrupt terrorist cells that might be planning an attack during the campaign or on inauguration day.

But government documents recently obtained by a team of Yale Law School students and faculty expose Operation Front Line as a massive fishing expedition that hinged on racial profiling.

Of the 300 case files supplied to Yale, not a single immigrant was charged with a terror-related crime. Nearly all the immigrants questioned came from Muslim-majority countries. Many weren't even in violation of their visas.

The Yale team says the evidence shows the feds "conflate 'Muslim background' with 'terrorist.'" The American Civil Liberties Union brands it "unconstitutional and discriminatory." The American-Arab Anti-Discrimination Committee calls it blatant racial and religious profiling that had "nothing to do with protecting the election process or anything relating to terrorism."

The Bush administration, meanwhile, has yet to say a word about it.

In a windowless basement room in Yale Law School's Ruttenberg Hall, law students Sameer Ahmed and Bram Elias recently told me how they and nine colleagues unraveled a Bush administration secret.

"We were reviewing documents in another case — we're not allowed to speak about the case — and the words Operation Front Line came up," says Ahmed.

So Yale Law School's National Litigation Project, a human rights advocacy clinic, filed a freedom of information request, and later a federal lawsuit, seeking records on the operation from U.S. Immigration and Customs Enforcement (ICE), its umbrella agency the U.S. Department of Homeland Security and a half dozen other agencies.

That launched a two-year legal battle during which the feds continually stonewalled the Yale lawyers, blowing off laws requiring an answer within 20 days, or saying they couldn't supply information for national security reasons.

The Yale lawyers didn't buy it and kept fighting for the records' release. Homeland Security finally relented in September of this year, reaching a partial settlement with Yale that supplied them with thousands of pages of heavily redacted case files and internal memos the feds previously claimed couldn't possibly be shared.

Exhibit E-2
230

The Yale team soon discovered what they suspect is the reason for the secrecy. ICE supplied them with 300 individual case files, selected at random from ICE offices all over the country. Separately, they supplied every case file from the Hartford office, about 25.

What they found was that Operation Front Line, conducted in two phases from May 2004 through February 2005, was a total bust. The sweeping immigration enforcement campaign involved 504 people and was justified on national security grounds, but didn't result in a single terror-related arrest. The worst crimes in the Yale files were identity theft and credit card forgery.

"What a huge waste of government resources," says Ahmed, "They were talking to people who are doctors and students and engineers, who come from Muslim backgrounds, and asking them the most widespread questions just to try to find something."

The information supplied by ICE shows a disturbing trend of what could only be read as ethnic profiling. Of the 300 immigrants, 79 percent were from Muslim-majority countries such as Pakistan, Iran and Somalia. Immigrants from Muslim-majority countries account for just one percent of the undocumented population in the U.S., meaning they were 1,280 times more likely to be targeted by Operation Front Line than non-Muslim counterparts.

Only 18 percent of the operation's targets were charged with any immigration violation at all; the most common, an overstayed visa. Three-quarters of them were men.

"The numbers speak for themselves," says Kareem Shora, national executive director of the American-Arab Anti-Discrimination Committee. "If you talk about a population that makes up less than 1 percent of the undocumented in the U.S., I would certainly call it profiling."

Rashid certainly felt profiled, even if he wasn't expressly intimidated.

Rashid was surprised to learn he'd been caught in a national security dragnet without knowing it. When I read him the details of his interview from an ICE incident report, Rashid was more unnerved about such information becoming public than about being pegged by ICE as a possible terrorist.

"This is not something I would want in the papers," he says.

Rashid agreed to speak about his experience as an Operation Front Line target on the condition that no revealing information would be published. What we can tell you is this: Rashid was born in Pakistan and moved to the U.S. to attend an elite university. After 9/11, Rashid and hundreds of thousands like him, men from the Muslim-majority countries that spawned the hijackers, were forced to register in a massive national database called NSEERS, the National Security Entry-Exit Registration System.

"Everyone had to do it," Rashid says. "Officially, they had a list of countries and people from those countries had to go and report."

Rashid gave fingerprints and personal information for NSEERS, so when agents questioned him for Operation Front Line, Rashid says it "seemed normal."

The agents asked him about weapons and whether he attended a mosque with radical ideologies. They asked what he knew about laundering money. Nothing, Rashid told them, adding that government crack-downs on money laundering have made it hard to send and receive money even for legitimate purposes, like when his parents send money for school.

Upon graduating Rashid secured a job and a work visa that lets him remain in the U.S. Rashid plays golf in his free time and likes the rock band Queen. His life, he says, is as normal as anyone he knows. How he got singled out as a possible terrorist, Rashid says, he'll never know.

The ICE reports provided to Yale are full of dead-end cases like Rashid's.

Though redacted with so much black ink they at times resemble Rorschach tests, a close reading of the documents reveals small sketches of lives caught in the crosshairs.

A student pursuing a degree in civil engineering; another attending the University of Hartford. Another report, heavily redacted, describes an immigrant who entered on a student visa and caught ICE's eye in 2002 when he or she opened an account with $100,000 in wired money. The report mentions subsequent transfers for $60,000 and $10,000 but deciphering why or what for is impossible. "All this for a 20 year old in the United States on a student visa," the report reads.

Another immigrant, not from Connecticut, told authorities he doesn't know anyone who poses a threat to the U.S. and if he did, he would turn them in. When asked for his opinion of America, the immigrant responded he "cared greatly for the equal opportunities, rights and values that are afforded in America," according to the ICE report.

I'm living the American dream, he said.

The Bush administration hasn't commented publicly on Operation Front Line since the details were made public last month in a *New York Times* article.

Exhibit E-2
231

The only window into their thinking comes from a single press release and internal policy documents obtained by the Yale team in the court settlement.

Perhaps the first mention of Operation Front Line came in a CBS News broadcast on Sept. 17, 2004, describing what the network called "The October Plan," a campaign by ICE and the FBI that was "a massive counter-offensive of interrogations, surveillance and possible detentions" to disrupt a terrorist plot.

A week later, ICE put out a news release that hinted at the scope of Operation Front Line without referring to it by name. The operation would go after immigrant status violators based on "national security criteria" and anyone out of status would be arrested. Importantly, ICE said it was operating "without regard to race, ethnicity or religion."

"ICE is not conducting a 'round-up' or a 'sweep' in any community," the release read, "ICE is not profiling based on race or religious affiliation."

ICE spokesman Richard Rocha says that ICE cannot comment, "due to ongoing litigation."

In a memo dated Sept. 27, 2004, to all ICE field office directors, the operation was again described in terms of counterterrorism. "ICE will conduct a nationwide disruption operation ... intended to detect, deter, and disrupt terrorist operations leading up to the Presidential Election."

In November 2004, ICE announced it had arrested 230 people so far in the disruption campaign. The concentration of Muslim names caught Kareem Shora's attention.

"They gave eight examples of people they had detained, six of which happened to be Arabs or Muslims," says Shora of the American-Arab Anti-Discrimination Committee (ADC).

The ADC filed suit in U.S. District Court in D.C., seeking the nationalities of all those arrested, but lost. When they learned Yale's National Litigation Project was looking for the same thing in federal court in Connecticut, they joined their effort. When Homeland Security finally handed over the files, Shora says his "worst fears" were confirmed.

"This was a slap in the face," Shora says. "What [the Department of Homeland Security] told us four years ago was that they are not profiling people and these numbers came up and they have yet to provide us an explanation. That tells me someone is either lying or being lied to within DHS." Shora says DHS needs to explain why so many Muslims were targeted "or litigation continues to be an option."

Both Shora and the Yale project members say it's unusual for ICE to be so tight-lipped about an operation of this size. And they suggest it's because the operation missed its intended target.

"If they got some high target terrorism threat, John Ashcroft and Alberto Gonzalez would have made this front page news," says Yale's Sameer Ahmed.

Aside from the 230 arrests publicized in November 2004, ICE did highlight two Front Line arrests in a briefing to the congressional Subcommittee on Immigration, Border Security and Claims on Nov. 10, 2004. But again, neither was charged with terror-related crimes.

The suspects' names are blacked out, but the 14-page document obtained by Yale tells us this:

One was arrested on Oct. 27, 2004, near Oklahoma City as a student visa violator. The immigrant was under investigation for trying to pass a stun gun through airport security in Oklahoma City.

The second immigrant was arrested in Miami on Oct. 28, 2004 (four days before election day), for making false statements and was under investigation for an unconfirmed NSEERS violation. The immigrant also flunked a polygraph test about his terrorist affiliations, had phone numbers linked to narcotics and terrorism investigations and possessed in his home "references to critical infrastructure activities (railroad lines)," the ICE briefing stated.

The people at the Yale clinic understand that the government needs to pursue terror investigations, Ahmed says. It's the indiscriminate methods employed under Operation Front Line that concern him.

"You could tell that ICE had no specific leads on any of these individuals, because if they did, the way these summaries would go is, We asked this person about this specific individual, etc.," says Ahmed.

Yale's case against Homeland Security is ongoing, as the sides will now fight over what information is reasonable to redact and what is not. But the biggest get has been gotten.

Hundreds of Muslim immigrants were arrested for what seem like legitimate crimes, like marriage fraud and forgery. But the way they were arrested may prove illegal. Lawyers could use the information gathered to make a compelling case that an immigrant arrested under Operation Front Line was unlawfully arrested because he was ethnically profiled, a denial of due process rights under the Constitution.

Yale's National Litigation Project isn't sure what its next move will be. Neither is ADC.

As for Rashid, he says his life will go on as normal. After the federal agents questioned him about weapons and terrorism, Rashid says he told the story to "almost everyone" he knew. "They just thought it was an interesting story," Rashid says. Imagine what they'll think when they hear

Exhibit E-2
232

the rest of the it.

A Profile in Ethnic Profiling: Operation Front Line

- Immigration crack-down launched during 2004 presidential campaign.

- More than 2,500 immigrants questioned about terrorism, including more than 20 in Connecticut.

- Out of 300 case files selected at random by ICE and reviewed by Yale Law School's National Litigation Project, 79 percent were from Muslim-majority countries. (Which accounts for only 1 percent of the total U.S. undocumented population.)

- No arrests for terror-related crimes.

- Only 18 percent of the case files were arrested for immigration violation.

- Crimes charged against immigrants include identity theft and credit card forgery.

© 2008 Fairfield County Weekly

Exhibit E-2
233

# EXHIBIT F

  

May 28, 2008

Hon. Patrick J. Leahy, Chairman
Sen. Arlen Specter, Ranking Member
Committee on the Judiciary
United States Senate
224 Dirksen Senate Office Building
Washington, DC 20510

Hon. John Conyers, Jr., Chairman
Hon. Lamar Smith, Ranking Member
Committee on the Judiciary
United States House of Representatives
2138 Rayburn House Office Building
Washington, DC 20515

Hon. Henry A. Waxman, Chairman
Hon. Thomas Davis, Ranking Member
Committee on Oversight and Government Reform
United States House of Representatives
2157 Rayburn House Office Building
Washington, D.C. 20515

Honorable Chairmen and Ranking Members:

On May 22, 2008, the San Diego Union-Tribune reported on a major security breach at the Strategic Technical Operations Center at Camp Pendleton, in which staff at the Center — including its chief — operated a ring that, for years, stole surveillance files to give to local law enforcement and perhaps to private defense contractors for financial gain.[1]

Based on transcripts of court martial proceedings and reports from the FBI, the Union-Tribune indicates that "a massive number of files were taken from Camp Pendleton, including those . . . [classified] Top Secret, Special Compartmentalized information." The report also revealed previously unconfirmed programs of surveillance of mosques in San Diego and Los Angeles. Some of the stolen records concern a San Diego mosque, the Islamic Center of San Diego, that was "monitored by a federal surveillance program targeting Muslim groups." According to previous articles, members of the theft ring

---

[1] *See* Rick Rogers, *Records Detail Security Failure in Base File Theft*, SAN DIEGO UNION-TRIBUNE (May 22, 2008), *available at* http://www.signonsandiego.com/news/military/20080522-9999-1n22theft.html.

Exhibit F-1
234

May 28, 2008
Page 2

included officers with both the Los Angeles County Sheriff's Department and the Los Angeles Police Department.[2]

The revelations in these articles not only demonstrate the perils of mass data-collection programs, but raise immediate concerns for the hundreds of thousands of members of the Southern California Muslim community, including the following:

- Whether and to what extent is surveillance being conducted and information compiled on law-abiding Muslim residents and citizens of Southern California, based solely on their choice of religion?  Who authorized this surveillance of Southern California Muslim community and why?

- To what extent has information on residents' lawful activities or unverified suspicions about residents been collected without any indication of criminal activity, in violation of federal law, and unlawfully shared between government agencies or with private contractors? How is such unlawfully obtained surveillance being used in ways that affect law-abiding residents and citizens?

- To what extent has local law enforcement engaged in unlawful surveillance or unlawfully obtained access to classified files held by the United States?

- What risks do mass-surveillance programs pose to citizens, and what procedures and protections can be implemented to prevent future security breaches like those at Camp Pendleton from undermining national security and threatening the safety of residents and citizens unlawfully monitored?

- Whether and to what extent have United States military forces participated in domestic surveillance operations in violation of the Posse Comitatus Act, 18 U.S.C. §1385?

We call on your committees to answer these questions by holding public hearings on the San Diego security breach.

The fight against terrorism will have failed at its outset if we sacrifice the essential freedoms, such as religious liberty and limits on government intrusion, on which our nation was founded.  The United States is home to 7 to 10 million American Muslims who are law-abiding citizens and who daily contribute to our country's progress. Holding the entire American Muslim community suspect not only threatens civil liberties and raises the specter of unconstitutional religious profiling, but undermines public safety by eroding that community's trust in law enforcement.  The San Diego breach revealed not

---

[2] *See* Rick Rogers, *Marine Took Files as Part of Spy Ring*, SAN DIEGO UNION-TRIBUNE (Oct. 6, 2007), *available at* http://www.signonsandiego.com/news/military/20071006-9999-1n6spies.html; Richard Winton, Tony Perry, and Andrew Blankstein, *Inquiry Opens Into Passing of Secret Files*, LOS ANGELES TIMES (Oct. 12, 2007).

May 28, 2008
Page 3

only flawed security, but unchecked surveillance and monitoring programs that must be subjected to Congressional oversight.

Respectfully,

Hussam Ayloush
Executive Director
Council on American-Islamic Relations,
    Greater Los Angeles Area

Caroline Fredrickson
Director
ACLU Washington Legislative Office

Edgar Hopida
Public Relations Director
Council on American-Islamic Relations,
    San Diego

Ramona Ripston
Executive Director
ACLU of Southern California

Shakeel Syed
Executive Director
Islamic Shura Council of
    Southern California

Kevin Keenan
Executive Director
ACLU of San Diego & Imperial
    Counties

# Los Angeles Times | California | Local

You are here: LAT Home > Articles > 2008 > May > 29 > California | Local

Archive for Thursday, May 29, 2008

# New fears in Muslim community follow reports of U.S. monitoring

*The ACLU and Islamic groups are seeking congressional hearings after a news report cites FBI and Defense Department files related to surveillance of centers in L.A. and San Diego.*

By H G. Reza
May 29, 2008 *in print edition B-3*

A report that mosques in Los Angeles and San Diego are under federal surveillance has resurrected fears in the Muslim community about government monitoring and led two civil rights groups Wednesday to call for congressional hearings.

The request for public hearings followed a newspaper article last week that cited FBI and Defense Department files pertaining to surveillance of mosques and Muslims in Southern California.

Corey Saylor, Washington spokesman for the Council on American-Islamic Relations, said the article in the San Diego Union-Tribune "has again raised concerns that our community is being watched."

"We've heard about this in the past, but this article appears to be the first confirmation that surveillance is taking place," Saylor said. "Has faith moved from a personal choice to probable cause?"

Council chapters in Anaheim and San Diego joined the American Civil Liberties Union and Islamic Shura Council of Southern California in asking the U.S. House and Senate judiciary committees and the House Committee on Oversight and Government Reform for hearings. In a letter to the committee chairmen and ranking minority members, the groups said hearings are needed to determine the extent of the surveillance and whether people are being monitored because they are Muslim.

Information about the alleged spying surfaced in a case about classified files concerning terrorism that the newspaper said were stolen from a secure office used by military and civilian law enforcement officials at Camp Pendleton.

Ed Buice, Naval Criminal Investigative Service spokesman in Washington, said an investigation was underway to determine "whether individuals connected to the military may have been involved in illegal activities."

"I appreciate that the groups asking for congressional hearings want to know more about where all the dots are and how they all connect," Buice said. "But there is still much work to be done in this case, and we cannot discuss the details of the ongoing investigation."

An FBI spokesman in San Diego would not confirm that an investigation was ongoing and said the agency regularly reaches out to Muslims through town meetings.

Exhibit F-2
237

New fears in Muslim community follow reports of U.S. monitoring - Los Angeles Times       Page 2 of 3

The civil rights groups also want the hearings to determine if the U.S. military has engaged in domestic surveillance in violation of federal law. The Islamic Center of San Diego, where two of the 9/11 hijackers worshiped in early 2000, was the only mosque mentioned in the San Diego Union-Tribune article. The report did not specify which other mosques in Los Angeles and San Diego were allegedly under surveillance. But Saylor said it would not be surprising if mosques in Orange County were also monitored.

Since the 2001 terrorist attacks, members of the Islamic Center of Irvine and other local mosques have complained about FBI agents questioning them about imams' sermons and how often they attend services. In 2006, J. Stephen Tidwell, then-FBI assistant director in Los Angeles, met at the Irvine mosque with about 200 people who questioned him about government monitoring.

The meeting was prompted by media reports that the FBI was monitoring Muslim students at UC Irvine and USC. Tidwell denied that monitoring was taking place, telling the audience that "we still play by the rules."

Ramona Ripston, executive director of the American Civil Liberties Union of Southern California, said the congressional hearings would compel the government "to say why they're amassing this information." "There's a lot of suspicion of the Muslim community," she said.

ACLU lawyers regularly go to mosques to advise worshipers that they do not have to answer questions from FBI agents about how long they have been in the United States, how often they attend services and what they get out of the sermons, Ripston said.

The newspaper said some missing files were made available to Los Angeles County sheriff's deputies. Larry Richards, a deputy and Marine reservist, is one of several people under investigation by the FBI and the Naval Criminal Investigative Service in the thefts.

Los Angeles County Sheriff's Department spokesman Steve Whitmore said Wednesday that Richards used to work with the Los Angeles Terrorism Early Warning Group but is currently on administrative leave. He declined to comment further because of the ongoing federal investigation.

hgreza@latimes.com

**Related Articles**
- 8 Islamic Suspects in Italy, Germany Are Questioned Jul 04, 2002
- On Behalf of Muslims, ACLU Seeks FBI Surveillance Data May 16, 2006
- Thieves had the brass to take a miner Feb 13, 2008
- Teacher sought in fatal shooting of his spouse Feb 06, 2008
- Body in San Diego is probably that of missing man Jan 30, 2008

**More articles by H G. Reza**

**More articles from the California | Local section**

---

California and the world. Get the Times from $1.35 a week

---

Copyright 2008 Los Angeles Times

Exhibit F-2
238

# EXHIBIT G



URL: http://www.aclu.org/safefree/general/37031prs20081003.html

ACLU Condemns New FBI Guidelines (10/3/2008)

*Guidelines Released Amid Protest from Congress, Privacy Groups and American Public*

FOR IMMEDIATE RELEASE
CONTACT: (202) 675-2312 or media@dcaclu.org
(212) 519-7829 or 549-2666 or media@aclu.org

Washington, DC – New FBI guidelines governing investigations were released today after being signed by Attorney General Michael Mukasey. The American Civil Liberties Union quickly blasted the Department of Justice and FBI for ignoring calls for more stringent protections of Americans' rights. The guidelines replace existing bureau guidelines for five types of investigations: general criminal, national security, foreign intelligence, civil disorders and demonstrations. The ACLU has been vocal in its disapproval of the overly broad guidelines, citing both the FBI's and DOJ's documented records of internal abuse.

The new guidelines reduce standards for beginning "assessments" (precursors to investigations), conducting surveillance and gathering evidence, meaning the threshold to beginning investigations across the board will be lowered. More troubling still, the guidelines allow a person's race or ethnic background to be used as a factor in opening an investigation, a move the ACLU believes may institute racial profiling as a matter of policy.

"The attorney general today gave the FBI a blank check to open investigations of innocent Americans based on no meaningful suspicion of wrongdoing," said Anthony D. Romero, Executive Director of the ACLU. "The new guidelines provide no safeguards against the FBI's improperly using race and religion as grounds for suspicion. They also fail to sufficiently prevent the government from infiltrating groups whose viewpoints it doesn't like. The FBI has shown time and time again that is incapable of policing itself and there is good reason to believe that these guidelines will lead to more abuse."

The FBI originally adopted internal guidelines in the mid-1970s after investigations showed widespread abuses and violations of constitutional rights by the agency, including the politically-motivated spying on figures like Martin Luther King, Jr. Ironically, these newly revised guidelines could open the bureau up to exactly that kind of abuse once more. Though the DOJ and FBI Director Robert Mueller have consistently claimed that the new guidelines would not give agents new authority, the previous guidelines governed very different types of investigations, and tearing down the walls between them will invariably mean that new powers will be applied where they were not before.

Last month, the ACLU formally requested the DOJ's Office of the Inspector General investigate current abuses of the attorney general guidelines. The investigation should particularly examine the manner in which the FBI uses race, religion, national origin or First Amendment protected activities in determining whether to initiate, expand or continue an investigation.

"Attorney General Mukasey has decided to implement these disastrous guidelines against the protests of members of Congress, privacy groups and the American public," said Caroline Fredrickson, Director of the ACLU Washington Legislative Office. "It is naïve to think these guidelines will not result in abuse. Though the DOJ and FBI claim they are doing what they must to meet the law enforcement needs of the future, they are only doomed to repeat the abuses of the past. Since, under these guidelines, a generalized 'threat' is enough to begin an investigation, the FBI will be given carte blanche to begin surveillance without factual evidence. The standard of suspicion is so low and the predicate for investigations so flimsy that it's inevitable we will all become suspects."

© ACLU, 125 Broad Street, 18th Floor New York, NY 10004
This is the Web siteof the American Civil Liberties Union and the
ACLU Foundation.
Learn more about the distinction between these two components of
the ACLU.

User Agreement | Privacy Statement | FAQs | Site Map

Exhibit G-1
239

New Guidelines Would Give F.B.I. Broader Powers - NYTimes.com                    Page 1 of 2

**The New York Times**
nytimes.com



August 21, 2008

# New Guidelines Would Give F.B.I. Broader Powers

### By ERIC LICHTBLAU

WASHINGTON — A Justice Department plan would loosen restrictions on the Federal Bureau of Investigation to allow agents to open a national security or criminal investigation against someone without any clear basis for suspicion, Democratic lawmakers briefed on the details said Wednesday.

The plan, which could be made public next month, has already generated intense interest and speculation. Little is known about its precise language, but civil liberties advocates say they fear it could give the government even broader license to open terrorism investigations.

Congressional staff members got a glimpse of some of the details in closed briefings this month, and four Democratic senators told Attorney General Michael B. Mukasey in a letter on Wednesday that they were troubled by what they heard.

The senators said the new guidelines would allow the F.B.I. to open an investigation of an American, conduct surveillance, pry into private records and take other investigative steps "without any basis for suspicion." The plan "might permit an innocent American to be subjected to such intrusive surveillance based in part on race, ethnicity, national origin, religion, or on protected First Amendment activities," the letter said. It was signed by Russ Feingold of Wisconsin, Richard J. Durbin of Illinois, Edward M. Kennedy of Massachusetts and Sheldon Whitehouse of Rhode Island.

As the end of the Bush administration nears, the White House has been seeking to formalize in law and regulation some of the aggressive counterterrorism steps it has already taken in practice since the Sept. 11 attacks.

Congress overhauled the federal wiretapping law in July, for instance, and President Bush issued an executive order this month ratifying new roles for intelligence agencies. Other pending changes would also authorize greater sharing of intelligence information with the local police, a major push in the last seven years.

The Justice Department is already expecting criticism over the F.B.I. guidelines. In an effort to pre-empt critics, Mr. Mukasey gave a speech last week in Portland, Ore., describing the unfinished plan as an effort to "integrate more completely and harmonize the standards that apply to the F.B.I.'s activities." Differing standards, he said, have caused confusion for field agents.

Mr. Mukasey emphasized that the F.B.I. would still need a "valid purpose" for an investigation, and that it could not be "simply based on somebody's race, religion, or exercise of First Amendment rights."

Rather than expanding government power, he said, "this document clarifies the rules by which the F.B.I.

Exhibit G-2
240

New Guidelines Would Give F.B.I. Broader Powers - NYTimes.com                    Page 2 of 2

conducts its intelligence mission."

In 2002, John Ashcroft, then the attorney general, allowed F.B.I. agents to visit public sites like mosques or monitor Web sites in the course of national security investigations. The next year, Mr. Bush issued guidelines allowing officials to use ethnicity or race in "narrow" circumstances to detect a terrorist threat.

The Democratic senators said the draft plan appeared to allow the F.B.I. to go even further in collecting information on Americans connected to "foreign intelligence" without any factual predicate. They also said there appeared to be few constraints on how the information would be shared with other agencies.

Michael German, a lawyer with the American Civil Liberties Union and a former F.B.I. agent, said the plan appeared to open the door still further to the use of data-mining profiles in tracking terrorism.

"This seems to be based on the idea that the government can take a bunch of data and create a profile that can be used to identify future bad guys," he said. "But that has not been demonstrated to be true anywhere else."

The Justice Department said Wednesday that in light of requests from members of Congress for more information, Mr. Mukasey would agree not to sign the new guidelines before a Sept. 17 Congressional hearing.

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

Exhibit G-2
241

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

October 4, 2008

# Justice Dept. Completes Revision of F.B.I. Guidelines for Terrorism Investigations

By ERIC LICHTBLAU

WASHINGTON — The Justice Department finalized on Friday an overhaul of rules that will give the Federal Bureau of Investigation freer rein to begin investigations into the possibility of terrorism, even without evidence of wrongdoing.

Attorney General Michael B. Mukasey approved the new guidelines after a review of several months that sought to consolidate different and sometimes conflicting standards within the F.B.I. that govern when agents can use informants, do undercover surveillance, interview witnesses or use other investigative techniques.

Mr. Mukasey and Robert S. Mueller III, director of the F.B.I., said the new guidelines, which will take effect Dec. 1, "provide the F.B.I. with the authority and flexibility it needs to protect the nation from terrorist threats."

The new guidelines, reflecting the evolution of the F.B.I. in the seven years since the Sept. 11 attacks, state that "the F.B.I. is an intelligence agency as well as a law enforcement agency." They are also one of the final steps by the Bush administration to extend its far-reaching counterterrorism policies into the next administration and beyond.

Earlier drafts of the guidelines met with strong criticism from civil liberties groups concerned about the prospect for abuse. This led the Justice Department in its final report to include what it called significant new restrictions on the tactics that agents can use in handling large-scale demonstrations and civil disturbances that could require federal intervention. Instead of broad approval to use any technique considered lawful in such demonstrations and disturbances, the final guidelines spell out the allowed tactics and limit such investigations to 30 days.

But civil rights leaders said they remained opposed to the new rules, saying they would give the F.B.I. greater latitude to use racial, ethnic and religious criteria in terrorism investigations.

"The attorney general today gave the F.B.I. a blank check to open investigations of innocent Americans based on no meaningful suspicion of wrongdoing," said Anthony D. Romero, executive director of the American Civil Liberties Union, which shared its concerns with Justice Department officials as the guidelines were being drafted.

Among the most controversial aspects of the guidelines is a section that allows F.B.I. agents to open so-called threat assessments to look into general patterns or suspicions about terrorist activity without any specific

Exhibit G-2
242

evidence of wrongdoing. Justice Department officials say this section of the guidelines, which remains virtually unchanged from earlier drafts, will allow agents to be more aggressive in identifying possible terrorist threats.

Copyright 2008 The New York Times Company

Exhibit G-2
243

# EXHIBIT H

# THE ATTORNEY GENERAL'S GUIDELINES ON GENERAL CRIMES, RACKETEERING ENTERPRISE AND TERRORISM ENTERPRISE INVESTIGATIONS

## PREAMBLE

As the primary criminal investigative agency in the federal government, the Federal Bureau of Investigation (FBI) has the authority and responsibility to investigate all criminal violations of federal law that are not exclusively assigned to another federal agency. The FBI thus plays a central role in the enforcement of federal laws and in the proper administration of justice in the United States. In discharging this function, the highest priority is to protect the security of the nation and the safety of the American people against the depredations of terrorists and foreign aggressors.

Investigations by the FBI are premised upon the fundamental duty of government to protect the public against general crimes, against organized criminal activity, and against those who would threaten the fabric of our society through terrorism or mass destruction. That duty must be performed with care to protect individual rights and to insure that investigations are confined to matters of legitimate law enforcement interest. The purpose of these Guidelines, therefore, is to establish a consistent policy in such matters. The Guidelines will enable Agents of the FBI to perform their duties with greater certainty, confidence and effectiveness, and will provide the American people with a firm assurance that the FBI is acting properly under the law.

These Guidelines provide guidance for general crimes and criminal intelligence investigations by the FBI. The standards and requirements set forth herein govern the circumstances under which such investigations may be begun, and the permissible scope, duration, subject matters, and objectives of these investigations. They do not limit activities carried out under other Attorney General guidelines addressing such matters as investigations and information collection relating to international terrorism, foreign counterintelligence, or foreign intelligence.

The Introduction that follows explains the background of the reissuance of these Guidelines, their general approach and structure, and their specific application in furtherance of the FBI's central mission to protect the United States and its people from acts of terrorism. Part I sets forth general principles that apply to all investigations conducted under these Guidelines. Part II governs investigations undertaken to prevent, solve or prosecute specific violations of federal law. Subpart A of Part III governs criminal intelligence investigations undertaken to obtain information concerning enterprises which are engaged in racketeering activities. Subpart B of Part III governs criminal intelligence investigations undertaken to obtain information concerning enterprises which seek to further political or social goals through violence or which otherwise aim to engage in terrorism or the commission of terrorism-related crimes. Parts IV through VII discuss authorized investigative techniques, dissemination and maintenance of information, counterterrorism activities and other authorized law enforcement activities, and miscellaneous matters.

These Guidelines are issued under the authority of the Attorney General as provided in sections 509, 510, 533, and 534 of title 28, United States Code.

Exhibit H
245

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    CHECKING OF LEADS AND PRELIMINARY INQUIRIES . . . . . . . . . . 1

    B.    FULL INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    AUTHORIZED INVESTIGATIVE TECHNIQUES . . . . . . . . . . . . . . . . . . 6

    D.    OTHER AUTHORIZED ACTIVITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    GENERAL PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    GENERAL CRIMES INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    PRELIMINARY INQUIRIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    CRIMINAL INTELLIGENCE INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . 12

    A.    RACKETEERING ENTERPRISE INVESTIGATIONS . . . . . . . . . . . . . . 13

        1.    Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    General Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.    Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        4.    Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        5.    Authorization and Renewal . . . . . . . . . . . . . . . . . . . . . 14

    B.    TERRORISM ENTERPRISE INVESTIGATIONS . . . . . . . . . . . . . . . . . 15

        1.    General Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.    Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.    Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

    4.    Authorization and Renewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.    <u>INVESTIGATIVE TECHNIQUES</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.    <u>DISSEMINATION AND MAINTENANCE OF INFORMATION</u> . . . . . . . . . . . . 20

VI.    <u>COUNTERTERRORISM ACTIVITIES AND OTHER AUTHORIZATIONS</u> . . . 21

    A.    **COUNTERTERRORISM ACTIVITIES** . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    Information Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.    Visiting Public Places and Events . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.    **OTHER AUTHORIZATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.    General Topical Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.    Use of Online Resources Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        3.    Reports and Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        4.    Cooperation with Secret Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.    **PROTECTION OF PRIVACY AND OTHER LIMITATIONS** . . . . . . . . . 23

        1.    General Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    Maintenance of Records Under the Privacy Act . . . . . . . . . . . . . . . . . . 23

        3.    Construction of Part . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII.    <u>RESERVATION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii

## INTRODUCTION

Following the September 11, 2001, terrorist attack on the United States, the Department of Justice carried out a general review of existing guidelines and procedures relating to national security and criminal matters. The reissuance of these Guidelines reflects the result of that review.

These Guidelines follow previous guidelines in their classification of levels of investigative activity, in their classification of types of investigations, in their standards for initiating investigative activity, and in their identification of permitted investigative techniques. There are, however, a number of changes designed to enhance the general effectiveness of criminal investigation, to bring the Guidelines into conformity with recent changes in the law, and to facilitate the FBI's central mission of preventing the commission of terrorist acts against the United States and its people.

In their general structure, these Guidelines provide graduated levels of investigative activity, allowing the FBI the necessary flexibility to act well in advance of the commission of planned terrorist acts or other federal crimes. The three levels of investigative activity are: (1) the prompt and extremely limited checking of initial leads, (2) preliminary inquiries, and (3) full investigations. Subject to these Guidelines and other guidelines and policies noted in Part IV below, any lawful investigative technique may be used in full investigations, and with some exceptions, in preliminary inquiries.

## A.    CHECKING OF LEADS AND PRELIMINARY INQUIRIES

The lowest level of investigative activity is the "prompt and extremely limited checking out of initial leads," which should be undertaken whenever information is received of such a nature that some follow-up as to the possibility of criminal activity is warranted. This limited activity should be conducted with an eye toward promptly determining whether further investigation (either a preliminary inquiry or a full investigation) should be conducted.

The next level of investigative activity, a preliminary inquiry, should be undertaken when there is information or an allegation which indicates the possibility of criminal activity and whose responsible handling requires some further scrutiny beyond checking initial leads. This authority allows FBI agents to respond to information that is ambiguous or incomplete. Even where the available information meets only this threshold, the range of available investigative techniques is broad. These Guidelines categorically prohibit only mail opening and nonconsensual electronic surveillance at this stage. Other methods, including the development of sources and informants and undercover activities and operations, are permitted in preliminary inquiries. The tools available to develop information sufficient for the commencement of a full investigation, or determining that one is not merited -- the purpose of a preliminary inquiry -- should be fully employed, consistent with these Guidelines, with a view toward preventing terrorist activities.

Whether it is appropriate to open a preliminary inquiry immediately, or instead to engage first in a limited checking out of leads, depends on the circumstances presented. If, for example, an agent receives an allegation that an individual or group has advocated the commission of criminal violence, and no other facts are available, an appropriate first step would be checking out of leads to determine whether the individual, group, or members of the audience have the apparent ability or intent to carry out the advocated crime. A similar response would be appropriate on the basis of non-verbal conduct of an ambiguous character – for example, where a report is received that an individual has accumulated explosives that could be used either in a legitimate business or to commit a terrorist act. Where the limited checking out of leads discloses a possibility or reasonable indication of criminal activity, a preliminary inquiry or full investigation may then be initiated. However, if the available information shows at the outset that the threshold standard for a preliminary inquiry or full investigation is satisfied, then the appropriate investigative activity may be initiated immediately, without progressing through more limited investigative stages.

The application of these Guidelines' standards for inquiries merits special attention in cases that involve efforts by individuals or groups to obtain, for no apparent reason, biological, chemical, radiological, or nuclear materials whose use or possession is constrained by such statutes as 18 U.S.C. 175, 229, or 831. For example, FBI agents are not required to possess information relating to an individual's intended criminal use of dangerous biological agents or toxins prior to initiating investigative activity. On the contrary, if an individual or group has attempted to obtain such materials, or has indicated a desire to acquire them, and the reason is not apparent, investigative action, such as conducting a checking out of leads or initiating a preliminary inquiry, may be appropriate to determine whether there is a legitimate purpose for the possession of the materials by the individual or group. Likewise, where individuals or groups engage in efforts to acquire or show an interest in acquiring, without apparent reason, toxic chemicals or their precursors or radiological or nuclear materials, investigative action to determine whether there is a legitimate purpose may be justified.

## B.     FULL INVESTIGATIONS

These Guidelines provide for two types of full investigations: general crimes investigations (Part II below) and criminal intelligence investigations (Part III below). The choice of the type of investigation depends on the information and the investigative focus. A general crimes investigation may be initiated where facts or circumstances reasonably indicate that a federal crime has been, is being, or will be committed. Preventing future criminal activity, as well as solving and prosecuting crimes that have already occurred, is an explicitly authorized objective of general crimes investigations. The "reasonable indication" threshold for undertaking such an investigation is substantially lower than probable cause. In addition, preparation to commit a criminal act can itself be a current criminal violation under the conspiracy or attempt provisions of federal criminal law or other provisions defining preparatory crimes, such as 18 U.S.C. 373 (solicitation of a crime of violence) or 18 U.S.C. 2339A (including provision of material support in preparation for a terrorist crime). Under these

Exhibit H
249

Guidelines, a general crimes investigation is warranted where there is not yet a current substantive or preparatory crime, but where facts or circumstances reasonably indicate that such a crime will occur in the future.

The second type of full investigation authorized under these Guidelines is the criminal intelligence investigation. The focus of criminal intelligence investigations is the group or enterprise, rather than just individual participants and specific acts. The immediate purpose of such an investigation is to obtain information concerning the nature and structure of the enterprise – including information relating to the group's membership, finances, geographical dimensions, past and future activities, and goals – with a view toward detecting, preventing, and prosecuting the enterprise's criminal activities. Criminal intelligence investigations, usually of a long-term nature, may provide vital intelligence to help prevent terrorist acts.

Authorized criminal intelligence investigations are of two types: racketeering enterprise investigations (Part III.A) and terrorism enterprise investigations (Part III.B).

A racketeering enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in a pattern of racketeering activity as defined in the Racketeer Influenced and Corrupt Organizations Act (RICO). However, the USA PATRIOT ACT (Public Law 107-56) expanded the predicate acts for RICO to include the crimes most likely to be committed by terrorists and their supporters, as described in 18 U.S.C. 2332b(g)(5)(B). To maintain uniformity in the standards and procedures for criminal intelligence investigations relating to terrorism, investigations premised on racketeering activity involving offenses described in 18 U.S.C. 2332b(g)(5)(B) are subject to the provisions for terrorism enterprise investigations rather than those for racketeering enterprise investigations.

A terrorism enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of: (1) furthering political or social goals wholly or in part through activities that involve force or violence and a federal crime, (2) engaging in terrorism as defined in 18 U.S.C. 2331(1) or (5) that involves a federal crime, or (3) committing any offense described in 18 U.S.C. 2332b(g)(5)(B). As noted above, criminal intelligence investigations premised on a pattern of racketeering activity involving an 18 U.S.C. 2332b(g)(5)(B) offense are also treated as terrorism enterprise investigations.

As with the other types of full investigations authorized by these Guidelines, any lawful investigative technique may be used in terrorism enterprise investigations, including the development of sources and informants and undercover activities and operations. The "reasonable indication" standard for commencing a terrorism enterprise investigation is the same as that for general crimes and racketeering enterprise investigations. As noted above, it is substantially lower than probable cause.

3

In practical terms, the "reasonable indication" standard for opening a criminal intelligence investigation of an enterprise in the terrorism context could be satisfied in a number of ways. In some cases satisfaction of the standard will be apparent on the basis of direct evidence of an enterprise's involvement in or planning for the commission of a federal offense involving the use of force or violence to further political or social goals, terrorism as defined in 18 U.S.C. 2331(1) or (5), or a crime described in 18 U.S.C. 2332b(g)(5)(B). For example, direct information may be available about statements made in furtherance of an enterprise's objectives which show a purpose of committing such crimes or securing their commission by others.

In other cases, the nature of the conduct engaged in by an enterprise will justify an inference that the standard is satisfied, even if there are no known statements by participants that advocate or indicate planning for violence or other prohibited acts. For example, such activities as attempting to obtain dangerous biological agents, toxic chemicals, or nuclear materials, or stockpiling explosives or weapons, with no discernible lawful purpose, may be sufficient to reasonably indicate that an enterprise aims to engage in terrorism.

Moreover, a group's activities and the statements of its members may properly be considered in conjunction with each other. A combination of statements and activities may justify a determination that the threshold standard for a terrorism enterprise investigation is satisfied, even if the statements alone or the activities alone would not warrant such a determination.

While no particular factor or combination of factors is required, considerations that will generally be relevant to the determination whether the threshold standard for a terrorism enterprise investigation is satisfied include, as noted, a group's statements, its activities, and the nature of potential federal criminal law violations suggested by its statements or activities. Thus, where there are grounds for inquiry concerning a group, it may be helpful to gather information about these matters, and then to consider whether these factors, either individually or in combination, reasonably indicate that the group is pursuing terrorist activities or objectives as defined in the threshold standard. Findings that would weigh in favor of such a conclusion include, for example, the following:

(1) Threats or advocacy of violence or other covered criminal acts:
Statements are made in relation to or in furtherance of an enterprise's political or social objectives that threaten or advocate the use of force or violence, or statements are made in furtherance of an enterprise that otherwise threaten or advocate criminal conduct within the scope of 18 U.S.C. 2331(1) or (5) or 2332b(g)(5)(B), which may concern such matters as (e.g.):

(i) engaging in attacks involving or threatening massive loss of life or injury, mass destruction, or endangerment of the national security;

4

(ii) killing or injuring federal personnel, destroying federal facilities, or defying lawful federal authority;

(iii) killing, injuring or intimidating individuals because of their status as United States nationals or persons, or because of their national origin, race, color, religion, or sex; or

(iv) depriving individuals of any rights secured by the Constitution or laws of the United States.

(2) Apparent ability or intent to carry out violence or other covered activities:
The enterprise manifests an apparent ability or intent to carry out violence or other activities within the scope of 18 U.S.C. 2331(1) or (5) or 2332b(g)(5)(B), e.g.:

(i) by acquiring, or taking steps towards acquiring, biological agents or toxins, toxic chemicals or their precursors, radiological or nuclear materials, explosives, or other destructive or dangerous materials (or plans or formulas for such materials), or weapons, under circumstances where, by reason of the quantity or character of the items, the lawful purpose of the acquisition is not apparent;

(ii) by the creation, maintenance, or support of an armed paramilitary organization;

(iii) by paramilitary training; or

(iv) by other conduct demonstrating an apparent ability or intent to injure or intimidate individuals, or to interfere with the exercise of their constitutional or statutory rights.

(3) Potential federal crime:
The group's statements or activities suggest potential federal criminal violations that may be relevant in applying the standard for initiating a terrorism enterprise investigation – such as crimes under the provisions of the U.S. Code that set forth specially defined terrorism or support-of-terrorism offenses, or that relate to such matters as aircraft hijacking or destruction, attacks on transportation, communications, or energy facilities or systems, biological or chemical weapons, nuclear or radiological materials, civil rights violations, assassinations or other violence against federal officials or facilities, or explosives (e.g., the offenses listed in 18 U.S.C. 2332b(g)(5)(B) or appearing in such provisions as 18 U.S.C. 111, 115, 231, 241, 245, or 247).

Exhibit H
252

## C.    AUTHORIZED INVESTIGATIVE TECHNIQUES

All lawful investigative techniques may be used in general crimes, racketeering enterprise, and terrorism enterprise investigations. In preliminary inquiries, these Guidelines bar the use of mail openings and nonconsensual electronic surveillance (including all techniques covered by chapter 119 of title 18, United States Code), but do not categorically prohibit the use of any other lawful investigative technique at that stage. As set forth in Part IV below, authorized methods in investigations include, among others, use of confidential informants, undercover activities and operations, nonconsensual electronic surveillance, pen registers and trap and trace devices, accessing stored wire and electronic communications and transactional records, consensual electronic monitoring, and searches and seizures. All requirements for the use of such methods under the Constitution, applicable statutes, and Department regulations or policies must, of course, be observed.

## D.    OTHER AUTHORIZED ACTIVITIES

Current counterterrorism priorities and the advent of the Internet have raised a number of issues which did not exist in any comparable form when the last general revision of these Guidelines was carried out in 1989 – a time long preceding the September 11 attack's disclosure of the full magnitude of the terrorist threat to the United States, and a time in which the Internet was not available in any developed form as a source of information for counterterrorism and other anti-crime purposes. Part VI of these Guidelines is designed to provide clear authorizations and statements of governing principles for a number of important activities that affect these areas. Among other things, Part VI makes it clear that the authorized law enforcement activities of the FBI include: (i) operating and participating in counterterrorism information systems, such as the Foreign Terrorist Tracking Task Force (VI.A(1)); (ii) visiting places and events which are open to the public for the purpose or detecting or preventing terrorist activities (VI.A(2)); (iii) carrying out general topical research, such as searching online under terms like "anthrax" or "smallpox" to obtain publicly available information about agents that may be used in bioterrorism attacks (VI.B(1)); (iv) surfing the Internet as any member of the public might do to identify, _e.g._, public websites, bulletin boards, and chat rooms in which bomb making instructions, child pornography, or stolen credit card information is openly traded or disseminated, and observing information open to public view in such forums to detect terrorist activities and other criminal activities (VI.B(2)); (v) preparing general reports and assessments relating to terrorism or other criminal activities in support of strategic planning and investigative operations (VI.B(3)); and (vi) providing investigative assistance to the Secret Service in support of its protective responsibilities (VI.B(4)).

## I. GENERAL PRINCIPLES

Preliminary inquiries and investigations governed by these Guidelines are conducted for the purpose of preventing, detecting, or prosecuting violations of federal law. The FBI shall

6

fully utilize the methods authorized by these Guidelines to maximize the realization of these
objectives.

The conduct of preliminary inquiries and investigations may present choices between the
use of investigative methods which are more or less intrusive, considering such factors as the
effect on the privacy of individuals and potential damage to reputation. Inquiries and
investigations shall be conducted with as little intrusion as the needs of the situation permit. It is
recognized, however, that the choice of techniques is a matter of judgment. The FBI shall not
hesitate to use any lawful techniques consistent with these Guidelines, even if intrusive, where
the intrusiveness is warranted in light of the seriousness of a crime or the strength of the
information indicating its commission or potential future commission. This point is to be
particularly observed in the investigation of terrorist crimes and in the investigation of
enterprises that engage in terrorism.

All preliminary inquiries shall be conducted pursuant to the General Crimes Guidelines
(i.e., Part II of these Guidelines). There is no separate provision for preliminary inquiries under
the Criminal Intelligence Guidelines (i.e., Part III of these Guidelines) because preliminary
inquiries under Part II may be carried out not only to determine whether the grounds exist to
commence a general crimes investigation under Part II, but alternatively or in addition to
determine whether the grounds exist to commence a racketeering enterprise investigation or
terrorism enterprise investigation under Part III. A preliminary inquiry shall be promptly
terminated when it becomes apparent that a full investigation is not warranted. If, on the basis of
information discovered in the course of a preliminary inquiry, an investigation is warranted, it
may be conducted as a general crimes investigation, or a criminal intelligence investigation, or
both. All such investigations, however, shall be based on a reasonable factual predicate and shall
have a valid law enforcement purpose.

In its efforts to anticipate or prevent crime, the FBI must at times initiate investigations in
advance of criminal conduct. It is important that such investigations not be based solely on
activities protected by the First Amendment or on the lawful exercise of any other rights secured
by the Constitution or laws of the United States. When, however, statements advocate criminal
activity or indicate an apparent intent to engage in crime, particularly crimes of violence, an
investigation under these Guidelines may be warranted unless it is apparent, from the
circumstances or the context in which the statements are made, that there is no prospect of harm.

General crimes investigations and criminal intelligence investigations shall be terminated
when all logical leads have been exhausted and no legitimate law enforcement interest justifies
their continuance.

Nothing in these Guidelines prohibits the FBI from ascertaining the general scope and
nature of criminal activity in a particular location or sector of the economy, or from collecting
and maintaining publicly available information consistent with the Privacy Act.

7

## II. GENERAL CRIMES INVESTIGATIONS

### A.    DEFINITIONS

(1) "Exigent circumstances" are circumstances requiring action before authorization otherwise necessary under these guidelines can reasonably be obtained, in order to protect life or substantial property interests; to apprehend or identify a fleeing offender; to prevent the hiding, destruction or alteration of evidence; or to avoid other serious impairment or hindrance of an investigation.

(2) "Sensitive criminal matter" is any alleged criminal conduct involving corrupt action by a public official or political candidate, the activities of a foreign government, the activities of a religious organization or a primarily political organization or the related activities of any individual prominent in such an organization, or the activities of the news media; and any other matter which in the judgment of a Special Agent in Charge (SAC) should be brought to the attention of the United States Attorney or other appropriate official in the Department of Justice, as well as FBI Headquarters (FBIHQ).

### B.    PRELIMINARY INQUIRIES

(1) On some occasions the FBI may receive information or an allegation not warranting a full investigation – because there is not yet a "reasonable indication" of criminal activities – but whose responsible handling requires some further scrutiny beyond the prompt and extremely limited checking out of initial leads. In such circumstances, though the factual predicate for an investigation has not been met, the FBI may initiate an "inquiry" in response to the allegation or information indicating the possibility of criminal activity.

This authority to conduct inquiries short of a full investigation allows the government to respond in a measured way to ambiguous or incomplete information, with as little intrusion as the needs of the situation permit. This is especially important in such areas as white-collar crime where no complainant is involved or when an allegation or information is received from a source of unknown reliability. Such inquiries are subject to the limitations on duration under paragraph (3) below and are carried out to obtain the information necessary to make an informed judgment as to whether a full investigation is warranted.

A preliminary inquiry is not a required step when facts or circumstances reasonably indicating criminal activity are already available; in such cases, a full investigation can be immediately opened.

(2) The FBI supervisor authorizing an inquiry shall assure that the allegation or other information which warranted the inquiry has been recorded in writing. In sensitive

8

criminal matters, the United States Attorney or an appropriate Department of Justice official shall be notified of the basis for an inquiry as soon as practicable after the opening of the inquiry, and the fact of notification shall be recorded in writing.

(3)  Inquiries shall be completed within 180 days after initiation of the first investigative step.  The date of the first investigative step is not necessarily the same date on which the first incoming information or allegation was received.  An extension of time in an inquiry for succeeding 90-day periods may be granted.  A SAC may grant up to two extensions based on a statement of the reasons why further investigative steps are warranted when there is no "reasonable indication" of criminal activity.  All extensions following the second extension may only be granted by FBI Headquarters upon receipt of a written request and such a statement of reasons.

(4)  The choice of investigative techniques in an inquiry is a matter of judgment, which should take account of: (i) the objectives of the inquiry and available investigative resources, (ii) the intrusiveness of a technique, considering such factors as the effect on the privacy of individuals and potential damage to reputation, (iii) the seriousness of the possible crime, and (iv) the strength of the information indicating its existence or future commission.  Where the conduct of an inquiry presents a choice between the use of more or less intrusive methods, the FBI should consider whether the information could be obtained in a timely and effective way by the less intrusive means.  The FBI should not hesitate to use any lawful techniques consistent with these Guidelines in an inquiry, even if intrusive, where the intrusiveness is warranted in light of the seriousness of the possible crime or the strength of the information indicating its existence or future commission.  This point is to be particularly observed in inquiries relating to possible terrorist activities.

(5)  All lawful investigative techniques may be used in an inquiry except:

(a)    Mail openings; and

(b)    Nonconsensual electronic surveillance or any other investigative technique covered by chapter 119 of title 18, United States Code (18 U.S.C. 2510-2522).

(6)  The following investigative techniques may be used in an inquiry without any prior authorization from a supervisory agent:

(a)    Examination of FBI indices and files;

(b)    Examination of records available to the public and other public sources of information;

9

(c)    Examination of available federal, state, and local government records;

(d)    Interview of the complainant, previously established informants, and other sources of information;

(e)    Interview of the potential subject;

(f)    Interview of persons who should readily be able to corroborate or deny the truth of the allegation, except this does not include pretext interviews or interviews of a potential subject's employer or co-workers unless the interviewee was the complainant; and

(g)    Physical or photographic surveillance of any person.

The use of any other lawful investigative technique that is permitted in an inquiry shall meet the requirements and limitations of Part IV and, except in exigent circumstances, requires prior approval by a supervisory agent.

(7) Where a preliminary inquiry fails to disclose sufficient information to justify an investigation, the FBI shall terminate the inquiry and make a record of the closing. In a sensitive criminal matter, the FBI shall notify the United States Attorney of the closing and record the fact of notification in writing. Information on an inquiry which has been closed shall be available on request to a United States Attorney or his or her designee or an appropriate Department of Justice official.

(8) All requirements regarding inquiries shall apply to reopened inquiries. In sensitive criminal matters, the United States Attorney or the appropriate Department of Justice official shall be notified as soon as practicable after the reopening of an inquiry.

## C.    INVESTIGATIONS

(1) A general crimes investigation may be initiated by the FBI when facts or circumstances reasonably indicate that a federal crime has been, is being, or will be committed. The investigation may be conducted to prevent, solve, or prosecute such criminal activity.

The standard of "reasonable indication" is substantially lower than probable cause. In determining whether there is reasonable indication of a federal criminal violation, a Special Agent may take into account any facts or circumstances that a prudent investigator would consider. However, the standard does require specific facts or circumstances indicating a past, current, or future violation. There must be an objective, factual basis for initiating the investigation; a mere hunch is insufficient.

10

(2)  Where a criminal act may be committed in the future, preparation for that act can be a current criminal violation under the conspiracy or attempt provisions of federal criminal law or other provisions defining preparatory crimes, such as 18 U.S.C. 373 (solicitation of a crime of violence) or 18 U.S.C. 2339A (including provision of material support in preparation for a terrorist crime). The standard for opening an investigation is satisfied where there is not yet a current substantive or preparatory crime, but facts or circumstances reasonably indicate that such a crime will occur in the future.

(3)  The FBI supervisor authorizing an investigation shall assure that the facts or circumstances meeting the standard of reasonable indication have been recorded in writing.

In sensitive criminal matters, as defined in paragraph A(2), the United States Attorney or an appropriate Department of Justice official, as well as FBIHQ, shall be notified in writing of the basis for an investigation as soon as practicable after commencement of the investigation.

(4)  The Special Agent conducting an investigation shall maintain periodic written or oral contact with the appropriate federal prosecutor, as circumstances require and as requested by the prosecutor.

When, during an investigation, a matter appears arguably to warrant prosecution, the Special Agent shall present the relevant facts to the appropriate federal prosecutor. In every sensitive criminal matter, the FBI shall notify the appropriate federal prosecutor of the termination of an investigation within 30 days of such termination. Information on investigations which have been closed shall be available on request to a United States Attorney or his or her designee or an appropriate Department of Justice official.

(5)  When a serious matter investigated by the FBI is referred to state or local authorities for prosecution, the FBI, insofar as resources permit, shall promptly advise the federal prosecutor in writing if the state or local authorities decline prosecution or fail to commence prosecutive action within 120 days. Where an FBI field office cannot provide this follow-up, the SAC shall so advise the federal prosecutor.

(6)  When credible information is received concerning serious criminal activity not within the FBI investigative jurisdiction, the FBI field office shall promptly transmit the information or refer the complainant to the law enforcement agencies having jurisdiction, except where disclosure would jeopardize an ongoing investigation, endanger the safety of an individual, disclose the identity of an informant, interfere with an informant's cooperation, or reveal legally privileged information. If full disclosure is not made for the reasons indicated, then whenever feasible the FBI field office shall make at least limited disclosure to the law enforcement agency having jurisdiction, and full

11

disclosure shall be made as soon as the need for restricting dissemination is no longer present. Where full disclosure is not made to the appropriate law enforcement agencies within 180 days, the FBI field office shall promptly notify FBI Headquarters in writing of the facts and circumstances concerning the criminal activity. The FBI shall make a periodic report to the Deputy Attorney General on such nondisclosure and incomplete disclosures, in a form suitable to protect the identity of informants.

Whenever information is received concerning unauthorized criminal activity by a confidential informant, it shall be handled in accordance with the Attorney General's Guidelines Regarding the Use of Confidential Informants.

(7) All requirements regarding investigations shall apply to reopened investigations. In sensitive criminal matters, the United States Attorney or the appropriate Department of Justice official shall be notified in writing as soon as practicable after the reopening of an investigation.

## III. CRIMINAL INTELLIGENCE INVESTIGATIONS

This section authorizes the FBI to conduct criminal intelligence investigations of certain enterprises. These investigations differ from general crimes investigations, authorized by Section II, in several important respects. As a general rule, an investigation of a completed criminal act is normally confined to determining who committed that act and securing evidence to establish the elements of the particular offense. It is, in this respect, self-defining. An intelligence investigation of an ongoing criminal enterprise must determine the size and composition of the group involved, its geographic dimensions, its past acts and intended criminal goals, and its capacity for harm. While a standard criminal investigation terminates with the decision to prosecute or not to prosecute, the investigation of a criminal enterprise does not necessarily end, even though one or more of the participants may have been prosecuted.

In addition, the organization provides a life and continuity of operation that are not normally found in a regular criminal activity. As a consequence, these investigations may continue for several years. Furthermore, the focus of such investigations "may be less precise than that directed against more conventional types of crime." United States v. United States District Court, 407 U.S. 297, 322 (1972). Unlike the usual criminal case, there may be no completed offense to provide a framework for the investigation. It often requires the fitting together of bits and pieces of information, many meaningless by themselves, to determine whether a pattern of criminal activity exists. For this reason, the investigation is broader and less discriminate than usual, involving "the interrelation of various sources and types of information." Id.

Members of groups or organizations acting in concert to violate the law present a grave threat to society. An investigation of organizational activity, however, may present special problems particularly where it deals with politically motivated acts. There is "often . . . a

12

convergence of First and Fourth Amendment values" in such matters that is "not present in cases of 'ordinary' crime." Id. at 313. Thus special care must be exercised in sorting out protected activities from those which may lead to violence or serious disruption of society. As a consequence, the guidelines establish safeguards for group investigations of special sensitivity, including tighter management controls and higher levels of review.

## A.    RACKETEERING ENTERPRISE INVESTIGATIONS

This section focuses on investigations of organized crime. It is concerned with the investigation of entire enterprises, rather than just individual participants and specific criminal acts, and authorizes investigations to determine the structure and scope of the enterprise as well as the relationship of the members.

### 1.    Definition

Racketeering activity is any offense, including a violation of state law, encompassed by the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961(1).

### 2.    General Authority

a.    A racketeering enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in a pattern of racketeering activity as defined in the RICO statute, 18 U.S.C. 1961(5). However, if the pattern of racketeering activity involves an offense or offenses described in 18 U.S.C. 2332b(g)(5)(B), the investigation shall be deemed a terrorism enterprise investigation and shall be subject to the standards and procedures of Subpart B of this Part in lieu of those set forth in this Subpart. The standard of "reasonable indication" is identical to that governing the initiation of a general crimes investigation under Part II.

b.    Authority to conduct racketeering enterprise investigations is in addition to general crimes investigative authority under Part II, terrorism enterprise investigative authority under Subpart B of this Part, and activities under other Attorney General guidelines addressing such matters as investigations and information collection relating to international terrorism, foreign counterintelligence, or foreign intelligence. Information warranting initiation of a racketeering enterprise investigation may be obtained during the course of a general crimes inquiry or investigation, a terrorism enterprise investigation, or an investigation under other Attorney General guidelines. Conversely, a racketeering enterprise investigation may yield information warranting a general crimes inquiry or

13

investigation, a terrorism enterprise investigation, or an investigation under other Attorney General guidelines.

3.     **Purpose**

The immediate purpose of a racketeering enterprise investigation is to obtain information concerning the nature and structure of the enterprise, as specifically delineated in paragraph (4) below, with a view to the longer range objective of detection, prevention, and prosecution of the criminal activities of the enterprise.

4.     **Scope**

a.     A racketeering enterprise investigation properly initiated under these guidelines may collect such information as:

(i)     the members of the enterprise and other persons likely to be knowingly acting in the furtherance of racketeering activity, provided that the information concerns such persons' activities on behalf of or in furtherance of the enterprise;

(ii)     the finances of the enterprise;

(iii)     the geographical dimensions of the enterprise; and

(iv)     the past and future activities and goals of the enterprise.

b.     In obtaining the foregoing information, any lawful investigative technique may be used, in accordance with the requirements of Part IV.

5.     **Authorization and Renewal**

a.     A racketeering enterprise investigation may be authorized by the Special Agent in Charge, with notification to FBIHQ, upon a written recommendation setting forth the facts and circumstances reasonably indicating that the standard of paragraph (2)(a) is satisfied.

b.     The FBI shall notify the Organized Crime and Racketeering Section of the Criminal Division and any affected United States Attorney's office of the opening of a racketeering enterprise investigation.  On receipt of such notice, the Organized Crime and Racketeering Section shall immediately notify the Attorney General and the Deputy Attorney General.  In all racketeering enterprise investigations,  the Chief of the Organized Crime

14

and Racketeering Section may, as he or she deems necessary, request the FBI to provide a report on the status of the investigation.

c. A racketeering enterprise investigation may be initially authorized for a period of up to a year. An investigation may be continued upon renewed authorization for additional periods each not to exceed a year. Renewal authorization shall be obtained from the SAC with notification to FBIHQ. The FBI shall notify the Organized Crime and Racketeering Section of any renewal, and the Organized Crime and Racketeering Section shall immediately notify the Attorney General and the Deputy Attorney General.

d. Investigations shall be reviewed by the SAC on or before the expiration of the period for which the investigation and each renewal thereof is authorized.

e. An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation.

f. In addition to the authority of Special Agents in Charge under this paragraph, the Director of the FBI, and any Assistant Director or senior Headquarters official designated by the Director, may authorize, renew, review, and reopen racketeering enterprise investigations in conformity with the standards of this paragraph.

## B. TERRORISM ENTERPRISE INVESTIGATIONS

This section focuses on investigations of enterprises that seek to further political or social goals through activities that involve force or violence, or that otherwise aim to engage in terrorism or terrorism-related crimes. Like the section addressing racketeering enterprise investigations, it is concerned with the investigation of entire enterprises, rather than just individual participants and specific criminal acts, and authorizes investigations to determine the structure and scope of the enterprise as well as the relationship of the members.

### 1. General Authority

a. A terrorism enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of: (i) furthering political or social goals wholly or in part through activities that involve force or violence and a violation of federal criminal law, (ii) engaging in terrorism as defined in 18 U.S.C. 2331(1) or (5) that involves a violation of federal criminal law,

15

or (iii) committing any offense described in 18 U.S.C. 2332b(g)(5)(B). A terrorism enterprise investigation may also be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in a pattern of racketeering activity as defined in the RICO statute, 18 U.S.C. 1961(5), that involves an offense or offenses described in 18 U.S.C. 2332b(g)(5)(B). The standard of "reasonable indication" is identical to that governing the initiation of a general crimes investigation under Part II. In determining whether an investigation should be conducted, the FBI shall consider all of the circumstances including: (i) the magnitude of the threatened harm; (ii) the likelihood it will occur; (iii) the immediacy of the threat; and (iv) any danger to privacy or free expression posed by an investigation.

b.    Authority to conduct terrorism enterprise investigations is in addition to general crimes investigative authority under Part II, racketeering enterprise investigative authority under Subpart A of this Part, and activities under other Attorney General guidelines addressing such matters as investigations and information collection relating to international terrorism, foreign counterintelligence, or foreign intelligence. Information warranting initiation of a terrorism enterprise investigation may be obtained during the course of a general crimes inquiry or investigation, a racketeering enterprise investigation, or an investigation under other Attorney General guidelines. Conversely, a terrorism enterprise investigation may yield information warranting a general crimes inquiry or investigation, a racketeering enterprise investigation, or an investigation under other Attorney General guidelines.

c.    Mere speculation that force or violence might occur during the course of an otherwise peaceable demonstration is not sufficient grounds for initiation of an investigation under this Subpart, but where facts or circumstances reasonably indicate that a group or enterprise has engaged or aims to engage in activities involving force or violence or other criminal conduct described in paragraph (1)(a) in a demonstration, an investigation may be initiated in conformity with the standards of that paragraph. For alternative authorities see Part II relating to General Crimes Investigations and the Attorney General's Guidelines on Reporting on Civil Disorders and Demonstrations Involving a Federal Interest. This does not limit the collection of information about public demonstrations by enterprises that are under active investigation pursuant to paragraph (1)(a) above.

16

2.      **Purpose**

The immediate purpose of a terrorism enterprise investigation is to obtain information concerning the nature and structure of the enterprise as specifically delineated in paragraph (3) below, with a view to the longer range objectives of detection, prevention, and prosecution of the criminal activities of the enterprise.

3.      **Scope**

a.      A terrorism enterprise investigation initiated under these guidelines may collect such information as:

(i)     the members of the enterprise and other persons likely to be knowingly acting in furtherance of its criminal objectives, provided that the information concerns such persons' activities on behalf of or in furtherance of the enterprise;

(ii)    the finances of the enterprise;

(iii)   the geographical dimensions of the enterprise; and

(iv)    past and future activities and goals of the enterprise.

b.      In obtaining the foregoing information, any lawful investigative technique may be used, in accordance with the requirements of Part IV.

4.      **Authorization and Renewal**

a.      A terrorism enterprise investigation may be authorized by the Special Agent in Charge, with notification to FBIHQ, upon a written recommendation setting forth the facts or circumstances reasonably indicating the existence of an enterprise as described in paragraph (1)(a). The FBI shall notify the Terrorism and Violent Crime Section of the Criminal Division, the Office of Intelligence Policy and Review, and any affected United States Attorney's office of the opening of a terrorism enterprise investigation. On receipt of such notice, the Terrorism and Violent Crime Section shall immediately notify the Attorney General and the Deputy Attorney General. In all such investigations, the Chief of the Terrorism and Violent Crime Section may, as he or she deems necessary, request the FBI to provide a report on the status of the investigation.

b.      A terrorism enterprise investigation may be initially authorized for a period of up to a year. An investigation may be continued upon renewed

17

authorization for additional periods each not to exceed a year. Renewal authorization shall be obtained from the SAC with notification to FBIHQ. The FBI shall notify the Terrorism and Violent Crime Section and the Office of Intelligence Policy and Review of any renewal, and the Terrorism and Violent Crime Section shall immediately notify the Attorney General and the Deputy Attorney General.

c.    Investigations shall be reviewed by the SAC on or before the expiration of the period for which the investigation and each renewal thereof is authorized. In some cases, the enterprise may meet the threshold standard but be temporarily inactive in the sense that it has not engaged in recent acts of violence or other criminal activities as described in paragraph (1)(a), nor is there any immediate threat of harm -- yet the composition, goals and prior history of the group suggest the need for continuing federal interest. The investigation may be continued in such cases with whatever scope is warranted in light of these considerations.

d.    An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation.

e.    In addition to the authority of Special Agents in Charge under this paragraph, the Director of the FBI, and any Assistant Director or senior Headquarters official designated by the Director, may authorize, renew, review, and reopen terrorism enterprise investigations in conformity with the standards of this paragraph.

f.    The FBI shall report to the Terrorism and Violent Crime Section of the Criminal Division and the Office of Intelligence Policy and Review the progress of a terrorism enterprise investigation not later than 180 days after its initiation, and the results at the end of each year the investigation continues. The Terrorism and Violent Crime Section shall immediately transmit copies of these reports to the Attorney General and the Deputy Attorney General.

## IV. INVESTIGATIVE TECHNIQUES

A.    When conducting investigations under these guidelines, the FBI may use any lawful investigative technique. The choice of investigative techniques is a matter of judgment, which should take account of: (i) the objectives of the investigation and available investigative resources, (ii) the intrusiveness of a technique, considering such factors as the effect on the privacy of individuals and potential damage to reputation, (iii) the seriousness of the crime, and (iv) the strength of the information indicating its existence

18

or future commission. Where the conduct of an investigation presents a choice between
the use of more or less intrusive methods, the FBI should consider whether the
information could be obtained in a timely and effective way by the less intrusive means.
The FBI should not hesitate to use any lawful techniques consistent with these Guidelines
in an investigation, even if intrusive, where the intrusiveness is warranted in light of the
seriousness of the crime or the strength of the information indicating its existence or
future commission. This point is to be particularly observed in investigations relating to
terrorist activities.

B.    All requirements for use of a technique set by statute, Department regulations and
      policies, or Attorney General Guidelines must be complied with. The investigative
      techniques listed below are subject to the noted restrictions:

      1.    Confidential informants must be used in compliance with the Attorney General's
            Guidelines Regarding the Use of Confidential Informants;

      2.    Undercover activities and operations must be conducted in compliance with the
            Attorney General's Guidelines on FBI Undercover Operations;

      3.    In situations involving undisclosed participation in the activities of an
            organization by an undercover employee or cooperating private individual, any
            potential constitutional concerns relating to activities of the organization
            protected by the First Amendment must be addressed through full compliance
            with all applicable provisions of the Attorney General's Guidelines on FBI
            Undercover Operations and the Attorney General's Guidelines Regarding the Use
            of Confidential Informants;

      4.    Nonconsensual electronic surveillance must be conducted pursuant to the warrant
            procedures and requirements of chapter 119 of title 18, United States Code (18
            U.S.C. 2510-2522);

      5.    Pen registers and trap and trace devices must be installed and used pursuant to the
            procedures and requirements of chapter 206 of title 18, United States Code (18
            U.S.C. 3121-3127);

      6.    Access to stored wire and electronic communications and transactional records
            must be obtained pursuant to the procedures and requirements of chapter 121 of
            title 18, United States Code (18 U.S.C. 2701-2712);

      7.    Consensual electronic monitoring must be authorized pursuant to Department
            policy. For consensual monitoring of conversations other than telephone
            conversations, advance authorization must be obtained in accordance with
            established guidelines. This applies both to devices carried by the cooperating

19

participant and to devices installed on premises under the control of the participant. See U.S. Attorneys' Manual 9-7.301 and 9-7.302. For consensual monitoring of telephone conversations, advance authorization must be obtained from the SAC or Assistant Special Agent in Charge and the appropriate U.S. Attorney, Assistant Attorney General, or Deputy Assistant Attorney General, except in exigent circumstances. An Assistant Attorney General or Deputy Assistant Attorney General who provides such authorization shall notify the appropriate U.S. Attorney;

8.      Searches and seizures must be conducted under the authority of a valid warrant unless the search or seizure comes within a judicially recognized exception to the warrant requirement. See also Attorney General's Guidelines on Methods of Obtaining Documentary Materials Held by Third Parties, 28 CFR Part 59;

9.      Classified investigative technologies must be used in compliance with the Procedures for the Use of Classified Investigative Technologies in Criminal Cases; and

10.     Whenever an individual is known to be represented by counsel in a particular matter, the FBI shall follow applicable law and Department procedure concerning contact with represented individuals in the absence of prior notice to their counsel. The SAC or his designee and the United States Attorney shall consult periodically on applicable law and Department procedure. Where issues arise concerning the consistency of contacts with represented persons with applicable attorney conduct rules, the United States Attorney should consult with the Professional Responsibility Advisory Office.

## V. DISSEMINATION AND MAINTENANCE OF INFORMATION

A.      The FBI may disseminate information during the checking of leads, preliminary inquiries, and investigations conducted pursuant to these Guidelines to United States Attorneys, the Criminal Division, and other components, officials, and officers of the Department of Justice. The FBI may disseminate information during the checking of leads, preliminary inquiries, and investigations conducted pursuant to these Guidelines to another Federal agency or to a State or local criminal justice agency when such information:

1.      falls within the investigative or protective jurisdiction or litigative responsibility of the agency;

2.      may assist in preventing a crime or the use of violence or any other conduct dangerous to human life;

20

3.   is required to be furnished to another Federal agency by Executive Order 10450, as amended, dated April 27, 1953, or a successor Order; or

4.   is required to be disseminated by statute, interagency agreement approved by the Attorney General, or Presidential Directive;

and to other persons and agencies as required by 5 U.S.C. 552 or as otherwise permitted by 5 U.S.C. 552a.

B.   The FBI shall maintain a database that identifies all preliminary inquiries and investigations conducted pursuant to these Guidelines and that permits the prompt retrieval of information concerning the status (open or closed) and subjects of all such inquiries and investigations.

## VI.  COUNTERTERRORISM ACTIVITIES AND OTHER AUTHORIZATIONS

In order to carry out its central mission of preventing the commission of terrorist acts against the United States and its people, the FBI must proactively draw on available sources of information to identify terrorist threats and activities. It cannot be content to wait for leads to come in through the actions of others, but rather must be vigilant in detecting terrorist activities to the full extent permitted by law, with an eye towards early intervention and prevention of acts of terrorism before they occur. This Part accordingly identifies a number of authorized activities which further this end, and which can be carried out even in the absence of a checking of leads, preliminary inquiry, or full investigation as described in Parts I-III of these Guidelines. The authorizations include both activities that are specifically focused on terrorism (Subpart A) and activities that are useful for law enforcement purposes in both terrorism and non-terrorism contexts (Subpart B).

## A.   COUNTERTERRORISM ACTIVITIES

### 1.   Information Systems

The FBI is authorized to operate and participate in identification, tracking, and information systems for the purpose of identifying and locating terrorists, excluding or removing from the United States alien terrorists and alien supporters of terrorist activity as authorized by law, assessing and responding to terrorist risks and threats, or otherwise detecting, prosecuting, or preventing terrorist activities. Systems within the scope of this paragraph may draw on and retain pertinent information from any source permitted by law, including information derived from past or ongoing investigative activities; other information collected or provided by governmental entities, such as foreign intelligence information and lookout list information; publicly available information, whether obtained directly or through services or resources (whether nonprofit or commercial) that compile

21

or analyze such information; and information voluntarily provided by private entities. Any such system operated by the FBI shall be reviewed periodically for compliance with all applicable statutory provisions, Department regulations and policies, and Attorney General Guidelines.

### 2.    Visiting Public Places and Events

For the purpose of detecting or preventing terrorist activities, the FBI is authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally. No information obtained from such visits shall be retained unless it relates to potential criminal or terrorist activity.

## B.    OTHER AUTHORIZATIONS

In addition to the checking of leads, preliminary inquiries, and investigations as described in Parts I-III of these Guidelines, and counterterrorism activities as described in Part A above, the authorized law enforcement activities of the FBI include carrying out and retaining information resulting from the following activities:

### 1.    General Topical Research

The FBI is authorized to carry out general topical research, including conducting online searches and accessing online sites and forums as part of such research on the same terms and conditions as members of the public generally. "General topical research" under this paragraph means research concerning subject areas that are relevant for the purpose of facilitating or supporting the discharge of investigative responsibilities. It does not include online searches for information by individuals' names or other individual identifiers, except where such searches are incidental to topical research, such as searching to locate writings on a topic by searching under the names of authors who write on the topic, or searching by the name of a party to a case in conducting legal research.

### 2.    Use of Online Resources Generally

For the purpose of detecting or preventing terrorism or other criminal activities, the FBI is authorized to conduct online search activity and to access online sites and forums on the same terms and conditions as members of the public generally.

22

3.    **Reports and Assessments**

The FBI is authorized to prepare general reports and assessments concerning terrorism or other criminal activities for purposes of strategic planning or in support of investigative activities.

4.    **Cooperation with Secret Service**

The FBI is authorized to provide investigative assistance in support of the protective responsibilities of the Secret Service, provided that all preliminary inquiries or investigations are conducted in accordance with the provisions of these Guidelines.

C.    **PROTECTION OF PRIVACY AND OTHER LIMITATIONS**

1.    **General Limitations**

The law enforcement activities authorized by this Part do not include maintaining files on individuals solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of any other rights secured by the Constitution or laws of the United States. Rather, all such law enforcement activities must have a valid law enforcement purpose as described in this Part, and must be carried out in conformity with all applicable statutes, Department regulations and policies, and Attorney General Guidelines. In particular, the provisions of this Part do not supersede any otherwise applicable provision or requirement of the Attorney General's Guidelines on FBI Undercover Operations or the Attorney General's Guidelines Regarding the Use of Confidential Informants.

2.    **Maintenance of Records Under the Privacy Act**

Under the Privacy Act, the permissibility of maintaining records relating to certain activities of individuals depends in part on whether the collection of such information is "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7). By its terms, the limitation of 5 U.S.C. 552a(e)(7) is inapplicable to activities that do not involve the "maintain[ing]" of a "record" within the meaning of the Privacy Act, or that occur pertinent to and within the scope of an authorized law enforcement activity. "Authorized law enforcement activit[ies]" for purposes of the Privacy Act include carrying out and retaining information resulting from the checking of leads, preliminary inquiries, or investigations as described in Parts I-III of these Guidelines, or from activities described in Subpart A or B of this Part. As noted in paragraph (3) below, however, this is not an exhaustive enumeration of "authorized law enforcement activit[ies]." Questions about the application of the Privacy Act to other activities should be addressed to the FBI Office of the General Counsel or the Office of Information and Privacy.

23

3.    **Construction of Part**

This Part does not limit any activities authorized by or carried out under other Parts of these Guidelines. The specification of authorized law enforcement activities under this Part is not exhaustive, and does not limit other authorized law enforcement activities, such as those relating to foreign counterintelligence or foreign intelligence.

## VII. RESERVATION

A.    Nothing in these Guidelines shall limit the general reviews or audits of papers, files, contracts, or other records in the government's possession, or the performance of similar services at the specific request of a Department or agency of the United States. Such reviews, audits or similar services must be for the purpose of detecting or preventing violations of federal law which are within the investigative responsibility of the FBI.

B.    Nothing in these Guidelines is intended to limit the FBI's responsibilities to investigate certain applicants and employees under the federal personnel security program.

C.    These Guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the Department of Justice.

Date: May 30, 2002

John Ashcroft
Attorney General

24

Exhibit H
271

# EXHIBIT I

**FOIA Update**
**Vol. XVI, No. 3**
**1995**

*OIP Guidance*

# Determining the Scope of a FOIA Request

In their administration of the Freedom of Information Act, federal agencies devote much time and attention to the possible applicability of FOIA exemptions in order to determine the information to be disclosed. It is necessary that they do so, and to consider even exempt information for possible discretionary disclosure, in order to serve the Act's goal of "maximum responsible disclosure." Attorney General's Memorandum for Heads of Departments and Agencies Regarding the Freedom of Information Act (Oct. 4, 1993), *reprinted in FOIA Update*, Summer/Fall 1993, at 4.

It also is necessary, however, for agencies to pay careful attention to the records and information that they include as responsive to a FOIA request in the first place. After all, if something is not included by an agency for purposes of a FOIA request to begin with, then that alone will mean that it cannot be disclosed in response to that request. Consequently, an agency's interpretation of the particular scope of a FOIA request, and its determinations regarding exactly which information falls within it, are vitally important aspects of FOIA administration.

## Liberal Interpretation of Requests

As a threshold matter, an agency should make sure that it carefully reads and fairly interprets the terms of the FOIA requests that it receives, in order to ensure that it is not unduly limiting the records found responsive to those requests. To be sure, the particular terms of a FOIA request are significant and, in making a FOIA request, a requester is obligated to "reasonably describe" what is being sought. 5 U.S.C. § 552(a)(3). But an agency "must be careful not to read [a] request so strictly that the requester is denied information the agency well knows exists in its files." *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985).

In this regard, it is significant that President Clinton has called upon all agencies to heed "both the letter and spirit of the Act." President's Memorandum for Heads of Departments and Agencies Regarding the Freedom of Information Act, 29 Weekly Comp. Pres. Doc. 1999 (Oct. 4, 1993), *reprinted in FOIA Update*, Summer/Fall 1993, at 3. This holds strong applicability to matters of request interpretation -- meaning that FOIA requesters should not be held to the strict letter of their requests when an agency has good reason to conclude that a broader interpretation is more appropriate. *See, e.g., Canning v. United States Dep't of Justice*, No. 92-0463, slip op. at 22 (D.D.C. Nov. 3, 1994) (holding that agency should have construed request as pertaining to more than single subject named, because it had good reason to do so). In short, as the Court of Appeals for the D.C. Circuit recently emphasized, agencies should interpret FOIA requests "liberally" when determining which records are responsive to them. *Nation Magazine v. United States Customs Serv.*, No. 94-5275, 1995 WL 722700, at *3 (D.C. Cir. Dec. 8, 1995).

## The "Scoping" of Responsive Records

A more difficult question about the scope of a FOIA request sometimes can be presented by records that deal with multiple subjects, only one of which pertains to the subject of a particular FOIA request. It is not uncommon for both agency files and individual records within those files to deal with more than a

Exhibit I-1
272

single subject, possibly even a range of different subjects. In many instances, the multiple subjects of such records will be related in some substantive way, which can bring them all within a requester's evident scope of interest for a given FOIA request.

In other instances, however, there might be no connection between the subjects other than that the agency chose as a matter of administrative convenience to combine them together in a single document, possibly a lengthy one. For example, the State Department frequently aggregates multiple subjects within a document that is transmitted as a single diplomatic communication. Similarly, the records of complex law enforcement investigations sometimes contain several distinct subjects that are addressed as part of an overall area of investigative activity.

The question in such a case is whether the agency should draw a line between the different parts of a multiple-subject record for purposes of processing a FOIA request that pertains to only one of the subjects contained in that document. When it does so, an agency determines that part of the record is "outside the scope" of a request and it does not include it. This sometimes is referred to as the "scoping" of records in response to a FOIA request and it is something not to be done by any agency lightly.

### Underlying Considerations

In determining what should be included within the scope of a FOIA request, agencies must bear in mind the following underlying considerations:

*First,* there is the basic fact that in most situations the FOIA requester will be unfamiliar with the exact nature of the agency's recordkeeping system, its filing practices, and the manner in which its files and records are compiled. FOIA requesters often are entirely "in the dark" about the structure and arrangement of the files and records that an agency will be searching through in order to locate the particular records that are responsive to their FOIA requests. When they formulate their requests, therefore, FOIA requesters are generally using their best efforts to "reasonably describe" the particular records that they are seeking from an agency's files in light of this limited knowledge of what might actually be there.

*Second,* FOIA requesters seeking records on a certain subject often phrase their requests in very broad and all-encompassing terms, with the primary purpose of including any and all records pertaining to the subject or subjects in which they are interested. It is only natural for FOIA requesters to be concerned that records of interest to them might not be included by an agency as responsive to their FOIA requests. Especially when they are operating "in the dark," FOIA requesters tend to sweep broadly in their requests for fear that doing otherwise might unintentionally limit their requests and exclude something that they actually do seek to obtain.

*Third,* agencies tend to maintain their files and compile their records in the manner that is most efficient for them and best facilitates the performance of their primary agency missions. This means that they will combine different subjects within files and records whenever it is efficient for them to do so, even though this can cause some uncertainty and potential inefficiency in processing FOIA requests for records on individual subjects. Agencies should be mindful of this inherent conflict between standard recordkeeping and FOIA-processing practices.

*Fourth,* especially when a broad FOIA request is processed for wide-ranging agency files, there is at least some potential for question about the scope of the records that are responsive to that request. Because only the agency ordinarily is aware of exactly what records exist within its files, it is up to it to recognize a potential scope question and to handle it fairly from both its and the requester's perspective.

Exhibit I-1
273

*Fifth,* from the FOIA requester's perspective, the primary interest is in obtaining the requested information as fully and as quickly as possible. However, FOIA requesters also are interested in understanding how agencies process their requests and in knowing of any assumption or conclusion that may be reached by an agency about them. Though a requester might not be interested in information pertaining to a subject beyond the stated scope of his or her request, that requester has a strong interest in learning about any determination that may be made regarding its scope -- including the full grounds for it in relation to the particular formats of existing documents. FOIA requesters are interested in being fully informed of all such scope matters and in having the opportunity to address them as a participant in the agency's administrative process.

*Sixth,* an additional consideration for many FOIA requesters is the potential cost involved. In determining the volume of records that are within the scope of a FOIA request, an agency in effect establishes the scope of FOIA fees that potentially will be charged to the requester for that request. In most cases, a FOIA requester will incur a document duplication charge for records processed and disclosed in response to a request, a charge that can range from ten cents per page to several times that amount at some agencies. In some cases, when a request is made for a commercial purpose, even more expensive "document review" charges can be incurred for the documents that are included. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(I). A requester who receives and must pay for pages of documents that were not intended to be within the request's scope can be aggrieved by that agency action as well, so agencies have an obligation not to heedlessly include document pages on superficial grounds.

*Seventh,* from the agency's perspective, there is a practical need to conduct its FOIA operations without any unnecessary administrative burden. While agencies create multiple-subject documents for sound programmatic purposes, they retain an interest in not having their FOIA programs unduly encumbered by that. The "processing" of a record's contents under the FOIA can be a very labor-intensive and time-consuming process, a burden that can be compounded if a FOIA request proceeds to the level of administrative appeal and possibly to litigation. Agencies have a strong interest in not undertaking such heavy burdens unnecessarily.

*Eighth,* for any agency that currently has a heavy backlog of pending FOIA requests, an additional consideration is the importance of its efforts to deal with that backlog and to devote its limited resources to serving its large volume of FOIA requesters as efficiently and economically as reasonably possible. The efficiency of administrative communications with FOIA requesters regarding any scope-of-request matters is especially important to such agencies.

*Ninth,* a final consideration is the importance of the public's trust in the functioning of its government, which comes into play every time that an agency deals with a member of the public on a matter of concern to that person or institution. For many FOIA requesters, their dealings with a federal agency on a FOIA request are a major part of their dealings with the federal government overall, so it is all the more important that agencies communicate forthrightly with FOIA requesters about the details of their requests and about documents that may or may not be included on one stated basis or another.

### Approach to Document "Scoping"

Based upon these considerations, agencies should use the following general approach to any potential "scoping" of a document in response to a FOIA request:

• Within a document page. First and foremost, information should not be determined to be beyond the scope of a request on less than a page-by-page basis. In other words, there should be no "scoping" within any document page. If any of the information on a page of a document falls within the subject matter of

Exhibit I-1
274

a FOIA request, then that entire page should be included as within the scope of that request. Doing so provides useful context for the FOIA requester, involves no additional duplication cost to the requester, and ordinarily involves only a relatively minimal administrative burden on the agency.

• Within a document. An agency may determine that only part of a multiple-subject document is responsive to a FOIA request (including any document page that is required for meaningful context), but any "scoping" of a document should be undertaken only when the circumstances fully justify such a step. The agency must have a firm basis for reaching the conclusion that the document pages in question deal with a subject that is clearly beyond the scope of the requester's evident interest in the request. An agency can make use of its administrative experience in drawing such conclusions about the FOIA requests that it receives, but its communication with the individual requester is essential in addressing any scope question. While the patterns of such communications may vary from case to case, the requester should be fully informed of any "scoping" determination in all instances and should be given an opportunity to question or disagree with it. In any instance in which a requester disagrees, the document pages involved should be included without question by the agency.

Additionally, before an agency considers "scoping" a document, it should at least preliminarily review the contents of the document pages in question with an eye toward FOIA exemption applicability. In some cases, the potentially "scoped" document pages might contain little or no exempt information, such that they can be as easily included within the FOIA request as not. In such a case, there is no good reason for those pages to be "scoped" unless they are so voluminous that the agency is compelled to do so purely as a cost savings to the requester.

This approach to the potential "scoping" of responsive records should be a workable one for all federal agencies and is consistent with the few judicial precedents to have adjudicated such issues under the FOIA. *See Dettmann v. United States Dep't of Justice*, 802 F.2d 1472, 1474-77 (D.C. Cir. 1986); *Posner v. Department of Justice*, 2 Gov't Disclosure Serv. (P-H) ¶ 82,229, at 82,650 (D.D.C. Mar. 9, 1982); *Dunaway v. Webster*, 519 F. Supp. 1059, 1083-84 (N.D. Cal. 1981).

**Conclusion**

In sum, all federal agencies should go as far as they reasonably can to ensure that they include what requesters want to have included within the scopes of their FOIA requests. Agencies can best do so through liberal interpretations of FOIA requests and by limiting their use of document "scoping" to only those instances that are justified by its underlying considerations. In all instances, the key consideration is the need for full and open communication with the FOIA requester, so that the requester can make a fully informed decision about any document "scoping" as part of the agency's administrative process.

Go to: FOIA Update Home Page

Exhibit I-1
275





## FOIA Counselor Q&A

**Q: Does an agency have an obligation under the Freedom of Information Act to search through all of the information that is available to it electronically, such as electronic databases to which it has access?**

A: No. Fundamentally, an agency responding to a FOIA request need conduct a search for responsive records only among its "agency records." It has long been settled that, for FOIA purposes, "agency records" are those records that are within an agency's possession and, most importantly, its "control." *See* *Freedom of Information Act Guide & Privacy Act Overview* (May 2004), at 37-38 & n.18 (citing *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)). To be sure, in this electronic age, much of what an agency has in its possession exists in electronic form, often including vast databases that might contain information responsive to a particular FOIA request. But that does not include electronic databases to which an agency has no more than "read only" access. Such databases sometimes are referred to as containing "distributed data," meaning that they constitute information that is distributed to and available to "on screen" to a viewer without being within the viewer's control. Examples are the data made available through LexisNexis, Westlaw, and other such data services; the on-screen viewing of such data by an agency does not make that data an "agency record" under the FOIA. If, however, an agency employee goes beyond that point by printing or otherwise obtaining any such data for the agency's use or its files, then that would constitute an exercise of "control" over the data, making that data an "agency record" subject to the FOIA. *Cf. Tax Analysts v. United States Dep't of Justice*, 913 F. Supp. 599, 603-04 (D.D.C. 1996) (distinguishing between agency "access to" JURIS database owned by West Publishing Co. on the one hand and "storage" or "any printout" on the other, the latter amounting to agency "control"), *aff'd*, No. 96-5109, 1997 WL 71746 (D.C. Cir. Jan. 21, 1997) (per curiam). Any "distributed data" that is handled by an agency in such a way certainly would have to be included within the scope of a search for records responsive to a particular FOIA request pertaining to it; otherwise, it would not. *Cf. Forsham v. Harris*, 445 U.S. 169, 185-86 & n.17

Exhibit I-2
276

(1980) (reasoning that "unexercised" agency ability to control is insufficient "control" to create "agency record" status under FOIA).

Q: Are agencies legally obligated to forward incorrectly directed FOIA requests to other agencies, or other components of the same agency, if the recipient thinks that responsive records might be located there?

A: No, not unless an agency chooses to obligate itself to do so by creating such a required practice through its own FOIA regulations. It is not uncommon for an agency to receive a FOIA request for records of a certain type that simply are not maintained by that agency. This likewise can occur within large, decentralized agencies that handle their FOIA requests separately within their components or sub-agencies. In some such instances, beyond determining that they have no record responsive to a FOIA request, the FOIA personnel handling that request might have a good basis to believe that another particular agency, or separate agency component, likely would have the type of record being requested. As a general rule, it is entirely up to the agency whether, as a matter of administrative discretion, it will direct the FOIA requester to that other agency location (which might even involve forwarding the request itself), because nothing in the Act compels an agency to do so. But if an agency's individual FOIA regulations establish such a practice, thereby creating an expectation on the FOIA requester's part, then such an obligation is created.

This situation arose in a recently decided case, *Friends of Blackwater v. United States Department of the Interior*, No. 04-2000 (D.D.C. Sept. 20, 2005), in which the FOIA requester complained of the agency's "failure to forward" its FOIA request, regarding the enforcement of certain environmental laws, to the Office of the Secretary of the Interior. Slip op. at 8. That FOIA request had been made directly to the Fish and Wildlife Service, a sub-agency within the Interior Department, where a search for responsive records was duly conducted. But after the requester challenged the adequacy of this record search, and focused on the Interior Secretary's office as a "likely" place to find some of the records that it sought, the court readily agreed with the requester, even though the requester admittedly had failed to send its request to that distinctly different part of the agency. *Id.* at 8-9. The court broadly declared: "[F]ailure by one DOI office to refer [sic] a FOIA request to another that is 'likely to have' responsive documents is sufficient to render the agency's search inadequate." *Id.* at 9. The key point of this decision, however, is that it was explicitly based upon an Interior Department regulation that specifically obligates the Fish and Wildlife Service to forward FOIA requests elsewhere within the Interior Department "if it knows another bureau [of the agency] has or is likely to have" responsive records. 43 C.F.R. § 2.22(a)(1) (2004). In the absence of such a regulation, or under agency FOIA regulations that provide otherwise, *see, e.g.,* 28 C.F.R. §§ 16.3(a), 16.4(a) (2005)

Exhibit I-2
277

(Department of Justice FOIA regulations), there exists no such obligation.

Therefore, there ought to be no confusion about the outcome of the *Friends of Blackwater* case, or the basis for it, just as no one should be confused by the mistaken use of the word "refer" instead of the word "forward" in parts of the court's decision. *See Friends of Blackwater*, slip op. at 8-10. The "forwarding" of a FOIA request, as noted above, involves nothing more than the discretionary transmittal of the *request*. A "referral" under the FOIA, of course, involves the transfer of responsibility for processing certain requested records to an agency that originated those particular records, which usually involves only part of the responsibility for an entire FOIA request. *See FOIA Update, Vol.* XII, No. 3, at 3-4 ("*OIP Guidance:* Referral and Consultation Procedures") (advising of the sound general rule that "the agency that is best able to determine a record's sensitivity . . . should process that record"). As has been advised in this area of FOIA administration in the past, it is very important to keep such terms "distinct" from one another lest their misuse lead to confusion. *See id.* at 4.

Q: Can an agency ever "scope" a FOIA request within a document page?

A: Yes, in some circumstances it can do so. The administrative step of "scoping" a FOIA request, or "scoping out" information within a document that is located in response to a particular request, can be a difficult one that agencies must be particularly careful to handle properly. *See FOIA Update, Vol. XVI, No. 3*, at 3-5 ("*OIP Guidance:* Determining the Scope of a FOIA Request") (advising of "general approach to any potential 'scoping' of a document in response to a FOIA request"). Indeed, "it is something not to be done by any agency lightly." *Id.* at 3. Increasingly, though, especially nowadays with electronic information, agencies find it most efficient to create and store records in forms in which they encompass multiple disparate subjects. Quintessential examples of this are diplomatic cables transmitted by the State Department, which often of necessity are multi-subject records, and lengthy chains of "electronic mail" that might wander through a wide range of subjects before they reach finality. Such documents easily can contain large segments of information that have nothing to do with the subject of the FOIA request for which they have been located.

When confronted with such a document in responding to a FOIA request, an agency could reasonably conclude that whole portions of it do not pertain to the subject that is of particular interest to the FOIA requester and that they can be clearly identified to the requester as such -- i.e., as "scoped out" of the agency's FOIA response. *See id.* at 5 (noting that "[t]he agency must have a firm basis for reaching the conclusion that the ['scoped' portions] deal with a subject that is clearly beyond the scope of the requester's evident interest in the request"). And in processing the growing numbers of aggregated "e-mail"

Exhibit I-2
278

records that agencies now regularly locate as responsive to their FOIA requests, FOIA personnel should use this same good judgment to delineate among the portions of a record that can happen to print out on one document page or another. *Cf. St. Andrews Park, Inc. v. United States Dep't of the Army Corps of Eng'rs*, 299 F. Supp. 2d 1264, 1271 (S.D. Fla. 2003) (analyzing a "*string* of e-mails comprising several different e-mails" as other than a single document: "Each such e-mail is a separate document" under the FOIA.). In applying this "scoping" approach to e-mail, for example, agencies should be sure to include any information that is necessary to give the requester "meaningful context" for what is specifically requested, and to of course make sure that the requester is "fully informed of any 'scoping' determination in all instances . . . [with] an opportunity to question or disagree with it." *FOIA Update*, Vol. XVI, No. 3, at 5 (emphasizing agency obligation to communicate with requesters on all "scoping" matters); *see also id.* at 4 (observing that "agencies create multiple-subject documents for sound programmatic purposes [and] retain an interest in not having their FOIA programs unduly encumbered by that," because the "'processing' of a record's contents under the FOIA can be a very labor-intensive and time-consuming process").

Q: What is the meaning of an "umbrella issue" under the FOIA?

A: The term "umbrella issue" is a relatively new one that has been used by agencies and courts alike to make important distinctions when considering public interest issues under the FOIA. It refers to the logical distinction between the public interest that can exist in an overall subject that relates to a FOIA request (e.g., some matter of significant, perhaps even controversial, agency activity) and the public interest that might or might not be served by disclosure of the actual records that are at hand in that particular FOIA request. For example, the District Court for the District of Columbia recently used this term when deciding whether a public interest organization was entitled to special expedited processing, on an urgent "media interest" basis under the Act, *see* 5 U.S.C. § 552(a)(6)(E)(v)(II), of its FOIA request for records relating to the general subject of "data mining." *Elec. Privacy Info. Ctr. v. DOD*, 355 F. Supp. 2d 98, 102 (D.D.C. 2004). Ruling against the FOIA requester, the court found that the requester had "failed to present the agency with evidence that there is a 'substantial interest' in the 'particular aspect' of [its] FOIA request." *Id.* In other words, the court said, "[t]he fact that [the requester] has provided evidence that there is some media interest in data mining *as an umbrella issue* does not satisfy the requirement that [it] demonstrate interest in the specific subject of [its] FOIA request." *Id.* (emphasis added); *see also ACLU of N. Cal. v. Dep't of Justice*, No. 04-4447, 2005 WL 588354, at *13 (N.D. Cal. Mar. 11, 2005) (likewise ruling that "it was not sufficient for the plaintiffs to show [public] interest in only the general subject area of the request").

Exhibit I-2
279

This approach of carefully distinguishing the general from the specific has ready application to other areas of FOIA decisionmaking, such as in determining whether particular record portions at hand are of such nature that their disclosure actually would serve an identified general public interest and therefore warrant the overriding of personal privacy interests in an Exemption 6 or Exemption 7(C) balancing process. *See, e.g., KTVY-TV v. United States*, 919 F.2d 1465, 1470 (10th Cir. 1990) (rejecting an assertion that "the public interest at stake is the right of the public to know" about a controversial event, because on careful analysis the particular record segments at issue "do not provide information about" that subject); *see also, e.g., NTEU v. Griffin*, 811 F.2d 644, 648 (D.C. Cir. 1987) (declaring similarly in the context of FOIA fee waiver decisionmaking that "the links between furnishing the requested information and benefitting the general public" should not be "tenuous"); *cf. Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (applying comparable approach to determination of plaintiff's entitlement to award of attorney fees under FOIA).

Q: Can "A-76 documents" be protected under a FOIA exemption?

A: Yes, in many instances, at least for a period of time, they can be withheld pursuant to the government's "commercial information" privilege under Exemption 5. The phrase "A-76 documents" commonly refers to the process by which an agency follows a longstanding federal policy for "the competition of commercial activities" of agencies, often generally known as "contracting out" or "competitive sourcing," under <u>OMB Circular A-76</u>. This policy traces back to the 1950s, but it has become a matter of greater agency priority during the past two years since Circular A-76 was revised by the Office of Management and Budget in 2003. In the words of OMB: "Circular A-76 is a set of policies and procedures to help determine whether public or private sources will undertake the federal government's commercial activities and services, ranging from software consulting, research and lab work to facilities management." *<u>Background and Facts on Competitive Sourcing and Revisions to Circular A-76</u>*, at 1 (May 29, 2003). When an agency follows this policy for the possible "outsourcing" of some of its "not inherently governmental" activities, it submits its own bid on that work through which it competes with potential private-sector contractors "to determine if government personnel should [continue to] perform" it. *<u>OMB Circular A-76</u>*, at ¶ 4.d (May 29, 2003). In so doing, an agency necessarily prepares several types of records, such as "agency cost estimate[s]," that lead to the compilation and submission of its "agency tender." *Id.*, Attachment D, at 2. This can be exactly the type of information that an outside bidder in the A-76 process could use to the agency's distinct commercial disadvantage in that process. Fortunately, Rule 26(c)(7) of the Federal Rules of Civil Procedure provides that "for good cause shown . . . a trade secret or other confidential research, development or commercial information" is privileged from

Exhibit I-2
280

discovery, and the Supreme Court has held that such information "generated by the Government itself in the process leading up to awarding a contract" therefore can fall within the protective ambit of Exemption 5. *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 360 (1979); *see also Freedom of Information Act Guide & Privacy Act Overview* (May 2004), at 415-16; *FOIA Update*, Vol. IV, No. 4, at 14-15.

Indeed, this very situation was confronted under a predecessor version of Circular A-76 during the 1980s, when such a potential outside bidder sought to obtain through the FOIA an agency's own analysis of its "manpower distribution," its "salary costs," its overall "cost data," and the like. *Morrison-Knudsen Co. v. Dep't of the Army of the United States*, 595 F. Supp. 352, 353 n.3 (D.D.C. 1984), *aff'd*, 762 F.2d 138 (D.C. Cir. 1985) (unpublished table decision). The agency in question, the Army Command at Fort Benning, Georgia, was in the process of "competing" certain of its facilities maintenance activities on that military base, and it fully intended to release the requested information "*after* bids [were] opened and [a contract] award made," but it argued vigorously that any earlier disclosure under the FOIA would "have an adverse effect on the procurement and the benefits expected from the competitive process." 595 F. Supp. at 354. The court firmly agreed with this agency judgment, concluding that FOIA disclosure would "place the Army at a competitive disadvantage with respect to the [c]urrent A-76 if the information [were] released before the bids [were] opened and an award made." *Id.* at 356; *see also id.* at 355 (reasoning further that disclosure "might also discourage firms from taking the initiative to come forward with more innovative techniques for cutting costs in the hope of underbidding a more uncertain Army 'bid'").

So an agency going through a current A-76 process that receives a FOIA request for records that would "enable an informed bidder . . . to make a closer approximation [of its bid] than would be possible on the basis of the information to be released with the bid invitation and other available data" should rely on this precedent, and the government's special commercial privilege under Exemption 5, in protecting its commercial interests in that process. *Id.* (emphasizing the commercial privilege's applicability where "the documents sought might place previously unavailable information in the hands of bidders who could use it to the competitive disadvantage of the government's in-house bid"); *see also Taylor Woodrow Int'l v. United States*, No. 88-429, 1989 WL 1095561, at *3 (W.D. Wash. Apr. 5, 1989) (upholding an agency's use of the commercial privilege where disclosure would permit the FOIA requester to take "unfair commercial advantage" of the agency); *Hack v. Dep't of Energy*, 538 F. Supp. 1098, 1104 (D.D.C. 1982) (applying the commercial privilege to procurement records where otherwise "the agency would not be on equal footing" with private-sector bidders). *(posted 1/24/06)*

Exhibit I-2
281

**Go to: <u>Main *FOIA Post* Page</u>**

Exhibit I-2
282

# EXHIBIT J

## CHART OF FIRST AMENDMENT ACTIVITY CONTAINED IN ACLU 1-124

This chart catalogues the information revealed (despite the "outside the scope" redactions) in the FBI investigation memos in ACLU 1-124 that deal with first amendment activity. "[ ]" indicates a redaction.

| Page | Date | Released Content | Referenced Plaintiff(s) | Activity Type | First Amendment Activity |
|------|------|------------------|-------------------------|---------------|--------------------------|
| 1 | 04/14/2003 | Describes two men handing out flyers outside mosque re fundraiser for Iraq (LIFE) | Islamic Shura Council<br><br>Muzammil Siddiqi | Leafleting; public event; fundraising | Speech |
| 2 | N/A | "According to [ ] who attended [ ] speakers at the event included [ ] of the Islamic Shura Council of Southern California, and [ ]" | Islamic Shura Council | Event | Speech |
| 4 | N/A | "During the late 1980's Shura Council included" | Islamic Shura Council | Organizational membership | Association |
| 6-7 | 06/21/2005<br>06/10/2005 | "and FNU [ ] from a Garden Grove mosque are all members of The Shura Council of California, an organization that acts as the umbrella over sixty-two (62) mosques" | Islamic Shura Council | Organizational membership | Association |
| 8 | 05/05/2005 | "faxed the following information to SA [ ] concerning [ ] members in Southern California and various mosques that were associated with the Shura Council:" | Islamic Shura Council | Organizational membership | Association |
| 9 | 05/05/2005 | "Some of the mosques in Southern California that belong to the Shura | Islamic Shura Council | Organizational membership | Association |

| | | | | | |
|---|---|---|---|---|---|
| | | Council are: [list of 13 mosques]" | Islamic Center of Hawthorne | | |
| 10-11 | 05/02/2006 | "The following Southern California Islamic organizations have become involved with the so-called immigration reform movement, and actively supported the recent protest in Los Angeles on 05/01/2006 [list of 6 organizations]" | Council of American-Islamic Relations<br><br>Islamic Shura Council | Political speech; political belief; protest | Speech |
| 13 | 05/06/2003 | "The flyers advertised an 'Emergency Fundraising Dinner for the people of Iraq' sponsored by LRD in cooperation with the Islamic Shura Council of Southern California (ISCSC) on April 19, 2003. Tickets were listed at $25.00 for adults and $20.00 for students. The following guest speakers were listed on the flyer:<br>1. Shaykh Shaker El-Syed, Secretary General of MAS<br>2. Dr. Muzammil Siddiqi, Chairman of ISCSC<br>3. Dr. Khalil Jassemm, President of LIFE<br>[ ]<br>The flyer advertising the fundraising dinner provided the following contact information for LRD:<br>[LRD contact information]" | Islamic Shura Council<br><br>Muzammil Siddiqi | Leafleting; public event; fundraising | Speech |

| 15-16 | 09/07/2005 | "2. Muslim American Society/ Islamic Circle of North America West Regional Convention, 11/24-26/2005, LAX Hilton, 1-888-mas-lcna, www.mas-la.org, endorsed by the Islamic Shura Council of Southern California, speakers: [list of names]" | Islamic Shura Council<br><br>Muzammil Siddiqi | Public event | Speech |
| 18 | 05/21/2005 | "4. A flyer for a 'Why Islam Fundraising Banquet' sponsored by Shura Council of Southern California; Endorsed by MAS, CAIR, MPAC, Islamicity, LALMA and MSA-West; 6:00 pm Sunday June 26, 2005 Tickets $30.00; Embassy Suites, 11767 Harbor Boulevard, Garden Grove, CA 92480. "1-877-WHY-ISLAM, www.whyislam.org.  Why Islam is a dedicated nationwide network of committed volunteers who provide means for non-Muslims to initiate dialog, arrange visits to Masjids, or acquire knowledge and free material on Islam. These services are offered via a toll-free hotline, website and information booths at public venues. For further information and to purchase tickets go to www.WhyIslamsc.org Speakers [list of speakers]" | Islamic Shura Council<br><br>Muzammil Siddiqi<br><br>Hussam Ayloush | Flyer; public event; fundraising | Speech |
| 20 | 04/29/2005 | "1. A flyer from the | Islamic | Flyer; public | Speech |

| | | MUSLIM AMERICAN SOCIETY (MAS) presenting 'Empowering the Community: Investing in the future, a Fund-raising Dinner for MAS Youth Center and MAS Freedom Foundation, Speakers [list of speakers]; Date 04/02/2005, Location Embassy Suites, 11767 Harbor Boulevard, Garden Grove, California 92840, telephone 714-539-3300, for more information contact 1-877-MAS-YOUTH or email info@mas-la.org or visit www.mas-la.org, MOHAMMAD ALADRA, email maladra@yahoo.com, telephone 714-932-9636" | Shura Council Muzammil Siddiqui | event; fundraising | |
|---|---|---|---|---|---|
| 21 | N/A | "...reported a special event occurring at the UCI campus on March 13, 2002, from 7 pm – 9 pm at the University Students Center, Emerald Bay Conference Room. The event is titled 'Jihad versus Terrorism'. It is being sponsored by UCI, Department of Social Sciences and the Muslim Public Affairs Counsel. Scheduled to speak at the event are Dr.'s Maher Hathour, Muzammil Siddiqi and Aslam Abdullah." | Muzammil Siddiqui | Public event | Speech |
| 22 | 04/28/2003 | "Individual, who has not agreed to testify, provided the following information: | Muzammil Siddiqui | Public event; fundraiser | Speech; religion |

| | | | | | |
|---|---|---|---|---|---|
| | | On April 19, 2003 at approximately 6:00 p.m., source attended an event described as an 'emergency fundraising dinner for the people of Iraq.' The dinner was sponsored by LIFE FOR RELIEF AND DEVELOPMENT (LRD) and held at the SEQUOIA CENTER in Buena Park, California. Source advised that the event consisted of four presentations and a videotape showing Iraqi civilians, including children, dying as a result of the current conflict in Iraq.<br><br>Source advised that the first speaker was introduced as DR. MUZZAMIL SIDDIQI. SIDDIQI spoke extensively on zakat, the Muslim requirement to provide donations to those in need." | | | |
| 23 | 07/12/2002 | "...a fund raising event presented by the Islamic Society of Orange County on July 20th at 6:00pm. The fund raiser is for earthquake relief in Gujarat, India. The location of the event is 4117 Overland, Culver City, California. The cost to attend the fund raiser is twenty dollars.<br><br>Sources stated that a brochure was obtained from the King Fahd | Muzzamil Siddiqui | Flyer; public event; fundraiser | Speech |

| | | | | | |
|---|---|---|---|---|---|
| | | Mosque for the event. The flyer stated that 5000 Muslims were killed, 300 Mosques were damaged, 3000 homes damaged, and 100's burnt alive. Dr. Muzzamil Siddiqi is listed as the main speaker." | | | |
| 25 | N/A | "Earlier this week Muzzamil Siddiqui and other leaders in the Muslim community issued a fatwa and spoke against violence." | Muzzamil Siddiqui | Speech | Speech |
| 26 | N/A | "(U) According to NAIT'S 2002 annual report filed 12/18/2002, Bassam Osman, 745 McClinktock Drive, Suite 114, Burr Ridge, IL 60527, is NAIT'S registered agent. NAIT'S officers and directors are as follows: [list of names and addresses]"" | Muzzamil Siddiqui | Organizational membership | Association |
| 28 | N/A | "Source provided a flyer for a fundraising dinner to benefit THE ISLAMIC SOCIETY OF CORONA/NORCO, 500 West Harrington Street, #L, Corona, California 92880, telephone (909) 736-8155. The flyer indicates that funds are needed for the construction of a mosque and school. The event is scheduled for 06/20/2004 at 5:30 p.m. at the Embassy Suites Hotel, 11767 Harbor Boulevard, Garden Grove, California 92840, telephone (714) | Muzammil Siddiqui | Public event; fundraiser | Speech |

| | | | | | |
|---|---|---|---|---|---|
| | | 539-3300. The flyer further indicates that guest speakers include DR. MAHER HATHOUT, DR. MUZAMMIL SIDDIQI, and BR. ABDUL JABBAR HAMDAN. Invited guests include BR. MUSTAFA KUKO [ ] The flyer states that further information can be obtained from the website www.coronamuslims.com or by calling the following persons: [list of people]" | | | |
| 30 | N/A | "...conference hosted by Muslims in America titled, "Muslim Family Development – Woman and Child." The conference is scheduled for 09/18/2004, from 10:00 am to 10:00 pm at California State University at Long Beach, 1250 Bellflower Blvd., Long Beach, California 90840. The following individuals are confirmed to speak at the conference: [ ] Dr. Muzzamil Siddiqi [ ]" | Muzzamil Siddiqui | Public event | Speech |
| 36-37 | N/A | "A flyer for a 'WHYISLAM FUNDRAISING BANQUET' Sponsored by SHURA COUNCIL OF SOUTHERN CALIFORNIA; Endorsed by MAS, CAIR, MPAC, ISLAMICITY, LALMA and MSA-WEST; 6:00 pm Sunday June 26, 2005 Tickets $30.00; Embassy Suites, 11767 Harbor | Islamic Shura Council<br><br>Muzzamil Siddiqui<br><br>Hussam Ayloush | Public event; fundraiser | Speech |

| | | | | | |
|---|---|---|---|---|---|
| | | Boulevard, Garden Grove, CA 92480. '1-877-WHY-ISLAM, www.whyislam.org. WhyIslam is a dedicated nationwide network of committed volunteers who provide means for non-Muslims to initiate dialog, arrange visits to Masjids, or acquire knowledge and free material on Islam. These services are offered via a toll-free hotline, website and information booths at public venues. For further information and to purchase tickets go to www.WhyIslamSC.org Speakers Dr. MUZAMMIL SIDDIQUI, Chairman ISLAMIC SHURA COUNCIL; Dr. AHMAD SAKR, Director, IEC; SHEIKH SADULLAH KHAN, Religious Director, ICOI; Brother HUSSAM AYLOUSH, Director CAIR Southern California; Brother Jim Coates, Coordinator, WhyIslam Housen. Tax ID#20-2355718, email info@whyislamsc.org An ICNA project." | | | |
| 40 | N/A | "'Dinner for the people of Iraq' sponsored by LRD in cooperation with the ISLAMIC SHURA COUNCIL OF SOUTHERN CALIFORNIA (ISCSC) on April 19, 2003.  Tickets were listed as $25.00 for | Islamic Shura Council<br><br>Muzammil Siddiqui | Flyer; public event | Speech |

| | | | | | |
|---|---|---|---|---|---|
| | | adults and $20.00 for students.  The following guest speakers were listed on the flyer:<br><br>1. SHAYKH SHAKER EL-SYED, Secretary General of MAS<br>2. DR. MUZAMMIL SIDDIQI, Chairman of ISCSC<br>3. DR. KHALIL JASSEM, President of LIFE<br><br>(U) The flyer advertising the fundraising dinner provided the following contact information for LRD:<br>　　[contact information]" | | | |
| 41 | N/A | "(U) Source advised that the first speaker was introduced as DR. MUZAMMIL SIDDIQI. SIDDIQI spoke extensively on zakat, the Muslim requirement to provide donations to those in need" | Muzammil Siddiqui | Speech; religion | Speech; religion |
| 42 | 04/14/2003 | "Individual, who has not agreed to testify, provided the following information: [ ] out flyers for an "Emergency Fundraising Dinner for the people of Iraq." The flyers indicated that the event was presented by LIFE FOR RELIEF AND DEVELOPMENT (LRD) in cooperation with the ISLAMIC SHURA | Muzammil Siddiqui | Flyer; fundraiser; public event | Speech |

| | | | | | |
|---|---|---|---|---|---|
| | | COUNCIL OF SOUTHERN CALIFORNIA (ISCSC). The fundraiser is to be held Saturday, April 19, 2003 at 6:00 p.m. at Sequoia Center, 7539 Orangethorpe Ave., Buena Park, California 90621. Tickets are $25.00 for adults and $20.00 for students. The following guest speakers are listed on the flyer:<br><br>4. SHAYKH SHAKER EL-SYED, Secretary General of MAS<br>5. DR. MUZAMMIL SIDDIQI, Chairman of ISCSC<br>6. DR. KHALIL JASSEM, President of LIFE<br><br>Source advised that besides the names of SIDDIQI and JASSEM as guest speakers and the reference to the cooperation of the ISCSC, the flyer was identical to a flyer that had been handed out at the same mosque on April 4, 2003. The April 04, 2003 and April 11, 2003 flyers are enclosed in a FD-340 1A envelope and photocopies of the flyers are attached to this FD-302.<br><br>The flyer provided the following information for LRD: [address and contact information]" | | | |
| 45- | 01/31/2002 | "This list appeared on the | Muzammil | Organizational | Association |

| 46 | | "eMulim" web site at www.eMuslim.com; and, a web site for the COUNSEL OF ISLAMIC EDUCATION located at www.cie.org.  This web site contained a listing of affiliated scholars and executive staff for the Council for Islamic Education.  These individuals were listed as follows:<br>Affiliated Scholars<br>[ ]<br>Dr. Muzammil Siddiqi Adjunct Professor of Religion California State University Fullerton, CA" | Siddiqui | membership | |
| 105 | 10/24/2002 | "On 10/09/2002 [ ] Special Agent (SA) [ ] participated in the execution of [ ].  During the search of [ ] the following items were observed: [ ] Membership application [ ] donation form and homework completed [ ] from the Islamic Center of Hawthorne" | Islamic Center of Hawthorne | Organizational membership; fundraising | Association; speech |